## marriaUNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **Matthew Couch,**<br>4000 S. Dixieland Road<br>Apartment A-201<br>Rogers, Arkansas 72758<br><br>    Plaintiff,<br><br>**v.**<br><br>**Verizon Communications, Inc.**<br>1095, Avenue of the Americas<br>New York, NY 10036<br><br>**Michael Isikoff**<br>6148 31st St. N.W.<br>Washington D.C. 20015<br><br>**National Public Radio, Inc.,**<br>1111 North Capitol St., NE<br>Washington D.C. 20002.<br><br>**Aaron Rich**<br><br>**Deborah Sines**<br>94 Cimmaron Drive<br>Palm Coast, Florida 32137-897<br><br>**Joe Capone**<br><br>**and**<br><br>**Mark Mueller,**<br><br>    Defendants. | **COMPLAINT**<br><br>**Jury Trial Demanded**<br><br><br>**Case No.** _____ |

Matthew Couch ("Plaintiff" or "Couch"), by and through his attorneys, Quainton

Law PLLC, for his complaint against Verizon Communications, Inc. ("Verizon"),  Michael Isikoff ("Isikoff"), National Public Radio, Inc. ("NPR"), Aaron Rich ("Aaron" or "Rich"), Deborah Sines ("Sines"), Joe Capone ("Capone") and Mark Mueller ("Mueller")(collectively, "Defendants"), alleges and states as follows:

## Introduction

1.      On August 6, 2020, as part of a six-part podcast entitled "Conspiracyland," published by *Yahoo!News*, a subsidiary of Verizon, Isikoff engaged in one of the most irresponsible smear campaigns in contemporary journalism, defaming and disparaging Plaintiff Matthew Couch, the publisher of a widely read online blog, the DC Patriot, and a conservative commentator with over 400,000 Twitter followers,  either through his own words or those he plainly endorsed, as a "vicious," "alt-right" "Internet crankster," "Internet conspiracy entrepreneur," "Internet troll" and "Internet bully," who, from the "mountains of the Ozarks" was spreading "lies" about Aaron, the brother of Seth Rich, the DNC staffer killed in the early morning hours of July 10, 2016 under circumstances that still, four years later, have not been explained.

2.      Isikoff is no ordinary "journalist." Rather, he is a shameless partisan hack, who was personally responsible for helping spread the baseless conspiracy theory that Donald Trump conspired with Vladimir Putin to steal the 2016 election. As this conspiracy theory has collapsed, Isikoff and others in the media have sought to attack and discredit anyone, including Plaintiff, associated with any investigations that would potentially undermine the official narrative promoted by Washington D.C. insiders to destroy Donald Trump.

3.      Couch has been one of the foremost, and perhaps most widely known, independent investigators seeking to uncover the truth of what happened to Seth Rich. Couch has never postulated any particular answer to Seth Rich murder mystery, but he has, in parallel, sought to research the links between Seth Rich, his brother Aaron and Wikileaks. Based on his sources and research, Couch has asserted that Seth and Aaron may have worked together to download DNC emails and transfer the emails and other data to Wikileaks, and received payment in exchange for such data from Wikileaks.

4.      Because the foregoing threatens the Isikoff-promoted conspiracy theory that Russian military intelligence attacked the DNC, stole compromising emails and provided them to Wikileaks as part of plot between Donald Trump and Vladimir Putin to steal the 2016 election from Hilary Clinton, Isikoff has sought to personally destroy Couch with misrepresentations, vile innuendo and outright lies, rather than exercising a minimum of journalistic professionalism to investigate and report honestly on the issues surrounding Seth and Aaron Rich.

5.      As a result of Defendants' conduct, orchestrated by Isikoff and undertaken with the approval of *Yahoo! News* and Verizon through the Yahoo/Verizon Internet platform, Plaintiff has faced death threats, experienced a nearly fatal heart condition, and suffered likely permanent damage to his career. Plaintiff's lawsuit seeks to hold Defendants accountable for their irresponsible and reprehensible behavior.

**<u>PARTIES</u>**

6.      Plaintiff Matthew Couch is a conservative commentator who operates the website the D.C. Patriot and has a wide following on social media, including Twitter.

7.      Defendant Verizon Communications, Inc. ("Verizon") is a Delaware corporation headquartered in New York, New York, with operations around the country, including substantial operations in Arkansas and Washington D.C. *Yahoo!News* is a business and brand within that corporation. The address of Verizon's headquarters is 1095, Avenue of the Americas, New York, NY 10036.

8.       Defendant Michael Isikoff is a partisan journalist and the "Chief Investigative Correspondent" for *Yahoo!News*.  He works in Washington, D.C. and resides at 6148 31st St. N.W., Washington D.C. 20015.

9.      Defendant NPR is a District of Columbia non-stock corporation with headquarters and principal places of business in Washington, D.C., California and New York.  NPR receives federal grants from the Corporation for Public Broadcasting and other federal agencies. <u>See</u> https://www.npr.org/about/annualreports/2017_Annual_Report.pdf. In 2017, NPR received approximately $2,000,000 in federal funding. NPR accepts public funding on the condition that it will publish truthful, honest and unbiased articles and statements, and that the federal funds it receives will not be used for political purposes or to promote the private agendas of third-parties. NPR's headquarters are located at 1111 North Capitol St., NE Washington D.C. 20002.

10.      Aaron Rich is the brother of Seth Rich, who was murdered in Washington D.C. on July 10, 2020. Aaron Rich is also the client of Meryl Governski, who is his agent and was acting at his direction and under his responsibility for all purposes herein. Rich resides in the State of Colorado. His address is confidential.

11.     Deborah Sines was the Assistant U.S. Attorney responsible for the Seth Rich murder investigation. Sines resides at 94 Cimmaron Drive, Palm Coast, Florida 32137-897.

12.     Joe Capone was the manager of Lou's City Bar in Washington D.C. where Seth Rich was last seen before the tragic shooting on July 10, 2020.  On information and belief Capone lives in the Washington D.C. metropolitan area.

13.     Michael Mueller was a neighbor of Seth Rich and the person who identified Seth Rich for the police in the morning of July 10, 2020. On information and belief Capone lives in the Washington D.C. metropolitan area.

## JURISDICTION AND VENUE

14.     The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because there is diversity of citizenship among the parties, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

15.     This Court has personal jurisdiction over Defendant Verizon because of its substantial activities in Washington D.C giving rise to Plaintiff's action, including providing a platform to its D.C.-based Chief Investigative Journalist to spread his lies about Plaintiff and publishing falsehoods relating to conduct or individuals located in Washington D.C. Verizon's headquarters are located at 1095 Avenue of the Americas, New York, NY 10036.

16.     This Court has personal jurisdiction over Defendant NPR because it is headquartered in Washington D.C.

17.     This Court has personal jurisdiction over Defendant Isikoff because he is a resident of Washington D.C. and a substantial number of his defamatory statements concern allegations related to or occurring in Washington D.C.

18.     This Court has personal jurisdiction over Aaron Rich because he has sued Plaintiff in this jurisdiction, has collaborated with Michael Isikoff in D.C., has frequently visited D.C. in connection with the conduct giving rise to Defendants' defamatory actions, and is responsible for the actions of his D.C.-based counsel and agent.

19.     This Court has personal jurisdiction over Deborah Sines because her defamatory statements were provided to a D.C.-based journalist who intended to disseminate said statements throughout the country, including to Arkansas where Plaintiff resides. This Court also has personal jurisdiction over Deborah Sines under D.C. Code § 13-423(a)(1) because Plaintiff's claims arise out of business that Deborah Sines has transacted in the District of Columbia and her continuous business contacts with the District of Columbia.

20.     This Court has personal jurisdiction over Joe Capone because, on information and belief, he is a resident within the jurisdiction of this Court and his defamatory statements were provided to a D.C.-based journalist who intended to disseminate said statements throughout the country including to Arkansas, where Plaintiff resides. This Court also has personal jurisdiction over Joe Capone under D.C. Code § 13-423(a)(1) because Plaintiff's claims arise out of business that Joe Capone has transacted in the District of Columbia and his continuous business contacts with the District of Columbia.

21.    This Court has personal jurisdiction over Mark Mueller because, on information and belief, he is a resident within the jurisdiction of this Court and because his defamatory statements were provided to a D.C. based journalist who intended to disseminate said statements throughout the country, including to Arkansas where Plaintiff resides. This Court also has personal jurisdiction over Mark Mueller under D.C. Code § 13-423(a)(1) because Plaintiff's claims arise out of business that Mark Mueller has transacted in the District of Columbia and his continuous business contacts with the District of Columbia.

22.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims occurred in this district.

**BACKGROUND**

23.    Plaintiff's action has its origins in the lead-up to the 2016 election. On June 12, 2016, Julian Assange stated publicly that he was in possession of compromising materials relating to presidential candidate Hilary Clinton. The Clinton campaign panicked, knowing that it had engaged in underhanded tactics to defeat Bernie Sanders' insurgency campaign, and that it was plagued by internal racism, sexism and anti-semitism, qualities that could fatally compromise the campaign's appeal to "progressives" and the groups necessary for a Clinton victory.

24.    To combat the forthcoming release of damaging information, the Clinton campaign, working with allies in the media and the U.S. intelligence community, concocted a barely plausible story that two Russian military hacking groups, nicknamed

"Cozy Bear" and "Fancy Bear," had penetrated the DNC servers and stolen compromising emails and other documents. This story was fed to compliant establishment stenographers, first to Ellen Nakashima at the Washington Post, who published her "scoop" promoting the Clinton conspiracy theory on June 14, 2016 in the Washington Post, and then to others, including Isikoff.

25.     Separately, the Clinton campaign coordinated with allies in the Intelligence Community, whom Hilary Clinton knew from her days as First Lady, Senator and Secretary of State, to promote a more elaborate version of the Cozy Bear/Fancy Bear hoax. The Clinton campaign hired a retired British spy, Christopher Steele, to compile "opposition research" on candidate Donald Trump. Mr. Steele, a virulent hater of Mr. Trump, put together a series of fictional tales about the future president, claiming that he had been engaged in a two-way conspiracy with Russian president Vladimir Putin for over five years through a network of overseas emigres and DNC moles to provide "dirt" on Putin's oligarch enemies (many of whom were prominent in the real estate world where Donald Trump made his fortune, lending a patina of plausibility to the Steele fairy tale) in exchange for damaging information on Trump's political enemies, including Hilary Clinton.

26.     The Steele memos, later known as the "Dossier," were provided to the U.S. intelligence community to help trigger a formal investigation into Donald Trump that, it was hoped, would uncover "dirt" that would destroy his chances of becoming president or, failing that, would serve as an "insurance policy" to be used to discredit him and remove him from office in the unlikely event he became President.

27.     At the same time, the Steele "Dossier" was seeded to select friendly outlets in the liberal establishment press to provide the background "noise" necessary to sustain the narrative that Donald Trump was a Russian "asset."  Isikoff acted as one of the most important media conduits for the Steele fictions, receiving a copy of the "Dossier" in its early stages and using it as background for stories painting candidate Trump as a Russian asset.  See https://justthenews.com/accountability/media/making-myth-timeline-media-role-selling-trump-russia-collusion-narrative; https://thehill.com/opinion/white-house/405242-the-mueller-probes-troubling-reliance-on-journalists-as-sources; https://www.realclearpolitics.com/articles/2019/07/12/isikoff_spins_his_own_russian_conspiracy_theories_--_again_140764.html

28.     Many of these stories were later gathered together in a thinly disguised work of establishment propaganda, Russian Roulette, The Inside Story of Putin's War on America and the Election of Donald Trump, published by Isikoff jointly with another Russia conspiracy fabulist, David Corn.

29.     Whole sections of Isikoff's fairly-tale are lifted straight out of establishment propaganda or the fanciful Dossier. Indeed, Russian Roulette reads in spots like a hagiography of the now discredited former British spy, Christopher Steele.  See Russian Roulette, pps 74-76, 139-152, 157-166.

30.     It is no exaggeration to state that Iskoff has staked his professional reputation on the most extreme partisan narrative of a Trump-Russia plot and therefore has personal reasons to join with Democratic party hacks in seeking to discredit or destroy anyone who casts doubt on what was once the official narrative regarding Trump

and Russia.

31.     Meanwhile, senior figures within the U.S. intelligence community had their

own, independent, reasons to both despise and fear Donald Trump. James Comey,

Director of the FBI, was in the middle of a 10-year term and had reason to believe that a

President Trump would no longer want his services. Mr. Comey's opportunities to garner

a lucrative board position after retirement from the FBI would also be put in question by

a Trump victory. Mr. Comey may also have convinced himself that Donald Trump posed

a "unique" threat to U.S. democracy and that using the tools of FBI against candidate and

then President Trump was called for by his belief in a "higher loyalty."

32.     CIA director John Brennan, for his part, looked with horror on the Trump

foreign policy vision that was based on ending U.S. "forever wars" the CIA and the

military industrial complex had a vested interest in promoting; demanding greater

financial contributions from NATO allies; and, most alarming of all, the possibility of

normalized, even cooperative relations with Russia, which threatened establishment

interests in Ukraine and Syria, and undermined one of the central justifications for

endless military spending.

33.     Rather than leave the issue of foreign policy priorities to voters – who had

grown weary of never ending wars and the constant stream of maimed soldiers and

funeral caskets returning from pointless foreign engagements and had no particular

animus towards Russia independently of media-induced phobia – Mr. Brennan took

matters into his own hands and, working with Mr. Comey and James Clapper, sought to

"entrap" various members of the Trump campaign (and then administration) in

compromising situations with Russian individuals to further the narrative that Trump was colluding with the omnipotent Putin in whose hands he was a mere puppet.

34.     Brennan and his team of hand-picked collaborators went so far as to incorporate the fanciful Steele Dossier into a classified Intelligence Community Assessment (the "ICA") provided to senior members of the Washington political establishment. The ICA served as the official establishment narrative that members of Russian military intelligence hacked the DNC, stole emails and other documents, funnelled them  to an obscure figure named Guccifer 2.0 (who of course left fingerprints enabling the Brennan team and their acolytes to conclude he or it was a "Russian" creation), who in turn transmitted the emails and other data to Wikileaks. This official fiction is referred to hereafter as the "Brennan Conspiracy Theory." The Dossier does not appear as such in the ICA or the Brennan Conspiracy Theory, but its principal claims were recycled in a classified annex to the ICA, which lent a certain mystique and aura of high drama to the Steele elucubrations, with no warning to the reader as to the unreliability of the claims or their origins as opposition research designed to help Hilary Clinton and smear Donald Trump.

## ISIKOFF'S INTEREST IN SPREADING LIES ABOUT COUCH

35.     Isikoff depends for his livelihood on access to sources such as Brennan, Comey and those around them and has every incentive to lie and misrepresent facts and destroy perceived enemies of the liberal establishment. Should Trump survive the onslaught of attacks against him, Isikoff could face a changed landscape in which intelligence and political sources no longer view him as a useful conduit for propaganda.

## MATT COUCH'S INVESTIGATION INTO  THE SETH RICH MURDER

36.     Plaintiff Matthew Couch is a former account executive who resides in Rogers, Arkansas. A gifted speaker, Couch was for many years a mainstream sports commentator with conservative political views.

37.     Couch also early on noticed the many anomalies in the reporting on the murder of Seth Rich—the fact that Couch's robbers did not appear to have taken anything of value, leaving his watch, wallet and cell phone; the failure of the police to make available the responding officers' body cameras or to release the Seth Rich autopsy; the strange resignation of the former D.C. police chief, Cathy Lanier, shortly after Ms. Lanier expressed doubt publicly as to the "botched robbery" murder theory; the political connections of Seth's roommates; the extraordinary high level focus on Seth Rich, a relatively low level DNC staffer, from the likes of Donna Brazile, who dedicated her book on alleged Russian hacking to Seth Rich; the contradictions in stories told by those who had last seen Seth alive; forensic analysis performed by luminaries such as William Binney and Adam Carter  proving that the DNC emails could not have been remotely hacked by Cozy Bear and Fancy Bear (as the establishment fiction pretended) but must have been locally downloaded by someone with physical access to the DNC network; and then, as the investigation progressed, disturbing reports that Aaron was blocking the investigation into his brother's murder, instructing witnesses not to discuss anything relating to Wikileaks with a private investigator hired by the family, failing to release Seth's cell phone and laptop for examination by the private investigator, and possibly coordinating with figures such as Donna Brazile, the former DNC chairwoman, and Brad

Bauman, a well-connected Washington public relations specialist with deep ties to the democratic party, to promote a narrative – which Aaron knew was false – that any suggestion Seth Rich had been in contact with Wikileaks and had transmitted DNC documents to Assange was a vile "conspiracy theory."

38.     Meanwhile, third parties, including journalist Cassandra Fairbanks and Internet impresario Kim Dotcom, made statements that Seth would have needed to work with someone "close" to him and that Julian Assange himself, after initially setting the Internet world on fire with suggestions that Seth Rich was a Wikileaks source, had indicated that payment for the DNC emails and documents had been made to Aaron.

**THE PLAN TO DESTROY MATT COUCH AND INDEPENDENT VOICES CHALLENGING THE BRENNAN CONSPIRACY THEORY**

39.     By July 2019, the D.C. establishment believed that it had sufficient material to definitively destroy Donald Trump. The long-awaited report by Special Counsel Robert Mueller was published and provided what was intended to be a road map for the impeachment of the President on obstruction of justice charges. Without any evidence and without interviewing or investigating any of the relevant individuals – Julian Assange, Craig Murray, Ellen Ratner, Kim Dotcom, Cassandra Fairbanks, William Binney, Adam Carter or Aaron – Mr. Mueller simply regurgitated the Brennan Conspiracy Theory that Russian military intelligence had hacked the DNC and used Guccifer 2.0 as a decoy to send compromising documents to Wikileaks, and stated in conclusory fashion that it was "false" to suggest Seth Rich had been involved in leaking emails to Wikileaks—a preposterous conclusion from someone who had not sought any

answers from Julian Assange or anyone who might actually have relevant information.

40.     At this point, it appeared clear to Isikoff that the terrain had been prepared

for the final assault on those who questioned the official narrative, and no-one more

prominently than Mathhew Couch.

## ISIKOFF USES HIS CONSPIRACY LAND PODCAST TO DEVELOP A HUB AND SPOKE CONSPIRACY TO DESTROY PLAINTIFF

41.     Isikoff begins his attack on Plaintiff by introducing him, at approximately

the 11:50 mark of Episode 6, as part of a conspiracy "horde." The use of the word

"horde" is designed to conjure up frightening images of large, unruly, poorly educated

and even violent mobs, as in the locutions, "hordes of peasants" or "hordes of rioters."

42.     Having thus set the stage, Isikoff then immediately introduces Matt

Couch's voice, making clear that Plaintiff is meant to be a member of the menacing

conspiracy "horde." After playing a short clip of Plaintiff's voice stating: "we do believe

it's possible that Aaron and Seth worked together and did the leaks together, folks"

Isikoff dismissively describes Plaintiff as a "one-time sales manager" living in the

"Arkansas Ozarks" who has become "a conspiracy entrepreneur."

43.     By falsely stating that Couch lives in the Ozarks, when he in fact lives in

the modern city of Rogers, part of one of the fastest growing regions in the United States,

and home of Walmart, one of the world's largest corporations, and then adding the phrase

"conspiracy entrepreneur," Defendant attempts to conjure up the image of a backwoods

hillbilly snake-oil salesman—a false and defamatory description of an educated Southern

urbanite with an established business and a serious investigative and journalistic

practice. Isikoff also took care to stress Plaintiff's residence in Arkansas to inflict the maximum damage on Couch where he lives.

44.     Isikoff then segues into another audio clip of Plaintiff asking, "Why are they covering everything up? Why did Aaron try to stop this investigation? And that is what my team is trying to figure out. Why is no-one talking about this? Why will no-one in the mainstream media touch this?"

45.     There are three separate points being made by Plaintiff in this clip. First, he is questioning why the DC police appears to be engaged in a cover-up. This is an observation corroborated by the Rich family private investigator, Rod Wheeler ("Wheeler") who would later be quoted as saying "I do believe the answer to who murdered Seth sits on his computer on a shelf at DC police headquarters."

46.     Second, Plaintiff is stating that Aaron attempted to stop Plaintiff's investigation, a demonstrably true statement, as Plaintiff not only blocked Wheeler's investigation, but also Couch's.

47.     Finally, it is also true that the mainstream press has failed to conduct any serious inquiry into the Seth Rich murder and has shown even less interest in any of evidence indicating that Seth Rich, alone or with his brother, leaked DNC emails and documents to Wikileaks. Instead of true investigation, mainstream journalists are content to report on the "harm" to the Rich family from investigation into the Seth Rich murder and links to Wikileaks and, with no sense of irony given Defendants' own conduct detailed below, the lack of "accountability" for independent investigators.

48.     Isikoff, for his part, is uninterested in the truth of what happened to Seth

Rich or whether and, if so, how Seth and/or Aaron downloaded and transmitted data to Wikileaks. He is interested in slandering Plaintiff and anyone who threatens the narrative Isikoff is desperate to protect.

49.     After setting the stage with his initial smears of Plaintiff, Isikoff plays a clip of Plaintiff introducing Mr. Butowsky on Plaintiff's "Periscope," a platform for video live-streaming. Isikoff immediately defames Butowsky with the utterly false statements (a) that Mr. Butowsky was "the man behind the Fox News debacle" (referring to a story by reporter Malia Zimmerman that was subsequently retracted by Fox News—but not in any way for anything attributed to Butowsky, as Isikoff falsely asserts) and (b) that Couch was an "ally" "found" by Butowsky "to keep his claims of a vast conspiracy alive" (a manufactured theory simply invented by Isikoff to besmirch those he perceives as "opponents").

50.     Couch is then quoted as saying "Aaron accepted money. Aaron had money from Wikileaks go into his personal account."  This statement is backed by, among other things, the following pieces of evidence:

   a.     Pulitzer prize winning journalist Sy Hersh has stated that what he "knows" about Seth Rich "comes off an FBI report" and that the FBI report states that Seth Rich transferred emails to Wikileaks and requested payment for such emails;

   b.     The statement of Kim Dotcom, who alleges he had direct communications with Seth Rich about the transfer of emails and documents to Wikileaks, that Seth would most likely have worked with someone trusted "close" to

him;

**c.**     Wheeler's repeated statements that Aaron sought to prevent any witnesses from discussing Seth's emails, computer or work situation, suggesting the presence of compromising information in the emails and/or computer, and Aaron's complicity in the handling of this compromising information; and

**d.**     Statements of Cassandra Fairbanks that Julian Assange had indicated, in response to questions about the Wikileaks source, that Aaron's accounts should be checked and further statements that Julian Assange had indicated that Aaron would have used a mechanism such as eBay to obtain payment.

51.     Naturally, Isikoff does not address any of this evidence as he intentionally or recklessly disregards anything that does not fit his preconceived narrative. Instead, Isikoff feigns surprise at Plaintiff's statement and says, "it was never clear" why Plaintiff discussed Aaron, a statement that could only have been made if Issikoff recklessly disregarded information in the public domain at that point, including the numerous statements of Wheeler that Aaron had blocked his investigation.[1] Statements such as these of course make it "very clear" why an investigator would and should take an interest in Aaron.

52.     Isikoff notes simply that Aaron has custody of his brother's computer and

---

[1] Among other things, long before the *Conspiracyland* podcast, Wheeler had appeared on another Internet podcast, Crowdsourcethetruth, and had publicly stated that Aaron was preventing investigation of what Wheeler termed "door number 3"—anything to do with Seth Rich's work at the DNC, where of course, it is alleged emails were downloaded by Seth. See https://video.search.yahoo.com/search/video?fr=mcafee&p=Crowdsource+the+Truth+Rod+wheeler#id=1&vid=026be6d2f1434e4733f0d4d1fc9344be&action=view.

that his computer was submitted to the police for analysis, but does not address or

question the timeline of Aaron's surrender of the computer or Aaron's control over his

brother's email accounts.

53.     Isikoff continues that the "cops found nothing on that computer or anything

else tying Seth's murder to his job at the DNC." Isikoff here willfully omits any mention

of the claims reported by Sy Hersh that, precisely, the DC police had not been able to

access Seth's computer and had instead requested assistance from the cyber unit at the

FBI.

54.     "As for the money flow in to Aaron's account," the basis for that was

"completely mysterious," claims Isikoff, ignoring the evidence described above, which

make it anything but mysterious that a serious investigation would explore every aspect

of Aaron's finances, including any use of cryptocurrency, another point that, naturally,

Isikoff fails to address. Isikoff's goal is clear and basic—to convey to his reader the false

and defamatory impression that Couch is simply lying.

## ISIKOFF USES AND COLLABORATES WITH AARON'S ATTORNEY AND AGENT TO SMEAR AND DEFAME PLAINTIFF

55.     To drive home this point, Isikoff immediately introduces, at approximately

the 13:56 mark of Episode 6, Aaron's lawyer, Meryl Governski, to address what Isikoff

labels the "bomb" that Aaron was getting money from Wikileaks.  Naturally, Defendant

does not offer any caveats about the reliability of an interested party – counsel for

plaintiff in a pending lawsuit – pontificating about "truth" but instead presents

Governski's comments "straight," adopting her voice as his own, and cutting

immediately to Governski stating, falsely, that "there is no factual place" the claims concerning Aaron's receipt of funds are coming from, and that it is a "contrived story."

56.     Without any qualifications other than introducing Governski as Aaron's lawyer who has just filed a defamation lawsuit, Isikoff elicits a series of categorical statements from Governski **_presented not as allegations in a complaint, but as the Truth_**.  These statements, which Isikoff never questions or challenges in any way and presents as "factual," are what Ms. Governksi labels the key "lies" made by Plaintiff:

     **e.**     that Aaron worked with Seth to download materials from the DNC;

     **f.**      that Aaron personally received money from Wikileaks in exchange for this data;

     **g.**     that Aaron is covering up his role in downloading DNC data; and, most explosively,

     **h.**     that Aaron is covering up his role in the murder of his brother.

57.     At no point does Isikoff alert his listeners that the claims being made by Governski are merely allegations in a complaint that, by definition, have not been proven to be true and cannot be "lies." Rather, **_Isikoff presents Governski's allegations as being themselves factual, already established as true, which is false_**.

58.     It is false to state as a fact that Couch is **_lying_** that Aaron worked with Seth to download materials.  Plaintiff had suggested a "possibility" (which he had and has a good faith basis to **_believe_** to be true) that Aaron had worked with his brother, Seth, in downloading emails, **_but he had never asserted as true that which he knew to be false, which is the definition of a lie_**.  To assert that Couch "lied" about whether Aaron worked

with Seth in downloading emails is, thus, itself a defamatory lie, since it is a knowingly false statement about what Couch had actually asserted (there is a possibility).

59.     The same is true for Governski's assertion that Couch is "lying" that Aaron received money or covered up his role in downloading DNC data. With respect to receiving money, Couch was simply repeating what he believed and believes to be a true statement, that Aaron received money in his account.

60.     Stating that he is "lying" implies that Isikoff **_knew_**, at the time he made his statements, that **_Couch knew_** his statements were false, a claim for which there is zero evidence and which is, therefore, itself a defamatory lie.

61.     Similarly, with respect to the assertion that Aaron was involved in a cover-up of his role in downloading DNC information, Couch actually stated, based on Aaron's stated refused to cooperate with him in his investigation, that Aaron was "blocking his investigation."

62.     Governski may believe that Aaron has every right to "block Couch's investigation" but it is a flat lie to claim that **_Couch_** is lying when he simply reports factually his own experience.

63.     Again, Isikoff is endorsing and adopting lies about Couch that are evidence-free assertions Couch is lying, consciously stating what he knows to be false. Isikoff's lies are all the more egregious in that he never interviewed Plaintiff and has no reasonable basis to make any claims about Plaintiff's subjective mental state.

64.     Finally, Isikoff adopts and endorses one of the most vicious and vile lies spouted by Governski: that Couch has "lied" that Aaron is covering up his role in his

brother's murder.

65.    ***But Couch has never stated that Aaron was covering up his role in his brother's murder***. This is a complete fabrication, and obviously highly damaging to Couch's reputation, painting him as monster who is falsely implying that Aaron participated in killing his own brother and then covered up this involvement. Isikoff knew or was reckless in not doing minimal due diligence to know that Couch never made any such statement and was being grossly, unfairly and viciously slandered with such an accusation.

66.    To make it crystal clear that Isikoff is endorsing and adopting Governski's statements, Isikoff immediately states that "the lies" – not the claims, the assertions, the allegations, but what he is presenting factually to his audience as knowing falsehoods – were amplified by Periscope, which Governski, to the approval of Isikoff states was "spreading lies."

67.    Isikoff then states that Matt Couch "twisted" the "special occasion" of Aaron's wedding by posting a public photo of Aaron and Seth standing together at Aaron's wedding.  Governski adds that by stating in connection with the photo of Aaron and Seth together that "the apple doesn't fall far from the tree" Couch was "spreading lies" about Aaron and "perverting" the photograph with "lies.  This is itself an obvious lie.  The statement "the apple doesn't fall far from the tree" is perfectly true and apt as a description of the relationship between Seth and Aaron.

68.    To the extent Couch is suggesting that Aaron worked with Seth in downloading DNC emails, this cannot be a lie – which Isikoff knows or should know.

First a _**suggestion**_, by definition, cannot be a lie and it is a lie to state the contrary.

Second, as discussed above, Couch had and has a reasonable belief that it was possible

Aaron worked with his brother in downloading Wikileaks data.

69.     It is impossible for Couch to "lie" given his beliefs. Isikoff had absolutely

no basis for accepting and endorsing – which he did by adopting the "lie" smear as his

own.

70.     Isikoff by his own admission failed to interview Couch and thus cannot

have any basis for accepting, endorsing or making any statements that Couch was "lying"

about Aaron's role in downloading DNC data.

71.     Instead of acting as a journalist, Isikoff continues to behave as an apologist

for Aaron, falsely telling his viewers that, faced with Couch's statements, Aaron

attempted to "reason" with Couch in sending him a "cease and desist" letter. Isikoff has

read this letter and knows it cannot, under any view, be construed as an attempt to

"reason" or "plead" with Couch, as Isikoff falsely states.

72.     In fact, Isikoff knows perfectly well that the purpose of the letter was not to

"reason" with Couch, but to establish the predicate for a lawsuit by Aaron and/or bully

and browbeat Couch into silence.

73.     Then, rather than factually presenting Plaintiff's response to Aaron's

attempt at intimidation, Issikoff characterizes Couch as "contemptuous," which itself a

knowing slur as there was nothing remotely "contemptuous" in Couch's public comments

on Aaron's letter.  Of course, Isikoff knows this, but he is not interested in accuracy, he is

interested in advocacy and his goal is to engage in character assassination of Couch that

will make the listener less likely to recognize the obvious smears orchestrated together with Governski, attributing malicious intent to "lie" to Couch without any evidence or basis.

74.    To further damage Couch's image, at approximately the 16:24 mark, Isikoff uses the loaded term "confederate" to describe one of Couch's colleagues. This is a blatant attempt to link Couch, without any basis, to the white nationalist or racist tendencies perceived in the Southern nostalgia for the "confederacy"—a particularly loaded term in post-Charlottesville America.

75.    Listeners of the podcast are expected to understand that Couch is an evil, racist, white nationalist because he does not accept Aaron's "reasoning"—which simply consists in the endless repetition of the same falsehood, that Couch is "spreading lies" and "false conspiracy theories about Seth Rich" when in fact Aaron knows of evidence supporting the view that Seth was in communication with Wikileaks.

76.    This makes Aaron's own letter false and defamatory, if not when it was first communicated by Aaron, certainly when it is republished and rebroadcast by Isikoff.

77.    Aaron's "reasoning" – which Isikofff knows to be nothing of the sort – consists primarily of attacks on Couch as "ridiculous and offensive" (statements rebroadcast by Isikoff at approximately the 17-minute mark of the podcast). Then to minimize the seriousness of the lie Issikoff has just spread about Couch, namely that Couch claimed Aaron was covering up his role in the killing of his own brother, Isikoff dismisses as "sidekick banter" Couch's clear rejection of any implication that he or anyone associated with him had ever suggested that Aaron participated in killing his

brother.

78.     Isikoff knew, when he approvingly adopted as his own Governski's slander of Couch, that Couch had not claimed and would deny ever having claimed that Aaron killed, participated in killing his brother or covered up his role in killing Seth.

79.     Isikoff makes clear that it is he who has utter contempt for Couch and disparages him as an "Internet troll," a knowingly slanderous falsehood.  According to a widely cited source, "An Internet troll is a member of an online social community who deliberately tries to disrupt, attack, offend or generally cause trouble within the community."  See https://www.lifewire.com/types-of-internet-trolls-3485894#:~:text=An%20Internet%20troll%20is%20a%20member%20of%20an,all%20over%20the%20Internet%20%E2%80%94%20on%20message%20boards%2C.

80.     Isikoff knows, to quote Governski, that "there is no factual place" where this slur is coming from. Couch is an independent investigator and journalist and publisher of a conservative blog, the DC Patriot. Even if Isikoff disagrees with the content of the DC Patriot, it is defamatory to label this content the work of a "troll."

81.     Isikoff is simply besmirching Couch because he thinks he can get away with it and because it furthers his narrative as to the nature of those who would question the establishment narrative he is so invested in preserving and protecting.

82.     As would be "support" for his smear job, Isikoff then gives the floor back to Governski who again baselessly claims that Couch has "invented" a story and "concocted" a narrative when she, as the lawyer for Aaron, knows perfectly well that it is utterly false to assert that Couch has "invented" or "concocted" anything.

83.     In one of the more bizarre moments of Episode 6 Isikoff then, with an evident tone of disgust, asserts that Couch is seeking "money" and "fundraising off Aaron's letter" when Couch has transparently stated that his investigation is 100% Crowdfunded. Isikoff's smear is intended to harm and has the direct effect of harming and limiting Couch's ability to use crowdfunding – a perfectly legitimate mode of fundraising – for any further investigation.

84.     By interfering with Couch's business and source of funding, Isikoff betrays his real purpose—to silence Couch and anyone like him dissatisfied with the "botched robbery theory" of Seth Rich's murder and the Brennan Conspiracy Theory promoted by Isikoff.

85.     Isikoff and Governski expressly seek to interfere with Couch's business, disparaging his sale of "America First Media" t-shirts, which of course Couch has every right to sell, as though it were somehow illicit to use legitimate fundraising and business techniques to finance an investigation in the public interest.

86.     Isikoff makes clear his horror at and intent to interfere with Couch's sale of t-shirts, by asking Governski with a tone of shocked incredulity, "Let me get this straight, they are fundraising off the letter?" Governski responds in the affirmative and then states that Couch has raised "tens of thousands" of dollars to fund "so-called" investigations, a disparaging and defamatory characterizing of Couch's professional work against which Isikoff does not push back in the slightest, but instead adopts as entirely his own, blessing one final smear from Governski who again, without any evidence, falsely states that Couch is using the funds raised to further a "fake contrived narrative" he and his team

have "created."

87.     To make clear where his sympathies lie and to leave no doubt that

Governski was speaking as Aaron's agent in publicly defaming and smearing Couch,

immediately after Governski concludes her final false peroration, Defendant Isikof

introduced Aaron, who states, at the 19:11 mark of the Episode, "it's been infurating, it's

been devastating . . . why do you feel the need to do this."  Although the "it" and the

"this' in Aaron's language is not explicitly stated, in context it is clear that he is referring

to what Governski has just referred to Couch's as "spreading" of "lies" and furthering a

"fake contrived narrative" that Couch has allegedly "created," which everyone involved

here – Governski, Aaron and Isikoff – knew to be false.

88.     Rich's  statement is all the more shocking in that, Isikoff and Governski

know perfectly well that the links between his brother and Wikileaks have not been

"created" or "contrived" or "concocted" and certainly not ***by Couch*** but are based in part

on evidence of which Aaron has long been aware, among other things that a Pulitzer

Prize winning journalist stated that he "knew" information about Seth Rich that "came

off" an "FBI report" and stated that Seth Rich had transmitted emails to Wikileaks and

requested payment in exchange.

89.     While giving Aaron a public platform to present his case to a jury pool he

hopes to precondition to view his perspective favorably, Isikoff carries water for Aaron's

case by saying, falsely, that "Aaron is a private person," a statement the purpose of which

is to provide greater protection for Aaron in his lawsuit against Couch. Isikoff goes

further and both lies about Couch and attempts to damage his business by asking Aaron

rhetorically what it is like to have Couch "raising money off his brother's murder."

90.     Isikoff's questions contains an utterly false premise. Isikoff knows that Aaron himself has set up a GoFundMe account to raise funds to investigate his brother's murder, but he does not accuse Mr. Rich of "raising money off his brother's murder" because such a charge would be ridiculous.  Isikoff hopes the listener will not grasp the absurdity of his attack on Couch because of the relentless barrage of slurs and lies to which the listener has been subjected by the 19'30 mark in the episode.

91.     Isikoff allows Aaron to slander Couch by saying that he is "profiting" off lies about him and his family. Even taking Governski's claim that Couch had raised tens of thousands of dollars for a multi-year investigation at face value, this generates no more "profit" than Rich's own GoFundMe campaign, which, on information and belief, has raised a similar amount, including from those like Couch, who believe that Seth Rich was a patriot seeking to call out racism, anti-semitism, sexism, bigotry and anti-Bernie Sanders bias—all of which were on display in the leaked DNC data published by Wikileaks. Isikoff knows or should know, moreover, that raising $30,000 for full-time investigatory work is insufficient to even cover basic expenses and cannot possibly generate a "profit."

**ISIKOFF USES AND COLLABORATES WITH DEBORAH SINES TO SMEAR AND DEFAME PLAINTIFF**

92.     Isikoff continues his relentless hatchet job by introducing Deborah Sines, the Assistant U.S. Attorney responsible for the Seth Rich murder investigation, to lend support to the lies that were spread by Governski and adopted by Isikoff, that Couch is responsible for stating that Aaron killed his brother or participated in the killing.

93.     Sines knew or should have known that Couch never made any such statements, but she nonetheless states, to the audibly beaming Isikoff, "You try asking a decedent's brother, did you kill your brother" and "did you have anything to do with his murder" "are you the one that set this up" "it's horrible, it's awful." In context, the only person who is alleged to have made comments that would lead Sines to feel the need to make the foregoing statements is Couch.

94.     Sines not only freely made these statements, but Isikoff gave her every opportunity to review and confirm her statements and their placement in his hatchet job on Couch and she knew and intended that she was supporting and furthering the baseless lie that Couch has supposedly accused Aaron of killing his brother and/or participating in the murder—an utterly shameful attack designed to permanently discredit Couch and prevent him from ever reaching a broad audience regardless of what his investigation would find.

95.     That Sines, who knew perfectly well what Couch had actually said, would voluntarily appear on Defendants' podcast to smear Couch and reveal grand jury questions is shocking. But Isikoff's hatred for Couch is so extreme that he even encourages Aaron, who has less reason than Sines to understand the rules and potential penalties for violating grand jury secrecy rules, to violate these rules and disclose that he had been asked during the grand jury proceedings about his alleged role in killing Seth. Isikoff, Governski, Sines and Aaron all lay the most extreme allegations about Aaron's conduct at the door of Plaintiff Couch, whom they believe they can demean, degrade, disgrace, humiliate, smear, and defame with impunity.

96.     To make unmistakable that the allegations and the smears – including that

Aaron had been publicly attacked as having murdered his own brother – concerned

Couch and no-one else, Isikoff pointedly asks Aaron, at approximately the 20'50 mark,

"you have to go in there [to the grand jury] and she has to ask you question by question

about what Matt Couch had been saying?"

97.     Sines publicly stated that the question she asked Aaron – which came from

a lie about Couch she spread jointly with Aaron, Governski and Isikoff – "did you murder

your brother?" was "horrible" and "awful."

98.     But at this point, giving the intensity of Isikoff's slanderous attacks, the

*Conspiracyland* listener has no doubt that the Internet troll from the Ozark mountains in

Arkansas, the ex-sales manager turned conspiracy entrepreneur, is himself a thoroughly

"horrible" and "awful" person who has been peddling the despicable claim, which all the

participants in the podcast know to be false and lacking any factual basis, that Aaron

murdered his own brother.

99.     Incredibly, Aaron admits that the hell he is putting Couch through with his

lies stems from the fact that Aaron perceives any inquiry into his brother's and his own

connections to Wikileaks to be worse than his brother's death itself, a horrible admission

Aaron publicly makes in Episode 6: "you would think the day your brother is killed is the

worst day of your life but it can actually go downhill from there."  According to Aaron,

facing inquiry into his role in leaking emails to Wikileaks is worse than the death of his

own brother—a truly shocking statement.

100.    After setting forth all the lies about Couch that he, Governski, Aaron and

Sines can conjure forth, Defendant Isikof frames Couch's conduct as a "vicious new turn" resulting from social media "attacks" on family members—the implication being that Couch has "viciously attacked" Aaron, an absurd  theory that would prevent any reporter from pursuing any story that reflected negatively on anyone, regardless of truth.

101.    Isikoff then gives the floor to Anna Merlan, an academic conspiracy theorist, who states, to the approbation of Isikoff, that there is a conspiracy "cottage industry" "devoted to hounding people" who have lost loved ones in violent ways. Aaron, according to Ms. Merlan, was a "very unique" example of this trend.

102.    By juxtaposing Ms. Merlan's statement that members of the conspiracy cottage industry are "hounding" people with the previous attacks on Couch, Isikoff is asserting, without any evidence, that Couch is guilty of "hounding" Aaron with his "conspiracy" theories.

**ISIKOFF USES AND COLLABORATES WITH JOE CAPONE TO SMEAR AND DEFAME PLAINTIFF**

103.    After collaborating with Governski, Sines and Aaron to slander Plaintiff, Isikoff then departs completely from reality and credits the wildest claims about Couch without any independent verification, presenting absurd and vicious claims about Plaintiff as though they were facts.

104.    Of course, Defendant is uninterested in Couch's reputation or the harm to his emotional well-being or professional future from being subjected to outrageous lies because his goal is to thoroughly destroy Plaintiff so that he is never taken seriously by anyone, regardless of the evidence he uncovers debunking the Brennan Conspiracy

Theory or the "botched robbery" theory of Seth's killing.

105.    Isikoff begins with Joe Capone, the manager of Lou's Bar and Grill, the last location where witnesses saw Seth alive before the shooting.  Capone takes a real and true claim made by Plaintiff – that Capone had visited the White House in the days before Seth Rich's murder – and proceeds to make an outrageous slur against Couch by claiming falsely that Couch had stated that the purpose of Mr. Capone's visit was to meet with Hilary Clinton and her team to plan the murder of Seth Rich.

106.    The following exchange illustrates Isikoff's defamation technique, through which he guides his willing inerlocutors to make false, ridiculous and slanderous claims that he then adopts and presents as factual to unsuspecting listeners.

> Isikoff (speaking about a visit to the White House several days before the Seth Rich murder Capone does not deny making): So your name shows up on the [White House] visitors logs and someone saw it. Who saw it and what did they do with it?:
> Capone: There's one guy, I'm totally blanking on his name . . . . Matt Couch
> Isikoff: Yup, we know him.
> Capone: He assumes a bunch of things . . .
> Isikoff: What was Matt Couch saying was the significance of the fact that you had been to the White House on July 6?
> Capone: That there were secret meetings going on.
> Isikoff: Secret meetings with who?
> Capone: Hilary. . . You know . . .
> Isikoff: That you were conspiring with Hilary Clinton or?
> Capone: Must have been right?
> Isikoff: Or aides to Hilary Clinton?
> Capone: Yeah. . .I've never met Hilary. . I've never seen any of these people.

107.    This entire exchange is based on a total fabrication. Both Isikoff and Capone know that Couch _**never**_ stated or even suggested that Capone was conspiring with Hilary Clinton or aides to Hilary Clinton. Isikoff uses leading questions to elicit the

answer he wants, ***knowing these answers to be false, knowing they will harm Couch,***

***and knowing they are defamatory***.

108.    In fact, Isikoff is deliberately injecting one of the wildest conspiracy

theories on the Internet – never promoted by Couch, who has been interested in solving

Seth Rich's murder, not inventing crazy theories with no facts – that Hilary Clinton

personally ordered the assassination of Seth Rich.

109.    According to Isikoff, in an interview with NPR's Steve Inskeep:

> But what we found was that, within three days of that murder, a conspiracy theory
> pops up on an obscure website called whatdoesitmean.com alleging that Rich was
> on his way to talk to the FBI about corruption by the Clintons when he was
> gunned down by a squad of assassins working for Hillary Clinton.

> It turns out that that very same day that that report popped up on this obscure
> website, the Russian SVR - that's its version of the CIA - circulated an intelligence
> bulletin making those exact same claims about Seth Rich. So in short, it was the
> SVR, the Russian intelligence agency, that planted the conspiracy theory about
> Seth Rich from the get-go.

110.  Isikoff promotes this bizarre conspiracy theory even though he knows it has

no connection to Plaintiff and even though it based on reporting so shoddy that it was

debunked by the Washington Post, normally friendly to conspiracy theories that paint

their preferred targets as dangerous and crazy Russian agents.

111.  By getting Capone to agree with him that Couch had claimed Capone met

with Hilary and/or adies to Hilary to plot the assassination of Seth Rich, Isikoff is

attempting to connect Couch with the wildest theories on the Internet, conveniently,

according to Defendant, promoted by Russia, so that Defendant can insinuate Couch is a

Russian sympathizer in addition to being a Southern "confederate" and Internet "troll."

112. Of course, Defendant Issikof's attack on Matt Couch is based on lies made up out of whole cloth, as Couch has never suggested Hilary Clinton killed Seth Rich or that Capone met with Hilary Clinton or her aides, whether to plan Seth Rich's murder or otherwise.

**ISIKOFF USES AND COLLABORATES WITH MARK MUELLER TO SMEAR AND DEFAME PLAINTIFF**

113. The final person Isikoff enlists to smear Couch is Mark Mueller ("Mueller"), the person who came to the scene of Seth's shooting and identified Seth for the police. Mueller makes a series of wild, outrageous claims and, under the guidance of Defendant, connects these claims to Math Couch, falsely asserting that Plaintiff has slandered or attacked him, which both he and Isikoff know to be false.

114. Mueller claims his ex-girlfriend told him to "watch out" because "people" were putting "stuff" about him on the Internet, in Mueller's words, "fake stuff." Isikoff corroborates Mueller's claims by saying "sure enough, Mr. Mueller was soon being linked to "Jeffrey Dahmer, the notorious Milwaukee serial killer." According to Mueller, "they" would take pictures of Jeffrey Dahmer and Dexter and superimpose his face on theirs, in an appalling effort to tarnish Mueller's image. Mueller goes on to state that "they" published all the phone numbers and addresses of his brothers and sisters and him and his neighbors, which he terms "vicious." According to Mr. Mueller, "they" were coming at [me] in various ways, over and over," contacting him through every one of his email accounts and calling him at work and calling him at home on his cell phone. Here the listener has in the back of his or her mind the previous evocation of Internet "hordes" led or inspired by, or acting with, the omnipresent Couch. Mueller claims that he was so

"freaked out" that he stayed away from his apartment on weekends and did not feel

comfortable renting his basement apartment for fear that people who "might be alt-right"

would seek access to his house to search his belongings.

115.  And as if on cue, Isikoff asks Mueller if he had to take all these precautions

"because of. . . Internet trolls. . ." to which Mr. Mueller immediately responds, "people

like Matt Couch."

116.  Thus, after a serious of anonymous references to "Internet trolls" who have

doctored pictures linking him to a serial killer, doxed him, his family and neighbors, and

jeopardized his business, Mueller connects all the horrible acts of which he complains to

"alt-right" "people like Matt Couch." Indeed, Couch is the **_only_** person mentioned and is

made to stand in for all the people who do the horrible, outrageous things Mr. Mueller

complains of.

117.  The only problem, which both Defendant and Mueller know, is that, **_as_**

**_applied to Matt Couch, all these statements are complete and total lies_**. Couch never

superimposed Mr. Mueller's photo on Jeffrey Dahmer's or Dexter's picture; Couch never

doxed Mr. Mueller's family and neighbors; Couch never sought to rent out a room in Mr.

Mueller's basement in an attempt to steal documents; Couch is not an "Internet troll" and

is not "alt-right."  Each and everyone of these statements applied to Couch, the only

person named in connection with them, is a lie, which both Isikoff or Mueller know or

should know.

118.  These baseless accusations have caused Couch to receive death threats,

compromised his health, ruined his ability to fundraise, damaged his business and

deprived him of any opportunity of returning to the corporate world, where his reputation has been tarnished beyond expression by the knowing lies promulgated by Isikoff and Mueller.

119. At the end of his brutal series of unrelenting attacking on Couch, Isikoff tips his hand.  The reason he has been so extreme, so reckless in his attacks on Couch is because he believes he can get away with it.

120. Not long before the publication of the *Conspiracyland* podcast, an exhausted Couch, lacking resources to continue defending himself against the attacks of two of the largest, most profitable, most aggressive law firms in the country, had asked the judge in Aaron's case against him to enter summary judgment so that he could be free of the pressure of big firm litigation, for which he did not have the resources to defend himself, and offered to "apologize to Aaron."

121. Isikoff clearly smelled blood and believed he could definitively terminate the prospects of an independent investigator who had just raised the white flag and, Isikoff wrongly believed, would never find counsel to defend him against Isikoff's smears. Couch's proposed "apology" was not intended as an admission of wrongdoing or that any of the lies that had been spread about Couch were true. Rather it was an attempt to acknowledge that Aaron had suffered following Seth's murder and that Couch was sorry for anyone's suffering, an admirable sentiment.

122. More importantly, Couch's letter to the judge was an attempt to put an end to draining litigation that was placing an unsustainable burden on him and would permit him at least to focus on the Seth Rich murder investigation.

123. Crucially, *__at no time__* did Couch give Isikoff, Governski, Sines, Capone or Mueller license to fabricate stories about him and spread lies that he claimed Aaron killed his brother, or asserted Capone had plotted Seth's death with Hilary Clinton, or sought to link Mueller with Jeffrey Dahmer, to take only the most extreme and outrageous lies that were made up about Couch.

## ISIKOFF WRAPS UP CONSPIRACY LAND WITH FINAL SMEARS OF COUCH

124. As a coda to his *Conspiracyland* hatchet job, Isikoff joined with the editor in chief of *Yahoo! News* for one last look at the "dark netherworld of American political conspiracies" in which Isikoff had left no doubt Couch was claimed to be, falsely, a central figure. As Isikoff puts it towards the 6 minute mark of the bonus episode to Episode 6, Couch – whom he again defames as an "Internet conspiracy entrepreneur in the Ozark mountains of Arkansas," falsely painting a picture of the urban Couch as a deplorable hillbilly mountain hick, something like a less intelligent version of the Unabomber – plays a "prominent role" in the "conspiracy theories" Isikoff's podcast is devoted to attacking.

125. Isikoff is particularly keen to stress Couch's Arkansas roots, both to cause Couch the maximum damage in his home state and to play on liberal elite prejudices against what he had previously described as Southern "confederates."

126. Defendant again smears Plaintiff as an Internet "crankster" in Arkansas. A "crankster" is commonly understood to be someone who is deranged, who rants and raves in a state of complete delusion. Obviously, for a serious investigator like Couch, who

Isikoff knows or should know publishes his own independent content and runs a blog that aggregates stories of general interest not covered by the mainstream media, the "crankster" slur is designed to convey that Couch is crazy, not to be trusted, not serious, a portrait that has harmed and will continue to harm Couch in his business affairs.

127. Isikoff takes one last opportunity to repeat the most brazen lie about Couch, that he had stated Aaron was "complicit" in his brother's murder, a lie made at approximately the 6'40 mark of the bonus episode. According to Isikoff, it is "sickening" to see the way "people like Matt Couch" operate, hoping to have so thoroughly destroyed Couch that the listener will feel only disgust for him and reflexively disbelieve anything he discovers—using vile language that is not only defamatory but also intentionally destructive of Couch's business in the process.

## NPR REPUBLISHES AND REBROADCASTS ISIKOFF'S LIES

128. Plaintiff repeats and realleges each and every foregoing allegation.

129. On August 8, 2020, Isikoff appeared on the program Fresh Air to be interviewed by Terry Gross about the defamatory *Conspiracyland* podcast.

130. Isikoff continued his smear campaign against Couch, repeating the lie that Matt Couch had stated Joe Capone met with aides to Hilary Clinton at the White House in the days before Seth Rich's murder.

131. Couch is referred to as a representative of the "Internet horde" that is "hounding" Aaron.  The alleged statement by Couch is intended to link Couch to the most extreme and vicious theories circulating in the backwater of the Internet—that Hilary Clinton had assassinated or ordered the assassination of Seth Rich.

132. Isikoff knew that Couch had never claimed Joe Capone met with Hilary Clinton or her aides at the White House but irresponsibly repeated this lie anyway.

133. NPR is liable for republishing and broadcasting Isikoff's lies, at the very least because they displayed a reckless disregard for the truth in not subjecting Isikoff's statements to any scrutiny, but blindly repeated his claims without any fact-checking.

134. Particularly in a story about "fake news," harmful lies, and the impact of spreading falsehoods on innocent victims, NPR had a duty to check the veracity of Isikoff's claims before spreading defamatory statements about third parties.

## FIRST CAUSE OF ACTION
## DEFAMATION
### (against all Defendants)

135.  Plaintiff restates each and every foregoing allegation.

136. Defendants published multiple defamatory statements of fact, or statements that implied knowledge of verifiable defamatory facts about Plaintiff. Those false statements included, but are not limited to, statements that the Plaintiff:

      a.  Lied about Aaron being involved in downloading DNC data;

      b.  Lied about Aaron receiving payment in exchange for said data;

      c.  Lied about Aaron covering up his role in downloading DNC data;

      d.  Lied about Aaron failing to cooperate with private investigators;

      e.  Lied about Aaron obstructing the official investigation;

      f.  Asserted that Aaron murdered his brother or participated in the murder of his brother or covered up his involvement in the murder of his brother.

g.   Asserted that Joe Capone met with Hilary Clinton or aides to Hilary Clinton in the days before Seth Rich's murder;

h.   Asserted that Joe Capone plotted Seth Rich's murder/assassination with Hilary Clinton or aides to Hilary Clinton;

i.   "Doxxed" Mark Mueller by publishing the addresses and phone numbers of his siblings and neighbors;

j.   Superimposed Mr. Mueller's head on pictures of serial killer Jeffrey Dahmer and Dexter;

k.   Sought to rent out Mr. Mueller's basement room to gain access to documents relating to Seth Rich

l.   Was an Internet "conspiracy entrepreneur;"

m.   Was an "Internet troll;"

n.   Was an "Internet crankster;"

o.   Was an "Internet bully;"

p.   Was a member of the "alt-right;"

q.   Was an associate of a Southern "confederate."

137.  In publishing the statements, Defendants acted with knowledge of the falsity of their statements, or with reckless disregard for the truth of their statements.

138.  Defendants' statements have had, and continue to have, an injurious and defamatory effect on Plaintiff's mental, physical and emotional health, professional reputation and activities, business opportunities, and finances. Defendants' statements are particularly harmful because Plaintiff is a journalist and an independent investigator and

the smears, slurs and lies to which he has been subject have had and will continue to have a deleterious effect on his ability to develop his journalism and investigatory business.

139.  Defendants cooperated among themselves to publish the false and defamatory statements by, among other acts, republishing and adopting the defamations of their codefendants. Each Defendant is jointly and severally liable for the torts of the other Defendants.

140.  Aaron is liable for the defamatory statements made by his counsel and agent, Meryl Governski, for and on his behalf.

141.  Defendant Verizon Communications is liable for the defamatory statements made on the Yahoo News *Conspiracyland* podcast because it directed Isikoff to make the *Conspiracyland* podcast to increase its profits, approved, endorsed and financed the podcast, and is the publisher of the content in the podcast and that appears through Yahoo! News and its "Skulduggery" division, and knew of and endorsed the false statements about Couch made on the podcast.

142.  As a direct and proximate cause of Defendants' defamatory statements, Plaintiff has suffered and continues to suffer compensable and pecuniary damages

**SECOND CAUSE OF ACTION**
**DEFAMATION PER SE**
**(Against all Defendants)**

143.  Plaintiff repeats and realleges each and every foregoing statement.

144.  Defendants' statements about Plaintiff constitute defamation per se because they falsely asserted, or implied, that Plaintiff has committed crimes for which he can be

criminally indicted and convicted, including falsely accusing a person of murder, illegally stealing and publishing personal information, and attempted burglary.

145. Defendants made and published statements of fact, or statements that implied knowledge of verifiable defamatory facts about Plaintiff.

146. Defendants knew at the time the defamatory statements were published that the statements were false, or at minimum  recklessly ignored evidence establishing the falsity of the statements.

147. Defendants' statements have had, and continue to have, an injurious and defamatory effect on Plaintiff's emotional, mental and physical health, professional reputation and activities, finances, and business opportunities. Defendants' statements are particularly harmful because Plaintiff is a journalist and an independent investigator and the smears, slurs and lies to which he has been subject have had and will continue to have a deleterious effect on his ability to develop his journalism and investigatory business.

148. Defendants cooperated among themselves to publish the false and defamatory statements by, among other acts, republishing and adopting the defamations of their codefendants. Each Defendant is jointly and severally liable for the torts of the other Defendants.

149. As a direct and proximate cause of Defendants' defamatory statements, Plaintiff has suffered and continues to suffer compensable and pecuniary damages.

## THIRD CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against all Defendants)

150. Plaintiff repeats and realleges each and every foregoing allegation

151. Defendants conduct was extreme and outrageous and goes beyond all possible bounds of decency and are utterly intolerable in a civilized community. They knowingly, or at a minimum recklessly, spread false statements about Plaintiff as detailed above, with actual knowledge of the falsity of the statements and the emotional harm such statements were causing Plaintiff.

152. The Defendants were on notice that Plaintiff was in an extraordinarily vulnerable condition given the relentless litigation to which he had been subjected and his willingness to issue an apology when they knew he had done nothing wrong. Yet notwithstanding this knowledge, Defendants continued their campaign to attack, besmirch, degrade and humiliate Plaintiff with the most outlandish and false claims, including that he had accused Aaron of murder, had published photographs of Mark Mueller as Jeffrey Dahmer and Dexter and has claimed that the manager of a local D.C. bar had met with Hilary Clinton and her aides to plot the assassination of Seth Rich, wild claims that were associated with Russian agents and "alt-right trolls" insinuating that Plaintiff was a white supremacist and a traitor to the United States.

153. Defendants acted intentionally to cause, or at the very least acted with reckless disregard of the probability that their behavior would cause, Plaintiff to suffer severe emotional distress.

154. As a direct and proximate result of the Defendants' statements, Plaintiff has suffered severe emotional distress, heart disease, continuous mental anguish, anxiety, and fear for his professional, personal, and physical security and severe emotional anguish for from the vicious claims that, among other things, he had accused Aaron of murder,

claimed that Capone was conspiring with Hilary Clinton, attempted burglary, doxed Mueller's family members and superimposed Mueller's face on the body of a serial killer. Defendants outrageous conduct would cause severe emotional harm to an ordinary person and even more so to a person in Plaintiff's unique circumstance.

155.  Defendants cooperated among themselves to intentionally inflict emotional distress by, among other acts, publishing false and defamatory statements and republishing and adopting the defamations of their codefendants. Each Defendant is jointly and severally liable for the torts of the other Defendants.

156.  As a direct and proximate cause of Defendants' defamatory statements, Plaintiff has suffered and continues to suffer compensable and pecuniary damages.

## FOURTH CAUSE OF ACTION
## FALSE LIGHT
### (Against all Defendants)

157.  Plaintiff repeats and realleges each and every foregoing statement.

158.  Defendants publicized false statements of and concerning Plaintiff that placed him in a false light by falsely attributing to him all of the conduct recited above. Defendants knew that the facts, representations, or imputations publicized about Plaintiff, were false, or at a minimum, Defendant's published them with reckless disregard for the truth of those facts. The repeated and continuous publication of false facts, derogatory and demeaning innuendo, and misrepresentations about Plaintiff placed him in a false light that would be highly offensive to a reasonable person.

159.  As a direct and proximate cause of Defendants' defamatory statements, Plaintiff has suffered reputational and emotional harm.

### FIFTH CAUSE OF ACTION
### CIVIL CONSPIRACY FOR ALL ALLEGED TORTS
### (Against all Defendants)

160.  Plaintiff repeats and realleges each and every foregoing allegation.

161.  All Defendants agreed to intentionally and maliciously participate in a civil conspiracy amongst themselves, and with other individuals, by their participation in a common conspiracy to defame through Episode 6 of *Conspiracyland*, the purpose of which was to commit the torts of: Defamation; Defamation Per Se; Intentional Infliction of Emotional Distress; and False Light against Plaintiff.

162.  Defendants participated in a hub and spoke conspiracy in which Defendants Isikoff and Verizon were the hub and each of the other Defendant was a spoke, and all Defendants sought the common goal of slandering and besmirching Couch and others who threatened a political narrative in which Defendants were all, to differing degrees, invested.

163.  Isikoff and Verizon conspired with Governski to repeat, endorse, adopt and republish the lies affirmed by Governski as the agent for Aaron. Isikoff and Verizon conspired with Sines to repeat, endorse, adopt and republish the lies affirmed by Sines. Issikof and Verizon conspired with Capone to repeat, endorse, adopt and publish the lies affirmed by Capone. Isikoff and Verizon conspired with Mueller to repeat, endorse, adopt and publish the lies affirmed by Mueller.

164. NPR conspired with all remaining Defendants by providing them with a further national broadcast with an even greater reach than *Conspiracyland* itself to promote their lies about Couch.

165. Throughout the course of the conspiracy, the Defendants, acting in concert, coordinated in furtherance of a common scheme to smear, disparage and defame Plaintiff.

166. Each Defendant is jointly and severally liable for the torts of the other members of the conspiracy which were committed in furtherance of the common scheme.

167. As a result of Defendants' conspiracy, Plaintiff suffered professional, reputational, and emotional harm, as outlined in the previous causes of action.

**SIXTH CAUSE OF ACTION**
**AIDING AND ABETTING FOR ALL ALLEGED TORTS**
**(Against all Defendants)**

168. Plaintiff repeats and realleges each and every foregoing allegation.

169. Defendants Rich, Sines, Capone and Mueller aided and abetted Defendants Isikoff and Verizon in committing tortious acts, including Defamation, Defamation Per Se, Intentional Infliction of Emotional Distress, False Light, and Invasion of Privacy, by, among other things, providing Isikoff and Verizon with sensational and false lies to be used in the *Conspiracyland* smear campaign. Defendants Rich, Sines, Mueller and Capone's knowingly and with full awareness substantially aided the wrongful conduct of Isikoff and Verizon.

170. Defendants Isikoff and Verizon aided and abetted Defendants Rich, Sines, Capone and Mueller in committing tortious acts, including Defamation, Defamation Per

Se, Intentional Infliction of Emotional Distress and False Light by providing Rich, Sines, Capone and Mueller a platform with a national reach on which to disseminate their attacks on and lies about Plaintiff. Defendants Isikoff and Verizon knowingly and with full awareness substantially aided the wrongful conduct of Rich, Sines, Mueller and Capone.

171. NPR aided and abetted all other Defendants by providing them with a further national broadcast with an even greater reach that *Conspiracyland* itself to promote their lies about Couch.

172. As a result of the Defendants' aiding and abetting the commission of the above-mentioned torts, Plaintiff suffered professional, reputational, and emotional harm, as outlined in the previous causes of action.

### SEVENTH CAUSE OF ACTION
### INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS
### (Against all Defendants)

173. Plaintiff repeats and realleges each and every foregoing allegation.

174. Defendants all knew that Plaintiff is a journalist and an independent investigator and that spreading smears, slurs, and lies about Plaintiff would damage his business relations with sources of funding, investigative colleagues, and journalistic contributors, among others.

175. Defendants intentionally and improperly interfered with Plaintiff's relationship with his sources of funding and contributors, among others, knowingly spreading lies about Plaintiff that would cause reasonable people to fear association with a "sickening" individual such as Plaintiff.

176. Plaintiff suffered significant damage as a result of Defendants' interference with his business relations.

177. Defendants engaged in conduct that was wanton and in reckless and knowing disregard of Plaintiff's rights.

### EIGHTH CAUES OF ACTION
### NEGLIGENT SUPERVISION AND RETENTION
### (Against Verizon and NPR)

178. Plaintiff repeats and realleges each and every foregoing allegation.

179. Isikoff is the Chief Investigative Journalist for *Yahoo! News*, which is wholly-owned by Verizon and, therefore, Isikoff and Verizon have an employer-employee relationship.

180. Verizon knew or should have known of the tortious propensities of Isikoff prior to his tortious conduct with respect to Plaintiff because Isikoff's role in the dissemination of the Trump Russia hoax and the Brennan Conspiracy Theory had been widely publicized by the time of Isikoff's *Conspiracyland* podcast. An employer using minimum due diligence would have known that Isikoff is not an "investigative" reporter, but a stenographer indifferent to truth and falsity, who simply repeats what his preferred sources tell him, regardless of the financial, emotional and professional consequences to innocent third parties.

181. Isikoff engaged in tortious conduct against Plaintiff on Verizon's premises and/or using property of Verizon.

182. In the alternative to Verizon's vicarious liability for its employees' and/or agents' intentional torts against Plaintiff, Verizon is directly liable for its negligent supervision and/or retention of Isikoff.

183. Plaintiff is entitled to damages as a result of Verizon's negligent supervision and/or retention of Isikoff.

184. Terry Gross is the host of the popular radio show Fresh Air that appears on NPR and, on information and belief, has an employee/employer relationship with NPR.

185. NPR is aware that Terry Gross invites guests onto her show who may make claims that harm the reputation and livelihoods of innocent parties.

186. Even if Terry Gross is not a direct employee of NPR but is an independent contractor, it was reasonably foreseeable that an interview format in which a partisan reporter would appear on Fresh Air and repeat sensational allegations made on a separate program could lead to the repetition, republication and rebroadcasting of defamatory statements made on the separate program.

187. NPR had a duty to supervise Terry Gross to ensure that guests who appear on her show are not free to make up or repeat lies that damage the well-being, reputation and livelihood of innocent parties.

188. Isikoff is notorious for his highly partisan views and his hatred of Donald Trump. A company such as NPR that operates with public funding has a heightened duty to ensure that political partisans do not use its facilities and allocated spectrum to spread lies about innocent third parties.

189.  NPR breached its duty to supervise Terry Gross by failing to perform any oversight or due diligence on the *Conspiracyland* podcast, failing to cite check any of the most outrageous claims, including the false and absurd claim that Couch had accused Joe Capone of meeting with Hilary Clinton's aides in the days before Seth Rich's murder and permitting Terry Gross to give Isikoff a new platform to disseminate his hurtful and made-up attacks on Couch.

190.  Plaintiff is entitled to damages as a result of NPR's negligent supervision of Couch.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief against all Defendants, jointly and severally, as follows:

a) An award against all Defendants to compensate for all economic damages sustained as a result of their tortious conduct in an amount to be determined at trial, but estimated to be no less than $15,000,000;

b) An award against all Defendants to compensate for all presumed and actual reputational damages sustained as result of their tortious conduct in an amount to be determined at trial, but estimated to be no less than $25,000,000;

c) An award against all Defendants to compensate for all presumed and actual

damages resulting from mental anguish and emotional distress sustained as a result of their tortious conduct in an amount to be determined at trial but estimated to be no less than $35,000,000;

d) An award against all Defendants for an award of punitive damages;

e) Attorney's fees and costs;

f) Injunctive relief, including but not limited to the removal of the false and defamatory materials from any websites, podcasts or publications over which Defendants have control.

g) Any and all other relief that the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a jury trial on all issues on all issues of fact and damages stated herein.

Dated: August 6, 2020

By:  /s/ Eden P. Quainton_____
     EDEN P. QUAINTON

     QUAINTON LAW PLLC
     1001 Avenue of the Americas, 11th Fl.
     New York, NY 10018
     Tel: 212-813-8389
     equainton@gmail.com