# **Exhibit A**



**null / ALL**
**Transmittal Number: 22276063**
**Date Processed: 11/09/2020**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Michelle Shanahan<br>National Public Radio, Inc.<br>1111 N Capitol St NE<br>Washington, DC 20002-7502 |

| | |
|---|---|
| **Electronic copy provided to:** | Deirdre Ferrick |

| | |
|---|---|
| **Entity:** | National Public Radio, Inc.<br>Entity ID Number  2430304 |
| **Entity Served:** | National Public Radio, Inc. |
| **Title of Action:** | Matthew Couch vs. Verizon Communications, Inc. |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Others |
| **Court/Agency:** | U.S. District Court, DC |
| **Case/Reference No:** | 1:20-cv-02151-RJL |
| **Jurisdiction Served:** | District Of Columbia |
| **Date Served on CSC:** | 11/06/2020 |
| **Answer or Appearance Due:** | 21 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Eden P. Quainton<br>212-813-8389 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

AO 440 (Rev. 06/12; DC 3/15)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| Matthew Couch <br><br><br> _____ <br> *Plaintiff(s)* <br> v. <br><br> Verizon Communications, Inc., Michael Isikoff, National Public Radio, Inc., Aaron Rich, Deborah Sines, Joe Capone and Mark Mueller <br> _____ <br> *Defendant(s)* | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Civil Action No. 20-cv-2151-RJL

### SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  National Public Radio, Inc.
1111 N Capitol St NE
Washington, DC 20002

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Eden P. Quainton, Quainton Law, PLLC, 1001 Avenue of the Americas, 11th Fl., New York, NY 10018

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*ANGELA D. CAESAR, CLERK OF COURT*

Date: _____08/07/2020_____          _____/s/ Mariela Cruz_____
                                                    *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____.

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00 .

I declare under penalty of perjury that this information is true.


Date: _____          _____
                                                    *Server's signature*

                                         _____
                                                    *Printed name and title*

                                         _____
                                                    *Server's address*

Additional information regarding attempted service, etc:

## UNITED STATES DISTRICT AND BANKRUPTCY COURTS
## FOR THE DISTRICT OF COLUMBIA

*ANGELA D. CAESAR*
*Clerk of Court*

## NOTICE OF RIGHT TO CONSENT TO TRIAL
## BEFORE A UNITED STATES MAGISTRATE JUDGE

The substantial criminal caseload in this Court and the requirements of the criminal Speedy Trial Act frequently result in the delay in the trial of civil cases. Aware of the hardship and expense to the parties, counsel, and witnesses caused by the delays which are beyond the control of the Court, this notice is to advise you of your right to trial of your case by a United States Magistrate Judge. By statute, 28 USC §636(c), Fed.R.Civ.P. 73 and Local Civil Rule 73.1, the parties, by consent, can try their case by means of a jury trial or bench trial before a United States Magistrate Judge. Appeals from judgments and final orders are taken directly to the United States Court of Appeals for the District of Columbia Circuit, in the same manner as an appeal from a judgment of a United States District Judge in a civil case.

### WHAT IS THE PROCEDURE?

One of the matters you are required to discuss at the meet-and-confer conference mandated by Local Civil Rule 16.3 is whether the case should be assigned to a United States Magistrate Judge for all purposes, including trial

All parties must consent before the case is assigned to a Magistrate Judge for trial. You may consent at any time prior to trial. If you expressly decline to consent or simply fail to consent early in the case, you are not foreclosed from consenting later in the case. However, a prompt election to proceed before a Magistrate Judge is encouraged because it will facilitate a more orderly scheduling of the case.

Counsel for the plaintiff has been furnished a copy of the "Consent to Proceed Before a United States Magistrate Judge for all Purposes" form. If and when the form is executed, your response should be made to the Clerk of the United States District Court only.

### WHAT IS THE ADVANTAGE?

The case will be resolved sooner and less expensively. The earlier the parties consent to assigning the case to a Magistrate Judge the earlier a firm and certain trial date can be established, even if the case is to be tried to a jury.

Upon the filing of the consent form the case will be randomly assigned for all purposes to a Magistrate Judge.

AO 85(Rev 11/11)
Consent to Trial by MJ

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
*Plaintiff*

v.                                    Civil Action No.

_____
*Defendant*

## NOTICE, CONSENT, AND REFERENCE OF A CIVIL ACTION TO A MAGISTRATE JUDGE

*Notice of a magistrate judge's availability.* A United States magistrate judge of this court is available to conduct all proceedings in this civil action (including a jury or nonjury trial) and to order the entry of a final judgment. Once judgment is entered an appeal must be taken to the U.S. Court of Appeals for the D.C. Circuit and not to the United States District Judge. A magistrate judge may exercise this authority only if all parties voluntarily consent.

You may consent to have your case referred to a magistrate judge, or you may withhold your consent without adverse substantive consequences. The name of any party withholding consent will not be revealed to any judge who may otherwise be involved with your case.

*Consent to a magistrate judge's authority.* The following parties consent to have a United States magistrate judge conduct all proceedings in this case including trial, the entry of final judgment, and all post-trial proceedings.

| *Parties' printed names* | *Signatures of parties or attorneys* | *Dates* |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Note: Return this form to the clerk of court only if you are consenting to the exercise jurisdiction by a United States magistrate judge. Do not return this form to a judge.

marriaUNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| **Matthew Couch,**<br>4000 S. Dixieland Road<br>Apartment A-201<br>Rogers, Arkansas 72758<br><br>    Plaintiff,<br><br>**v.**<br><br>**Verizon Communications, Inc.**<br>1095, Avenue of the Americas<br>New York, NY 10036<br><br>**Michael Isikoff**<br>6148 31st St. N.W.<br>Washington D.C. 20015<br><br>**National Public Radio, Inc.,**<br>1111 North Capitol St., NE<br>Washington D.C. 20002.<br><br>**Aaron Rich**<br><br>**Deborah Sines**<br>94 Cimmaron Drive<br>Palm Coast, Florida 32137-897<br><br>**Joe Capone**<br><br>and<br><br>**Mark Mueller,**<br><br>    Defendants. | **COMPLAINT**<br><br><u>**Jury Trial Demanded**</u><br><br><br>Case No. _____ |

Matthew Couch ("Plaintiff" or "Couch"), by and through his attorneys, Quainton

Law PLLC, for his complaint against Verizon Communications, Inc. ("Verizon"), Michael

Isikoff ("Isikoff"), National Public Radio, Inc. ("NPR"), Aaron Rich ("Aaron" or "Rich"),

Deborah   Sines   ("Sines"),   Joe   Capone   ("Capone")   and   Mark   Mueller

("Mueller")(collectively, "Defendants"), alleges and states as follows:

### Introduction

1.      On August 6, 2020, as part of a six-part podcast entitled "Conspiracyland,"

published by *Yahoo!News*, a subsidiary of Verizon, Isikoff engaged in one of the most

irresponsible smear campaigns in contemporary journalism, defaming and disparaging

Plaintiff Matthew Couch, the publisher of a widely read online blog, the DC Patriot, and

a conservative commentator with over 400,000 Twitter followers,  either through his own

words or those he plainly endorsed, as a "vicious," "alt-right" "Internet crankster,"

"Internet conspiracy entrepreneur," "Internet troll" and "Internet bully," who, from the

"mountains of the Ozarks" was spreading "lies" about Aaron, the brother of Seth Rich,

the DNC staffer killed in the early morning hours of July 10, 2016 under circumstances

that still, four years later, have not been explained.

2.      Isikoff is no ordinary "journalist." Rather, he is a shameless partisan hack,

who was personally responsible for helping spread the baseless conspiracy theory that

Donald Trump conspired with Vladimir Putin to steal the 2016 election. As this

conspiracy theory has collapsed, Isikoff and others in the media have sought to attack and

discredit anyone, including Plaintiff, associated with any investigations that would

potentially undermine the official narrative promoted by Washington D.C. insiders to

destroy Donald Trump.

3.      Couch has been one of the foremost, and perhaps most widely known,
independent investigators seeking to uncover the truth of what happened to Seth Rich.
Couch has never postulated any particular answer to Seth Rich murder mystery, but he
has, in parallel, sought to research the links between Seth Rich, his brother Aaron and
Wikileaks. Based on his sources and research, Couch has asserted that Seth and Aaron
may have worked together to download DNC emails and transfer the emails and other
data to Wikileaks, and received payment in exchange for such data from Wikileaks.

4.      Because the foregoing threatens the Isikoff-promoted conspiracy theory
that Russian military intelligence attacked the DNC, stole compromising emails and
provided them to Wikileaks as part of plot between Donald Trump and Vladimir Putin to
steal the 2016 election from Hilary Clinton, Isikoff has sought to personally destroy
Couch with misrepresentations, vile innuendo and outright lies, rather than exercising a
minimum of journalistic professionalism to investigate and report honestly on the issues
surrounding Seth and Aaron Rich.

5.      As a result of Defendants' conduct, orchestrated by Isikoff and undertaken
with the approval of *Yahoo! News* and Verizon through the Yahoo/Verizon Internet
platform, Plaintiff has faced death threats, experienced a nearly fatal heart condition, and
suffered likely permanent damage to his career. Plaintiff's lawsuit seeks to hold
Defendants accountable for their irresponsible and reprehensible behavior.

**PARTIES**

6.      Plaintiff Matthew Couch is a conservative commentator who operates the
website the D.C. Patriot and has a wide following on social media, including Twitter.

7.      Defendant Verizon Communications, Inc. ("Verizon") is a Delaware corporation headquartered in New York, New York, with operations around the country, including substantial operations in Arkansas and Washington D.C. *Yahoo!News* is a business and brand within that corporation. The address of Verizon's headquarters is 1095, Avenue of the Americas, New York, NY 10036.

8.      Defendant Michael Isikoff is a partisan journalist and the "Chief Investigative Correspondent" for *Yahoo!News*. He works in Washington, D.C. and resides at 6148 31st St. N.W., Washington D.C. 20015.

9.      Defendant NPR is a District of Columbia non-stock corporation with headquarters and principal places of business in Washington, D.C., California and New York. NPR receives federal grants from the Corporation for Public Broadcasting and other federal agencies. See https://www.npr.org/about/annualreports/2017_Annual_Report.pdf. In 2017, NPR received approximately $2,000,000 in federal funding. NPR accepts public funding on the condition that it will publish truthful, honest and unbiased articles and statements, and that the federal funds it receives will not be used for political purposes or to promote the private agendas of third-parties. NPR's headquarters are located at 1111 North Capitol St., NE Washington D.C. 20002.

10.      Aaron Rich is the brother of Seth Rich, who was murdered in Washington D.C. on July 10, 2020. Aaron Rich is also the client of Meryl Governski, who is his agent and was acting at his direction and under his responsibility for all purposes herein. Rich resides in the State of Colorado. His address is confidential.

11.     Deborah Sines was the Assistant U.S. Attorney responsible for the Seth

Rich murder investigation. Sines resides at 94 Cimmaron Drive, Palm Coast, Florida

32137-897.

12.     Joe Capone was the manager of Lou's City Bar in Washington D.C. where

Seth Rich was last seen before the tragic shooting on July 10, 2020. On information and

belief Capone lives in the Washington D.C. metropolitan area.

13.     Michael Mueller was a neighbor of Seth Rich and the person who identified

Seth Rich for the police in the morning of July 10, 2020. On information and belief

Capone lives in the Washington D.C. metropolitan area.

**JURISDICTION AND VENUE**

14.     The Court has subject matter jurisdiction over this action under 28 U.S.C. §

1332 because there is diversity of citizenship among the parties, and the amount in

controversy exceeds $75,000 exclusive of interest and costs.

15.     This Court has personal jurisdiction over Defendant Verizon because of its

substantial activities in Washington D.C giving rise to Plaintiff's action, including

providing a platform to its D.C.-based Chief Investigative Journalist to spread his lies

about Plaintiff and publishing falsehoods relating to conduct or individuals located in

Washington D.C. Verizon's headquarters are located at 1095 Avenue of the Americas,

New York, NY 10036.

16.     This Court has personal jurisdiction over Defendant NPR because it is

headquartered in Washington D.C.

17.     This Court has personal jurisdiction over Defendant Isikoff because he is a resident of Washington D.C. and a substantial number of his defamatory statements concern allegations related to or occurring in Washington D.C.

18.     This Court has personal jurisdiction over Aaron Rich because he has sued Plaintiff in this jurisdiction, has collaborated with Michael Isikoff in D.C., has frequently visited D.C. in connection with the conduct giving rise to Defendants' defamatory actions, and is responsible for the actions of his D.C.-based counsel and agent.

19.     This Court has personal jurisdiction over Deborah Sines because her defamatory statements were provided to a D.C.-based journalist who intended to disseminate said statements throughout the country, including to Arkansas where Plaintiff resides. This Court also has personal jurisdiction over Deborah Sines under D.C. Code § 13-423(a)(1) because Plaintiff's claims arise out of business that Deborah Sines has transacted in the District of Columbia and her continuous business contacts with the District of Columbia.

20.     This Court has personal jurisdiction over Joe Capone because, on information and belief, he is a resident within the jurisdiction of this Court and his defamatory statements were provided to a D.C.-based journalist who intended to disseminate said statements throughout the country including to Arkansas, where Plaintiff resides. This Court also has personal jurisdiction over Joe Capone under D.C. Code § 13-423(a)(1) because Plaintiff's claims arise out of business that Joe Capone has transacted in the District of Columbia and his continuous business contacts with the District of Columbia.

- 6 -

21.     This Court has personal jurisdiction over Mark Mueller because, on
information and belief, he is a resident within the jurisdiction of this Court and because
his defamatory statements were provided to a D.C. based journalist who intended to
disseminate said statements throughout the country, including to Arkansas where Plaintiff
resides. This Court also has personal jurisdiction over Mark Mueller under D.C. Code §
13-423(a)(1) because Plaintiff's claims arise out of business that Mark Mueller has
transacted in the District of Columbia and his continuous business contacts with the
District of Columbia.

22.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a
substantial part of the events giving rise to these claims occurred in this district.

**BACKGROUND**

23.     Plaintiff's action has its origins in the lead-up to the 2016 election. On June
12, 2016, Julian Assange stated publicly that he was in possession of compromising
materials relating to presidential candidate Hilary Clinton. The Clinton campaign
panicked, knowing that it had engaged in underhanded tactics to defeat Bernie Sanders'
insurgency campaign, and that it was plagued by internal racism, sexism and anti-
semitism, qualities that could fatally compromise the campaign's appeal to
"progressives" and the groups necessary for a Clinton victory.

24.     To combat the forthcoming release of damaging information, the Clinton
campaign, working with allies in the media and the U.S. intelligence community,
concocted a barely plausible story that two Russian military hacking groups, nicknamed

"Cozy Bear" and "Fancy Bear," had penetrated the DNC servers and stolen compromising emails and other documents. This story was fed to compliant establishment stenographers, first to Ellen Nakashima at the Washington Post, who published her "scoop" promoting the Clinton conspiracy theory on June 14, 2016 in the Washington Post, and then to others, including Isikoff.

25.     Separately, the Clinton campaign coordinated with allies in the Intelligence Community, whom Hilary Clinton knew from her days as First Lady, Senator and Secretary of State, to promote a more elaborate version of the Cozy Bear/Fancy Bear hoax. The Clinton campaign hired a retired British spy, Christopher Steele, to compile "opposition research" on candidate Donald Trump. Mr. Steele, a virulent hater of Mr. Trump, put together a series of fictional tales about the future president, claiming that he had been engaged in a two-way conspiracy with Russian president Vladimir Putin for over five years through a network of overseas emigres and DNC moles to provide "dirt" on Putin's oligarch enemies (many of whom were prominent in the real estate world where Donald Trump made his fortune, lending a patina of plausibility to the Steele fairy tale) in exchange for damaging information on Trump's political enemies, including Hilary Clinton.

26.     The Steele memos, later known as the "Dossier," were provided to the U.S. intelligence community to help trigger a formal investigation into Donald Trump that, it was hoped, would uncover "dirt" that would destroy his chances of becoming president or, failing that, would serve as an "insurance policy" to be used to discredit him and remove him from office in the unlikely event he became President.

27.     At the same time, the Steele "Dossier" was seeded to select friendly outlets in the liberal establishment press to provide the background "noise" necessary to sustain the narrative that Donald Trump was a Russian "asset."  Isikoff acted as one of the most important media conduits for the Steele fictions, receiving a copy of the "Dossier" in its early stages and using it as background for stories painting candidate Trump as a Russian asset.  See https://justthenews.com/accountability/media/making-myth-timeline-media-role-selling-trump-russia-collusion-narrative; https://thehill.com/opinion/white-house/405242-the-mueller-probes-troubling-reliance-on-journalists-as-sources; https://www.realclearpolitics.com/articles/2019/07/12/isikoff_spins_his_own_russian_conspiracy_theories_--_again_140764.html

28.     Many of these stories were later gathered together in a thinly disguised work of establishment propaganda, Russian Roulette, The Inside Story of Putin's War on America and the Election of Donald Trump, published by Isikoff jointly with another Russia conspiracy fabulist, David Corn.

29.     Whole sections of Isikoff's fairly-tale are lifted straight out of establishment propaganda or the fanciful Dossier. Indeed, Russian Roulette reads in spots like a hagiography of the now discredited former British spy, Christopher Steele.  See Russian Roulette, pps 74-76, 139-152, 157-166.

30.     It is no exaggeration to state that Iskoff has staked his professional reputation on the most extreme partisan narrative of a Trump-Russia plot and therefore has personal reasons to join with Democratic party hacks in seeking to discredit or destroy anyone who casts doubt on what was once the official narrative regarding Trump

and Russia.

31.　Meanwhile, senior figures within the U.S. intelligence community had their own, independent, reasons to both despise and fear Donald Trump. James Comey, Director of the FBI, was in the middle of a 10-year term and had reason to believe that a President Trump would no longer want his services. Mr. Comey's opportunities to garner a lucrative board position after retirement from the FBI would also be put in question by a Trump victory. Mr. Comey may also have convinced himself that Donald Trump posed a "unique" threat to U.S. democracy and that using the tools of FBI against candidate and then President Trump was called for by his belief in a "higher loyalty."

32.　CIA director John Brennan, for his part, looked with horror on the Trump foreign policy vision that was based on ending U.S. "forever wars" the CIA and the military industrial complex had a vested interest in promoting; demanding greater financial contributions from NATO allies; and, most alarming of all, the possibility of normalized, even cooperative relations with Russia, which threatened establishment interests in Ukraine and Syria, and undermined one of the central justifications for endless military spending.

33.　Rather than leave the issue of foreign policy priorities to voters – who had grown weary of never ending wars and the constant stream of maimed soldiers and funeral caskets returning from pointless foreign engagements and had no particular animus towards Russia independently of media-induced phobia – Mr. Brennan took matters into his own hands and, working with Mr. Comey and James Clapper, sought to "entrap" various members of the Trump campaign (and then administration) in

compromising situations with Russian individuals to further the narrative that Trump was

colluding with the omnipotent Putin in whose hands he was a mere puppet.

34.   Brennan and his team of hand-picked collaborators went so far as to

incorporate the fanciful Steele Dossier into a classified Intelligence Community

Assessment (the "ICA") provided to senior members of the Washington political

establishment. The ICA served as the official establishment narrative that members of

Russian military intelligence hacked the DNC, stole emails and other documents,

funnelled them  to an obscure figure named Guccifer 2.0 (who of course left fingerprints

enabling the Brennan team and their acolytes to conclude he or it was a "Russian"

creation), who in turn transmitted the emails and other data to Wikileaks. This official

fiction is referred to hereafter as the "Brennan Conspiracy Theory." The Dossier does not

appear as such in the ICA or the Brennan Conspiracy Theory, but its principal claims

were recycled in a classified annex to the ICA, which lent a certain mystique and aura of

high drama to the Steele elucubrations, with no warning to the reader as to the

unreliability of the claims or their origins as opposition research designed to help Hilary

Clinton and smear Donald Trump.

**ISIKOFF'S INTEREST IN SPREADING LIES ABOUT COUCH**

35.   Isikoff depends for his livelihood on access to sources such as Brennan,

Comey and those around them and has every incentive to lie and misrepresent facts and

destroy perceived enemies of the liberal establishment. Should Trump survive the

onslaught of attacks against him, Isikoff could face a changed landscape in which

intelligence and political sources no longer view him as a useful conduit for propaganda.

## MATT COUCH'S INVESTIGATION INTO THE SETH RICH MURDER

36.     Plaintiff Matthew Couch is a former account executive who resides in

Rogers, Arkansas. A gifted speaker, Couch was for many years a mainstream sports

commentator with conservative political views.

37.     Couch also early on noticed the many anomalies in the reporting on the

murder of Seth Rich—the fact that Couch's robbers did not appear to have taken anything

of value, leaving his watch, wallet and cell phone; the failure of the police to make

available the responding officers' body cameras or to release the Seth Rich autopsy; the

strange resignation of the former D.C. police chief, Cathy Lanier, shortly after Ms. Lanier

expressed doubt publicly as to the "botched robbery" murder theory; the political

connections of Seth's roommates; the extraordinary high level focus on Seth Rich, a

relatively low level DNC staffer, from the likes of Donna Brazile, who dedicated her

book on alleged Russian hacking to Seth Rich; the contradictions in stories told by those

who had last seen Seth alive; forensic analysis performed by luminaries such as William

Binney and Adam Carter  proving that the DNC emails could not have been remotely

hacked by Cozy Bear and Fancy Bear (as the establishment fiction pretended) but must

have been locally downloaded by someone with physical access to the DNC network; and

then, as the investigation progressed, disturbing reports that Aaron was blocking the

investigation into his brother's murder, instructing witnesses not to discuss anything

relating to Wikileaks with a private investigator hired by the family, failing to release

Seth's cell phone and laptop for examination by the private investigator, and possibly

coordinating with figures such as Donna Brazile, the former DNC chairwoman, and Brad

Bauman, a well-connected Washington public relations specialist with deep ties to the democratic party, to promote a narrative – which Aaron knew was false – that any suggestion Seth Rich had been in contact with Wikileaks and had transmitted DNC documents to Assange was a vile "conspiracy theory."

38.     Meanwhile, third parties, including journalist Cassandra Fairbanks and Internet impresario Kim Dotcom, made statements that Seth would have needed to work with someone "close" to him and that Julian Assange himself, after initially setting the Internet world on fire with suggestions that Seth Rich was a Wikileaks source, had indicated that payment for the DNC emails and documents had been made to Aaron.

**THE PLAN TO DESTROY MATT COUCH AND INDEPENDENT VOICES CHALLENGING THE BRENNAN CONSPIRACY THEORY**

39.     By July 2019, the D.C. establishment believed that it had sufficient material to definitively destroy Donald Trump. The long-awaited report by Special Counsel Robert Mueller was published and provided what was intended to be a road map for the impeachment of the President on obstruction of justice charges. Without any evidence and without interviewing or investigating any of the relevant individuals – Julian Assange, Craig Murray, Ellen Ratner, Kim Dotcom, Cassandra Fairbanks, William Binney, Adam Carter or Aaron – Mr. Mueller simply regurgitated the Brennan Conspiracy Theory that Russian military intelligence had hacked the DNC and used Guccifer 2.0 as a decoy to send compromising documents to Wikileaks, and stated in conclusory fashion that it was "false" to suggest Seth Rich had been involved in leaking emails to Wikileaks—a preposterous conclusion from someone who had not sought any

answers from Julian Assange or anyone who might actually have relevant information.

40.    At this point, it appeared clear to Isikoff that the terrain had been prepared

for the final assault on those who questioned the official narrative, and no-one more

prominently than Matthew Couch.

## ISIKOFF USES HIS CONSPIRACY LAND PODCAST TO DEVELOP A HUB AND SPOKE CONSPIRACY TO DESTROY PLAINTIFF

41.    Isikoff begins his attack on Plaintiff by introducing him, at approximately

the 11:50 mark of Episode 6, as part of a conspiracy "horde." The use of the word

"horde" is designed to conjure up frightening images of large, unruly, poorly educated

and even violent mobs, as in the locutions, "hordes of peasants" or "hordes of rioters."

42.    Having thus set the stage, Isikoff then immediately introduces Matt

Couch's voice, making clear that Plaintiff is meant to be a member of the menacing

conspiracy "horde." After playing a short clip of Plaintiff's voice stating: "we do believe

it's possible that Aaron and Seth worked together and did the leaks together, folks"

Isikoff dismissively describes Plaintiff as a "one-time sales manager" living in the

"Arkansas Ozarks" who has become "a conspiracy entrepreneur."

43.    By falsely stating that Couch lives in the Ozarks, when he in fact lives in

the modern city of Rogers, part of one of the fastest growing regions in the United States,

and home of Walmart, one of the world's largest corporations, and then adding the phrase

"conspiracy entrepreneur," Defendant attempts to conjure up the image of a backwoods

hillbilly snake-oil salesman—a false and defamatory description of an educated Southern

urbanite with an established business and a serious investigative and journalistic

- 14 -

practice. Isikoff also took care to stress Plaintiff's residence in Arkansas to inflict the maximum damage on Couch where he lives.

44.     Isikoff then segues into another audio clip of Plaintiff asking, "Why are they covering everything up? Why did Aaron try to stop this investigation? And that is what my team is trying to figure out. Why is no-one talking about this? Why will no-one in the mainstream media touch this?"

45.     There are three separate points being made by Plaintiff in this clip. First, he is questioning why the DC police appears to be engaged in a cover-up. This is an observation corroborated by the Rich family private investigator, Rod Wheeler ("Wheeler") who would later be quoted as saying "I do believe the answer to who murdered Seth sits on his computer on a shelf at DC police headquarters."

46.     Second, Plaintiff is stating that Aaron attempted to stop Plaintiff's investigation, a demonstrably true statement, as Plaintiff not only blocked Wheeler's investigation, but also Couch's.

47.     Finally, it is also true that the mainstream press has failed to conduct any serious inquiry into the Seth Rich murder and has shown even less interest in any of evidence indicating that Seth Rich, alone or with his brother, leaked DNC emails and documents to Wikileaks. Instead of true investigation, mainstream journalists are content to report on the "harm" to the Rich family from investigation into the Seth Rich murder and links to Wikileaks and, with no sense of irony given Defendants' own conduct detailed below, the lack of "accountability" for independent investigators.

48.     Isikoff, for his part, is uninterested in the truth of what happened to Seth

Rich or whether and, if so, how Seth and/or Aaron downloaded and transmitted data to Wikileaks. He is interested in slandering Plaintiff and anyone who threatens the narrative Isikoff is desperate to protect.

49.     After setting the stage with his initial smears of Plaintiff, Isikoff plays a clip of Plaintiff introducing Mr. Butowsky on Plaintiff's "Periscope," a platform for video live-streaming. Isikoff immediately defames Butowsky with the utterly false statements (a) that Mr. Butowsky was "the man behind the Fox News debacle" (referring to a story by reporter Malia Zimmerman that was subsequently retracted by Fox News—but not in any way for anything attributed to Butowsky, as Isikoff falsely asserts) and (b) that Couch was an "ally" "found" by Butowsky "to keep his claims of a vast conspiracy alive" (a manufactured theory simply invented by Isikoff to besmirch those he perceives as "opponents").

50.     Couch is then quoted as saying "Aaron accepted money. Aaron had money from Wikileaks go into his personal account." This statement is backed by, among other things, the following pieces of evidence:

a.     Pulitzer prize winning journalist Sy Hersh has stated that what he "knows" about Seth Rich "comes off an FBI report" and that the FBI report states that Seth Rich transferred emails to Wikileaks and requested payment for such emails;

b.     The statement of Kim Dotcom, who alleges he had direct communications with Seth Rich about the transfer of emails and documents to Wikileaks, that Seth would most likely have worked with someone trusted "close" to

him;

c.    Wheeler's repeated statements that Aaron sought to prevent any witnesses from discussing Seth's emails, computer or work situation, suggesting the presence of compromising information in the emails and/or computer, and Aaron's complicity in the handling of this compromising information; and

d.    Statements of Cassandra Fairbanks that Julian Assange had indicated, in response to questions about the Wikileaks source, that Aaron's accounts should be checked and further statements that Julian Assange had indicated that Aaron would have used a mechanism such as eBay to obtain payment.

51.    Naturally, Isikoff does not address any of this evidence as he intentionally or recklessly disregards anything that does not fit his preconceived narrative. Instead, Isikoff feigns surprise at Plaintiff's statement and says, "it was never clear" why Plaintiff discussed Aaron, a statement that could only have been made if Issikoff recklessly disregarded information in the public domain at that point, including the numerous statements of Wheeler that Aaron had blocked his investigation.[1] Statements such as these of course make it "very clear" why an investigator would and should take an interest in Aaron.

52.    Isikoff notes simply that Aaron has custody of his brother's computer and

---

[1] Among other things, long before the *Conspiracyland* podcast, Wheeler had appeared on another Internet podcast, Crowdsourcethetruth, and had publicly stated that Aaron was preventing investigation of what Wheeler termed "door number 3"—anything to do with Seth Rich's work at the DNC, where of course, it is alleged emails were downloaded by Seth. See https://video.search.yahoo.com/search/video?fr=mcafee&p=Crowdsource+the+Truth+Rod+wheeler#id=1&vid=026be6d2f1434e4733f0d4d1fc9344be&action=view.

that his computer was submitted to the police for analysis, but does not address or

question the timeline of Aaron's surrender of the computer or Aaron's control over his

brother's email accounts.

53.     Isikoff continues that the "cops found nothing on that computer or anything

else tying Seth's murder to his job at the DNC." Isikoff here willfully omits any mention

of the claims reported by Sy Hersh that, precisely, the DC police had not been able to

access Seth's computer and had instead requested assistance from the cyber unit at the

FBI.

54.     "As for the money flow in to Aaron's account," the basis for that was

"completely mysterious," claims Isikoff, ignoring the evidence described above, which

make it anything but mysterious that a serious investigation would explore every aspect

of Aaron's finances, including any use of cryptocurrency, another point that, naturally,

Isikoff fails to address. Isikoff's goal is clear and basic—to convey to his reader the false

and defamatory impression that Couch is simply lying.

**ISIKOFF USES AND COLLABORATES WITH AARON'S ATTORNEY AND
AGENT TO SMEAR AND DEFAME PLAINTIFF**

55.     To drive home this point, Isikoff immediately introduces, at approximately

the 13:56 mark of Episode 6, Aaron's lawyer, Meryl Governski, to address what Isikoff

labels the "bomb" that Aaron was getting money from Wikileaks.  Naturally, Defendant

does not offer any caveats about the reliability of an interested party – counsel for

plaintiff in a pending lawsuit – pontificating about "truth" but instead presents

Governski's comments "straight," adopting her voice as his own, and cutting

- 18 -

immediately to Governski stating, falsely, that "there is no factual place" the claims

concerning Aaron's receipt of funds are coming from, and that it is a "contrived story."

56.   Without any qualifications other than introducing Governski as Aaron's

lawyer who has just filed a defamation lawsuit, Isikoff elicits a series of categorical

statements from Governski ***presented not as allegations in a complaint, but as the***

***Truth***. These statements, which Isikoff never questions or challenges in any way and

presents as "factual," are what Ms. Governksi labels the key "lies" made by Plaintiff:

    **e.**        that Aaron worked with Seth to download materials from the DNC;

    **f.**       ·that Aaron personally received money from Wikileaks in exchange for this

        data;

    **g.**        that Aaron is covering up his role in downloading DNC data; and, most

        explosively,

    **h.**        that Aaron is covering up his role in the murder of his brother.

57.   At no point does Isikoff alert his listeners that the claims being made by

Governski are merely allegations in a complaint that, by definition, have not been proven

to be true and cannot be "lies." Rather, ***Isikoff presents Governski's allegations as being***

***themselves factual, already established as true, which is false***.

58.   It is false to state as a fact that Couch is ***lying*** that Aaron worked with Seth

to download materials.  Plaintiff had suggested a "possibility" (which he had and has a

good faith basis to ***believe*** to be true) that Aaron had worked with his brother, Seth, in

downloading emails, ***but he had never asserted as true that which he knew to be false,***

***which is the definition of a lie***. To assert that Couch "lied" about whether Aaron worked

with Seth in downloading emails is, thus, itself a defamatory lie, since it is a knowingly

false statement about what Couch had actually asserted (there is a possibility).

59.     The same is true for Governski's assertion that Couch is "lying" that Aaron

received money or covered up his role in downloading DNC data. With respect to

receiving money, Couch was simply repeating what he believed and believes to be a true

statement, that Aaron received money in his account.

60.     Stating that he is "lying" implies that Isikoff **_knew_**, at the time he made his

statements, that **_Couch knew_** his statements were false, a claim for which there is zero

evidence and which is, therefore, itself a defamatory lie.

61.     Similarly, with respect to the assertion that Aaron was involved in a cover-

up of his role in downloading DNC information, Couch actually stated, based on Aaron's

stated refused to cooperate with him in his investigation, that Aaron was "blocking his

investigation."

62.     Governski may believe that Aaron has every right to "block Couch's

investigation" but it is a flat lie to claim that **_Couch_** is lying when he simply reports

factually his own experience.

63.     Again, Isikoff is endorsing and adopting lies about Couch that are

evidence-free assertions Couch is lying, consciously stating what he knows to be false.

Isikoff's lies are all the more egregious in that he never interviewed Plaintiff and has no

reasonable basis to make any claims about Plaintiff's subjective mental state.

64.     Finally, Isikoff adopts and endorses one of the most vicious and vile lies

spouted by Governski: that Couch has "lied" that Aaron is covering up his role in his

brother's murder.

65.   **_But Couch has never stated that Aaron was covering up his role in his_**
**_brother's murder_**. This is a complete fabrication, and obviously highly damaging to
Couch's reputation, painting him as monster who is falsely implying that Aaron
participated in killing his own brother and then covered up this involvement. Isikoff knew
or was reckless in not doing minimal due diligence to know that Couch never made any
such statement and was being grossly, unfairly and viciously slandered with such an
accusation.

66.   To make it crystal clear that Isikoff is endorsing and adopting Governski's
statements, Isikoff immediately states that "the lies" – not the claims, the assertions, the
allegations, but what he is presenting factually to his audience as knowing falsehoods –
were amplified by Periscope, which Governski, to the approval of Isikoff states was
"spreading lies."

67.   Isikoff then states that Matt Couch "twisted" the "special occasion" of
Aaron's wedding by posting a public photo of Aaron and Seth standing together at
Aaron's wedding.  Governski adds that by stating in connection with the photo of Aaron
and Seth together that "the apple doesn't fall far from the tree" Couch was "spreading
lies" about Aaron and "perverting" the photograph with "lies.  This is itself an obvious
lie.  The statement "the apple doesn't fall far from the tree" is perfectly true and apt as a
description of the relationship between Seth and Aaron.

68.   To the extent Couch is suggesting that Aaron worked with Seth in
downloading DNC emails, this cannot be a lie – which Isikoff knows or should know.

- 21 -

First a ***suggestion***, by definition, cannot be a lie and it is a lie to state the contrary.

Second, as discussed above, Couch had and has a reasonable belief that it was possible

Aaron worked with his brother in downloading Wikileaks data.

69.     It is impossible for Couch to "lie" given his beliefs. Isikoff had absolutely

no basis for accepting and endorsing – which he did by adopting the "lie" smear as his

own.

70.     Isikoff by his own admission failed to interview Couch and thus cannot

have any basis for accepting, endorsing or making any statements that Couch was "lying"

about Aaron's role in downloading DNC data.

71.     Instead of acting as a journalist, Isikoff continues to behave as an apologist

for Aaron, falsely telling his viewers that, faced with Couch's statements, Aaron

attempted to "reason" with Couch in sending him a "cease and desist" letter. Isikoff has

read this letter and knows it cannot, under any view, be construed as an attempt to

"reason" or "plead" with Couch, as Isikoff falsely states.

72.     In fact, Isikoff knows perfectly well that the purpose of the letter was not to

"reason" with Couch, but to establish the predicate for a lawsuit by Aaron and/or bully

and browbeat Couch into silence.

73.     Then, rather than factually presenting Plaintiff's response to Aaron's

attempt at intimidation, Issikoff characterizes Couch as "contemptuous," which itself a

knowing slur as there was nothing remotely "contemptuous" in Couch's public comments

on Aaron's letter.  Of course, Isikoff knows this, but he is not interested in accuracy, he is

interested in advocacy and his goal is to engage in character assassination of Couch that

will make the listener less likely to recognize the obvious smears orchestrated together

with Governski, attributing malicious intent to "lie" to Couch without any evidence or

basis.

74.     To further damage Couch's image, at approximately the 16:24 mark, Isikoff

uses the loaded term "confederate" to describe one of Couch's colleagues. This is a

blatant attempt to link Couch, without any basis, to the white nationalist or racist

tendencies perceived in the Southern nostalgia for the "confederacy"—a particularly

loaded term in post-Charlottesville America.

75.     Listeners of the podcast are expected to understand that Couch is an evil,

racist, white nationalist because he does not accept Aaron's "reasoning"—which simply

consists in the endless repetition of the same falsehood, that Couch is "spreading lies"

and "false conspiracy theories about Seth Rich" when in fact Aaron knows of evidence

supporting the view that Seth was in communication with Wikileaks.

76.     This makes Aaron's own letter false and defamatory, if not when it was

first communicated by Aaron, certainly when it is republished and rebroadcast by Isikoff.

77.     Aaron's "reasoning" – which Isikofff knows to be nothing of the sort –

consists primarily of attacks on Couch as "ridiculous and offensive" (statements

rebroadcast by Isikoff at approximately the 17-minute mark of the podcast). Then to

minimize the seriousness of the lie Issikoff has just spread about Couch, namely that

Couch claimed Aaron was covering up his role in the killing of his own brother, Isikoff

dismisses as "sidekick banter" Couch's clear rejection of any implication that he or

anyone associated with him had ever suggested that Aaron participated in killing his

brother.

78.     Isikoff knew, when he approvingly adopted as his own Governski's slander

of Couch, that Couch had not claimed and would deny ever having claimed that Aaron

killed, participated in killing his brother or covered up his role in killing Seth.

79.     Isikoff makes clear that it is he who has utter contempt for Couch and

disparages him as an "Internet troll," a knowingly slanderous falsehood.  According to a

widely cited source, "An Internet troll is a member of an online social community who

deliberately tries to disrupt, attack, offend or generally cause trouble within the

community."  See https://www.lifewire.com/types-of-internet-trolls-

3485894#:~:text=An%20Internet%20troll%20is%20a%20member%20of%20an,all%20o

ver%20the%20Internet%20%E2%80%94%20on%20message%20boards%2C.

80.     Isikoff knows, to quote Governski, that "there is no factual place" where

this slur is coming from. Couch is an independent investigator and journalist and

publisher of a conservative blog, the DC Patriot. Even if Isikoff disagrees with the

content of the DC Patriot, it is defamatory to label this content the work of a "troll."

81.     Isikoff is simply besmirching Couch because he thinks he can get away

with it and because it furthers his narrative as to the nature of those who would question

the establishment narrative he is so invested in preserving and protecting.

82.     As would be "support" for his smear job, Isikoff then gives the floor back

to Governski who again baselessly claims that Couch has "invented" a story and

"concocted" a narrative when she, as the lawyer for Aaron, knows perfectly well that it is

utterly false to assert that Couch has "invented" or "concocted" anything.

83.     In one of the more bizarre moments of Episode 6 Isikoff then, with an evident tone of disgust, asserts that Couch is seeking "money" and "fundraising off Aaron's letter" when Couch has transparently stated that his investigation is 100% Crowdfunded. Isikoff's smear is intended to harm and has the direct effect of harming and limiting Couch's ability to use crowdfunding – a perfectly legitimate mode of fundraising – for any further investigation.

84.     By interfering with Couch's business and source of funding, Isikoff betrays his real purpose—to silence Couch and anyone like him dissatisfied with the "botched robbery theory" of Seth Rich's murder and the Brennan Conspiracy Theory promoted by Isikoff.

85.     Isikoff and Governski expressly seek to interfere with Couch's business, disparaging his sale of "America First Media" t-shirts, which of course Couch has every right to sell, as though it were somehow illicit to use legitimate fundraising and business techniques to finance an investigation in the public interest.

86.     Isikoff makes clear his horror at and intent to interfere with Couch's sale of t-shirts, by asking Governski with a tone of shocked incredulity, "Let me get this straight, they are fundraising off the letter?" Governski responds in the affirmative and then states that Couch has raised "tens of thousands" of dollars to fund "so-called" investigations, a disparaging and defamatory characterizing of Couch's professional work against which Isikoff does not push back in the slightest, but instead adopts as entirely his own, blessing one final smear from Governski who again, without any evidence, falsely states that Couch is using the funds raised to further a "fake contrived narrative" he and his team

have "created."

87.    To make clear where his sympathies lie and to leave no doubt that

Governski was speaking as Aaron's agent in publicly defaming and smearing Couch,

immediately after Governski concludes her final false peroration, Defendant Isikof

introduced Aaron, who states, at the 19:11 mark of the Episode, "it's been infurating, it's

been devastating . . . why do you feel the need to do this." Although the "it" and the

"this' in Aaron's language is not explicitly stated, in context it is clear that he is referring

to what Governski has just referred to Couch's as "spreading" of "lies" and furthering a

"fake contrived narrative" that Couch has allegedly "created," which everyone involved

here – Governski, Aaron and Isikoff – knew to be false.

88.    Rich's  statement is all the more shocking in that, Isikoff and Governski

know perfectly well that the links between his brother and Wikileaks have not been

"created" or "contrived" or "concocted" and certainly not ***by Couch*** but are based in part

on evidence of which Aaron has long been aware, among other things that a Pulitzer

Prize winning journalist stated that he "knew" information about Seth Rich that "came

off" an "FBI report" and stated that Seth Rich had transmitted emails to Wikileaks and

requested payment in exchange.

89.    While giving Aaron a public platform to present his case to a jury pool he

hopes to precondition to view his perspective favorably, Isikoff carries water for Aaron's

case by saying, falsely, that "Aaron is a private person," a statement the purpose of which

is to provide greater protection for Aaron in his lawsuit against Couch. Isikoff goes

further and both lies about Couch and attempts to damage his business by asking Aaron

rhetorically what it is like to have Couch "raising money off his brother's murder."

90.   Isikoff's questions contains an utterly false premise. Isikoff knows that

Aaron himself has set up a GoFundMe account to raise funds to investigate his brother's

murder, but he does not accuse Mr. Rich of "raising money off his brother's murder"

because such a charge would be ridiculous.  Isikoff hopes the listener will not grasp the

absurdity of his attack on Couch because of the relentless barrage of slurs and lies to

which the listener has been subjected by the 19'30 mark in the episode.

91.   Isikoff allows Aaron to slander Couch by saying that he is "profiting" off

lies about him and his family. Even taking Governski's claim that Couch had raised tens

of thousands of dollars for a multi-year investigation at face value, this generates no more

"profit" than Rich's own GoFundMe campaign, which, on information and belief, has

raised a similar amount, including from those like Couch, who believe that Seth Rich was

a patriot seeking to call out racism, anti-semitism, sexism, bigotry and anti-Bernie

Sanders bias—all of which were on display in the leaked DNC data published by

Wikileaks. Isikoff knows or should know, moreover, that raising $30,000 for full-time

investigatory work is insufficient to even cover basic expenses and cannot possibly

generate a "profit."

**ISIKOFF USES AND COLLABORATES WITH DEBORAH SINES TO SMEAR
AND DEFAME PLAINTIFF**

92.   Isikoff continues his relentless hatchet job by introducing Deborah Sines,

the Assistant U.S. Attorney responsible for the Seth Rich murder investigation, to lend

support to the lies that were spread by Governski and adopted by Isikoff, that Couch is

responsible for stating that Aaron killed his brother or participated in the killing.

- 27 -

93.     Sines knew or should have known that Couch never made any such statements, but she nonetheless states, to the audibly beaming Isikoff, "You try asking a decedent's brother, did you kill your brother" and "did you have anything to do with his murder" "are you the one that set this up" "it's horrible, it's awful." In context, the only person who is alleged to have made comments that would lead Sines to feel the need to make the foregoing statements is Couch.

94.     Sines not only freely made these statements, but Isikoff gave her every opportunity to review and confirm her statements and their placement in his hatchet job on Couch and she knew and intended that she was supporting and furthering the baseless lie that Couch has supposedly accused Aaron of killing his brother and/or participating in the murder—an utterly shameful attack designed to permanently discredit Couch and prevent him from ever reaching a broad audience regardless of what his investigation would find.

95.     That Sines, who knew perfectly well what Couch had actually said, would voluntarily appear on Defendants' podcast to smear Couch and reveal grand jury questions is shocking. But Isikoff's hatred for Couch is so extreme that he even encourages Aaron, who has less reason than Sines to understand the rules and potential penalties for violating grand jury secrecy rules, to violate these rules and disclose that he had been asked during the grand jury proceedings about his alleged role in killing Seth. Isikoff, Governski, Sines and Aaron all lay the most extreme allegations about Aaron's conduct at the door of Plaintiff Couch, whom they believe they can demean, degrade, disgrace, humiliate, smear, and defame with impunity.

96.     To make unmistakable that the allegations and the smears – including that

Aaron had been publicly attacked as having murdered his own brother – concerned

Couch and no-one else, Isikoff pointedly asks Aaron, at approximately the 20'50 mark,

"you have to go in there [to the grand jury] and she has to ask you question by question

about what Matt Couch had been saying?"

97.     Sines publicly stated that the question she asked Aaron – which came from

a lie about Couch she spread jointly with Aaron, Governski and Isikoff – "did you murder

your brother?" was "horrible" and "awful."

98.     But at this point, giving the intensity of Isikoff's slanderous attacks, the

*Conspiracyland* listener has no doubt that the Internet troll from the Ozark mountains in

Arkansas, the ex-sales manager turned conspiracy entrepreneur, is himself a thoroughly

"horrible" and "awful" person who has been peddling the despicable claim, which all the

participants in the podcast know to be false and lacking any factual basis, that Aaron

murdered his own brother.

99.     Incredibly, Aaron admits that the hell he is putting Couch through with his

lies stems from the fact that Aaron perceives any inquiry into his brother's and his own

connections to Wikileaks to be worse than his brother's death itself, a horrible admission

Aaron publicly makes in Episode 6: "you would think the day your brother is killed is the

worst day of your life but it can actually go downhill from there." According to Aaron,

facing inquiry into his role in leaking emails to Wikileaks is worse than the death of his

own brother—a truly shocking statement.

100.    After setting forth all the lies about Couch that he, Governski, Aaron and

Sines can conjure forth, Defendant Isikof frames Couch's conduct as a "vicious new

turn" resulting from social media "attacks" on family members—the implication being

that Couch has "viciously attacked" Aaron, an absurd theory that would prevent any

reporter from pursuing any story that reflected negatively on anyone, regardless of truth.

101.    Isikoff then gives the floor to Anna Merlan, an academic conspiracy

theorist, who states, to the approbation of Isikoff, that there is a conspiracy "cottage

industry" "devoted to hounding people" who have lost loved ones in violent ways.

Aaron, according to Ms. Merlan, was a "very unique" example of this trend.

102.    By juxtaposing Ms. Merlan's statement that members of the conspiracy

cottage industry are "hounding" people with the previous attacks on Couch, Isikoff is

asserting, without any evidence, that Couch is guilty of "hounding" Aaron with his

"conspiracy" theories.

## ISIKOFF USES AND COLLABORATES WITH JOE CAPONE TO SMEAR AND DEFAME PLAINTIFF

103.    After collaborating with Governski, Sines and Aaron to slander Plaintiff,

Isikoff then departs completely from reality and credits the wildest claims about Couch

without any independent verification, presenting absurd and vicious claims about

Plaintiff as though they were facts.

104.    Of course, Defendant is uninterested in Couch's reputation or the harm to

his emotional well-being or professional future from being subjected to outrageous lies

because his goal is to thoroughly destroy Plaintiff so that he is never taken seriously by

anyone, regardless of the evidence he uncovers debunking the Brennan Conspiracy

Theory or the "botched robbery" theory of Seth's killing.

105.     Isikoff begins with Joe Capone, the manager of Lou's Bar and Grill, the last

location where witnesses saw Seth alive before the shooting.  Capone takes a real and

true claim made by Plaintiff – that Capone had visited the White House in the days before

Seth Rich's murder – and proceeds to make an outrageous slur against Couch by claiming

falsely that Couch had stated that the purpose of Mr. Capone's visit was to meet with

Hilary Clinton and her team to plan the murder of Seth Rich.

106.     The following exchange illustrates Isikoff's defamation technique, through

which he guides his willing inerlocutors to make false, ridiculous and slanderous claims

that he then adopts and presents as factual to unsuspecting listeners.

> Isikoff (speaking about a visit to the White House several days before the Seth
> Rich murder Capone does not deny making): So your name shows up on the
> [White House] visitors logs and someone saw it. Who saw it and what did they do
> with it?:
> Capone: There's one guy, I'm totally blanking on his name . . . . Matt Couch
> Isikoff: Yup, we know him.
> Capone: He assumes a bunch of things . . .
> Isikoff: What was Matt Couch saying was the significance of the fact that you had
> been to the White House on July 6?
> Capone: That there were secret meetings going on.
> Isikoff: Secret meetings with who?
> Capone: Hilary. . . You know . . .
> Isikoff: That you were conspiring with Hilary Clinton or?
> Capone: Must have been right?
> Isikoff: Or aides to Hilary Clinton?
> Capone: Yeah. . .I've never met Hilary. . I've never seen any of these people.

107.     This entire exchange is based on a total fabrication. Both Isikoff and

Capone know that Couch *never* stated or even suggested that Capone was conspiring

with Hilary Clinton or aides to Hilary Clinton. Isikoff uses leading questions to elicit the

- 31 -

answer he wants, *__knowing these answers to be false, knowing they will harm Couch,__*

*__and knowing they are defamatory__*.

108.   In fact, Isikoff is deliberately injecting one of the wildest conspiracy

theories on the Internet – never promoted by Couch, who has been interested in solving

Seth Rich's murder, not inventing crazy theories with no facts – that Hilary Clinton

personally ordered the assassination of Seth Rich.

109.   According to Isikoff, in an interview with NPR's Steve Inskeep:

> But what we found was that, within three days of that murder, a conspiracy theory
> pops up on an obscure website called whatdoesitmean.com alleging that Rich was
> on his way to talk to the FBI about corruption by the Clintons when he was
> gunned down by a squad of assassins working for Hillary Clinton.

> It turns out that that very same day that that report popped up on this obscure
> website, the Russian SVR - that's its version of the CIA - circulated an intelligence
> bulletin making those exact same claims about Seth Rich. So in short, it was the
> SVR, the Russian intelligence agency, that planted the conspiracy theory about
> Seth Rich from the get-go.

110. Isikoff promotes this bizarre conspiracy theory even though he knows it has

no connection to Plaintiff and even though it based on reporting so shoddy that it was

debunked by the Washington Post, normally friendly to conspiracy theories that paint

their preferred targets as dangerous and crazy Russian agents.

111. By getting Capone to agree with him that Couch had claimed Capone met

with Hilary and/or adies to Hilary to plot the assassination of Seth Rich, Isikoff is

attempting to connect Couch with the wildest theories on the Internet, conveniently,

according to Defendant, promoted by Russia, so that Defendant can insinuate Couch is a

Russian sympathizer in addition to being a Southern "confederate" and Internet "troll."

112. Of course, Defendant Issikof's attack on Matt Couch is based on lies made up out of whole cloth, as Couch has never suggested Hilary Clinton killed Seth Rich or that Capone met with Hilary Clinton or her aides, whether to plan Seth Rich's murder or otherwise.

## ISIKOFF USES AND COLLABORATES WITH MARK MUELLER TO SMEAR AND DEFAME PLAINTIFF

113. The final person Isikoff enlists to smear Couch is Mark Mueller ("Mueller"), the person who came to the scene of Seth's shooting and identified Seth for the police. Mueller makes a series of wild, outrageous claims and, under the guidance of Defendant, connects these claims to Math Couch, falsely asserting that Plaintiff has slandered or attacked him, which both he and Isikoff know to be false.

114. Mueller claims his ex-girlfriend told him to "watch out" because "people" were putting "stuff" about him on the Internet, in Mueller's words, "fake stuff." Isikoff corroborates Mueller's claims by saying "sure enough, Mr. Mueller was soon being linked to "Jeffrey Dahmer, the notorious Milwaukee serial killer." According to Mueller, "they" would take pictures of Jeffrey Dahmer and Dexter and superimpose his face on theirs, in an appalling effort to tarnish Mueller's image. Mueller goes on to state that "they" published all the phone numbers and addresses of his brothers and sisters and him and his neighbors, which he terms "vicious." According to Mr. Mueller, "they" were coming at [me] in various ways, over and over," contacting him through every one of his email accounts and calling him at work and calling him at home on his cell phone.  Here the listener has in the back of his or her mind the previous evocation of Internet "hordes" led or inspired by, or acting with, the omnipresent Couch. Mueller claims that he was so

"freaked out" that he stayed away from his apartment on weekends and did not feel comfortable renting his basement apartment for fear that people who "might be alt-right" would seek access to his house to search his belongings.

115. And as if on cue, Isikoff asks Mueller if he had to take all these precautions "because of. . . Internet trolls. . ." to which Mr. Mueller immediately responds, "people like Matt Couch."

116. Thus, after a serious of anonymous references to "Internet trolls" who have doctored pictures linking him to a serial killer, doxed him, his family and neighbors, and jeopardized his business, Mueller connects all the horrible acts of which he complains to "alt-right" "people like Matt Couch." Indeed, Couch is the **_only_** person mentioned and is made to stand in for all the people who do the horrible, outrageous things Mr. Mueller complains of.

117. The only problem, which both Defendant and Mueller know, is that, **_as applied to Matt Couch, all these statements are complete and total lies_**. Couch never superimposed Mr. Mueller's photo on Jeffrey Dahmer's or Dexter's picture; Couch never doxed Mr. Mueller's family and neighbors; Couch never sought to rent out a room in Mr. Mueller's basement in an attempt to steal documents; Couch is not an "Internet troll" and is not "alt-right." Each and everyone of these statements applied to Couch, the only person named in connection with them, is a lie, which both Isikoff or Mueller know or should know.

118. These baseless accusations have caused Couch to receive death threats, compromised his health, ruined his ability to fundraise, damaged his business and

deprived him of any opportunity of returning to the corporate world, where his reputation

has been tarnished beyond expression by the knowing lies promulgated by Isikoff and

Mueller.

119. At the end of his brutal series of unrelenting attacking on Couch, Isikoff tips

his hand. The reason he has been so extreme, so reckless in his attacks on Couch is

because he believes he can get away with it.

120. Not long before the publication of the *Conspiracyland* podcast, an exhausted

Couch, lacking resources to continue defending himself against the attacks of two of the

largest, most profitable, most aggressive law firms in the country, had asked the judge in

Aaron's case against him to enter summary judgment so that he could be free of the

pressure of big firm litigation, for which he did not have the resources to defend himself,

and offered to "apologize to Aaron."

121. Isikoff clearly smelled blood and believed he could definitively terminate the

prospects of an independent investigator who had just raised the white flag and, Isikoff

wrongly believed, would never find counsel to defend him against Isikoff's smears.

Couch's proposed "apology" was not intended as an admission of wrongdoing or that any

of the lies that had been spread about Couch were true. Rather it was an attempt to

acknowledge that Aaron had suffered following Seth's murder and that Couch was sorry

for anyone's suffering, an admirable sentiment.

122. More importantly, Couch's letter to the judge was an attempt to put an end to

draining litigation that was placing an unsustainable burden on him and would permit

him at least to focus on the Seth Rich murder investigation.

- 35 -

123. Crucially, **_at no time_** did Couch give Isikoff, Governski, Sines, Capone or

Mueller license to fabricate stories about him and spread lies that he claimed Aaron killed

his brother, or asserted Capone had plotted Seth's death with Hilary Clinton, or sought to

link Mueller with Jeffrey Dahmer, to take only the most extreme and outrageous lies that

were made up about Couch.

## ISIKOFF WRAPS UP CONSPIRACY LAND WITH FINAL SMEARS OF COUCH

124. As a coda to his *Conspiracyland* hatchet job, Isikoff joined with the editor in

chief of *Yahoo! News* for one last look at the "dark netherworld of American political

conspiracies" in which Isikoff had left no doubt Couch was claimed to be, falsely, a

central figure. As Isikoff puts it towards the 6 minute mark of the bonus episode to

Episode 6, Couch – whom he again defames as an "Internet conspiracy entrepreneur in

the Ozark mountains of Arkansas," falsely painting a picture of the urban Couch as a

deplorable hillbilly mountain hick, something like a less intelligent version of the

Unabomber – plays a "prominent role" in the "conspiracy theories" Isikoff's podcast is

devoted to attacking.

125. Isikoff is particularly keen to stress Couch's Arkansas roots, both to cause

Couch the maximum damage in his home state and to play on liberal elite prejudices

against what he had previously described as Southern "confederates."

126. Defendant again smears Plaintiff as an Internet "crankster" in Arkansas. A

"crankster" is commonly understood to be someone who is deranged, who rants and raves

in a state of complete delusion. Obviously, for a serious investigator like Couch, who

Isikoff knows or should know publishes his own independent content and runs a blog that

aggregates stories of general interest not covered by the mainstream media, the

"crankster" slur is designed to convey that Couch is crazy, not to be trusted, not serious, a

portrait that has harmed and will continue to harm Couch in his business affairs.

127. Isikoff takes one last opportunity to repeat the most brazen lie about Couch,

that he had stated Aaron was "complicit" in his brother's murder, a lie made at

approximately the 6'40 mark of the bonus episode. According to Isikoff, it is "sickening"

to see the way "people like Matt Couch" operate, hoping to have so thoroughly destroyed

Couch that the listener will feel only disgust for him and reflexively disbelieve anything

he discovers—using vile language that is not only defamatory but also intentionally

destructive of Couch's business in the process.

## NPR REPUBLISHES AND REBROADCASTS ISIKOFF'S LIES

128. Plaintiff repeats and realleges each and every foregoing allegation.

129. On August 8, 2020, Isikoff appeared on the program Fresh Air to be

interviewed by Terry Gross about the defamatory *Conspiracyland* podcast.

130. Isikoff continued his smear campaign against Couch, repeating the lie that

Matt Couch had stated Joe Capone met with aides to Hilary Clinton at the White House

in the days before Seth Rich's murder.

131. Couch is referred to as a representative of the "Internet horde" that is

"hounding" Aaron. The alleged statement by Couch is intended to link Couch to the

most extreme and vicious theories circulating in the backwater of the Internet—that

Hilary Clinton had assassinated or ordered the assassination of Seth Rich.

132. Isikoff knew that Couch had never claimed Joe Capone met with Hilary Clinton or her aides at the White House but irresponsibly repeated this lie anyway.

133. NPR is liable for republishing and broadcasting Isikoff's lies, at the very least because they displayed a reckless disregard for the truth in not subjecting Isikoff's statements to any scrutiny, but blindly repeated his claims without any fact-checking.

134. Particularly in a story about "fake news," harmful lies, and the impact of spreading falsehoods on innocent victims, NPR had a duty to check the veracity of Isikoff's claims before spreading defamatory statements about third parties.

## FIRST CAUSE OF ACTION
## DEFAMATION
### (against all Defendants)

135. Plaintiff restates each and every foregoing allegation.

136. Defendants published multiple defamatory statements of fact, or statements that implied knowledge of verifiable defamatory facts about Plaintiff. Those false statements included, but are not limited to, statements that the Plaintiff:

   a. Lied about Aaron being involved in downloading DNC data;

   b. Lied about Aaron receiving payment in exchange for said data;

   c. Lied about Aaron covering up his role in downloading DNC data;

   d. Lied about Aaron failing to cooperate with private investigators;

   e. Lied about Aaron obstructing the official investigation;

   f. Asserted that Aaron murdered his brother or participated in the murder of his brother or covered up his involvement in the murder of his brother.

g.  Asserted that Joe Capone met with Hilary Clinton or aides to Hilary

Clinton in the days before Seth Rich's murder;

h.  Asserted that Joe Capone plotted Seth Rich's murder/assassination with

Hilary Clinton or aides to Hilary Clinton;

i.  "Doxxed" Mark Mueller by publishing the addresses and phone

numbers of his siblings and neighbors;

j.  Superimposed Mr. Mueller's head on pictures of serial killer Jeffrey

Dahmer and Dexter;

k.  Sought to rent out Mr. Mueller's basement room to gain access to

documents relating to Seth Rich

l.  Was an Internet "conspiracy entrepreneur;"

m.  Was an "Internet troll;"

n.  Was an "Internet crankster;"

o.  Was an "Internet bully;"

p.  Was a member of the "alt-right;"

q.  Was an associate of a Southern "confederate."

137. In publishing the statements, Defendants acted with knowledge of the falsity

of their statements, or with reckless disregard for the truth of their statements.

138. Defendants' statements have had, and continue to have, an injurious and

defamatory effect on Plaintiff's mental, physical and emotional health, professional

reputation and activities, business opportunities, and finances. Defendants' statements are

particularly harmful because Plaintiff is a journalist and an independent investigator and

the smears, slurs and lies to which he has been subject have had and will continue to have a deleterious effect on his ability to develop his journalism and investigatory business.

139. Defendants cooperated among themselves to publish the false and defamatory statements by, among other acts, republishing and adopting the defamations of their codefendants. Each Defendant is jointly and severally liable for the torts of the other Defendants.

140. Aaron is liable for the defamatory statements made by his counsel and agent, Meryl Governski, for and on his behalf.

141. Defendant Verizon Communications is liable for the defamatory statements made on the Yahoo News *Conspiracyland* podcast because it directed Isikoff to make the *Conspiracyland* podcast to increase its profits, approved, endorsed and financed the podcast, and is the publisher of the content in the podcast and that appears through Yahoo! News and its "Skulduggery" division, and knew of and endorsed the false statements about Couch made on the podcast.

142. As a direct and proximate cause of Defendants' defamatory statements, Plaintiff has suffered and continues to suffer compensable and pecuniary damages

### SECOND CAUSE OF ACTION
### DEFAMATION PER SE
### (Against all Defendants)

143. Plaintiff repeats and realleges each and every foregoing statement.

144. Defendants' statements about Plaintiff constitute defamation per se because they falsely asserted, or implied, that Plaintiff has committed crimes for which he can be

criminally indicted and convicted, including falsely accusing a person of murder, illegally

stealing and publishing personal information, and attempted burglary.

145. Defendants made and published statements of fact, or statements that implied

knowledge of verifiable defamatory facts about Plaintiff.

146. Defendants knew at the time the defamatory statements were published that

the statements were false, or at minimum  recklessly ignored evidence establishing the

falsity of the statements.

147. Defendants' statements have had, and continue to have, an injurious and

defamatory effect on Plaintiff's emotional, mental and physical health, professional

reputation and activities, finances, and business opportunities. Defendants' statements are

particularly harmful because Plaintiff is a journalist and an independent investigator and

the smears, slurs and lies to which he has been subject have had and will continue to have

a deleterious effect on his ability to develop his journalism and investigatory business.

148. Defendants cooperated among themselves to publish the false and

defamatory statements by, among other acts, republishing and adopting the defamations

of their codefendants. Each Defendant is jointly and severally liable for the torts of the

other Defendants.

149. As a direct and proximate cause of Defendants' defamatory statements,

Plaintiff has suffered and continues to suffer compensable and pecuniary damages.

### THIRD CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against all Defendants)

150. Plaintiff repeats and realleges each and every foregoing allegation

151. Defendants conduct was extreme and outrageous and goes beyond all possible bounds of decency and are utterly intolerable in a civilized community. They knowingly, or at a minimum recklessly, spread false statements about Plaintiff as detailed above, with actual knowledge of the falsity of the statements and the emotional harm such statements were causing Plaintiff.

152. The Defendants were on notice that Plaintiff was in an extraordinarily vulnerable condition given the relentless litigation to which he had been subjected and his willingness to issue an apology when they knew he had done nothing wrong. Yet notwithstanding this knowledge, Defendants continued their campaign to attack, besmirch, degrade and humiliate Plaintiff with the most outlandish and false claims, including that he had accused Aaron of murder, had published photographs of Mark Mueller as Jeffrey Dahmer and Dexter and has claimed that the manager of a local D.C. bar had met with Hilary Clinton and her aides to plot the assassination of Seth Rich, wild claims that were associated with Russian agents and "alt-right trolls" insinuating that Plaintiff was a white supremacist and a traitor to the United States.

153. Defendants acted intentionally to cause, or at the very least acted with reckless disregard of the probability that their behavior would cause, Plaintiff to suffer severe emotional distress.

154. As a direct and proximate result of the Defendants' statements, Plaintiff has suffered severe emotional distress, heart disease, continuous mental anguish, anxiety, and fear for his professional, personal, and physical security and severe emotional anguish for from the vicious claims that, among other things, he had accused Aaron of murder,

claimed that Capone was conspiring with Hilary Clinton, attempted burglary, doxed

Mueller's family members and superimposed Mueller's face on the body of a serial killer.

Defendants outrageous conduct would cause severe emotional harm to an ordinary person

and even more so to a person in Plaintiff's unique circumstance.

155. Defendants cooperated among themselves to intentionally inflict emotional

distress by, among other acts, publishing false and defamatory statements and

republishing and adopting the defamations of their codefendants. Each Defendant is

jointly and severally liable for the torts of the other Defendants.

156. As a direct and proximate cause of Defendants' defamatory statements,

Plaintiff has suffered and continues to suffer compensable and pecuniary damages.

### FOURTH CAUSE OF ACTION
### FALSE LIGHT
#### (Against all Defendants)

157. Plaintiff repeats and realleges each and every foregoing statement.

158. Defendants publicized false statements of and concerning Plaintiff that

placed him in a false light by falsely attributing to him all of the conduct recited above.

Defendants knew that the facts, representations, or imputations publicized about Plaintiff,

were false, or at a minimum, Defendant's published them with reckless disregard for the

truth of those facts. The repeated and continuous publication of false facts, derogatory

and demeaning innuendo, and misrepresentations about Plaintiff placed him in a false

light that would be highly offensive to a reasonable person.

- 43 -

159. As a direct and proximate cause of Defendants' defamatory statements, Plaintiff has suffered reputational and emotional harm.

## FIFTH CAUSE OF ACTION
## CIVIL CONSPIRACY FOR ALL ALLEGED TORTS
### (Against all Defendants)

160. Plaintiff repeats and realleges each and every foregoing allegation.

161. All Defendants agreed to intentionally and maliciously participate in a civil conspiracy amongst themselves, and with other individuals, by their participation in a common conspiracy to defame through Episode 6 of *Conspiracyland*, the purpose of which was to commit the torts of: Defamation; Defamation Per Se; Intentional Infliction of Emotional Distress; and False Light against Plaintiff.

162. Defendants participated in a hub and spoke conspiracy in which Defendants Isikoff and Verizon were the hub and each of the other Defendant was a spoke, and all Defendants sought the common goal of slandering and besmirching Couch and others who threatened a political narrative in which Defendants were all, to differing degrees, invested.

163. Isikoff and Verizon conspired with Governski to repeat, endorse, adopt and republish the lies affirmed by Governski as the agent for Aaron. Isikoff and Verizon conspired with Sines to repeat, endorse, adopt and republish the lies affirmed by Sines. Issikof and Verizon conspired with Capone to repeat, endorse, adopt and publish the lies affirmed by Capone. Isikoff and Verizon conspired with Mueller to repeat, endorse, adopt and publish the lies affirmed by Mueller.

164. NPR conspired with all remaining Defendants by providing them with a further national broadcast with an even greater reach than *Conspiracyland* itself to promote their lies about Couch.

165. Throughout the course of the conspiracy, the Defendants, acting in concert, coordinated in furtherance of a common scheme to smear, disparage and defame Plaintiff.

166. Each Defendant is jointly and severally liable for the torts of the other members of the conspiracy which were committed in furtherance of the common scheme.

167. As a result of Defendants' conspiracy, Plaintiff suffered professional, reputational, and emotional harm, as outlined in the previous causes of action.

## SIXTH CAUSE OF ACTION
## AIDING AND ABETTING FOR ALL ALLEGED TORTS
### (Against all Defendants)

168. Plaintiff repeats and realleges each and every foregoing allegation.

169. Defendants Rich, Sines, Capone and Mueller aided and abetted Defendants Isikoff and Verizon in committing tortious acts, including Defamation, Defamation Per Se, Intentional Infliction of Emotional Distress, False Light, and Invasion of Privacy, by, among other things, providing Isikoff and Verizon with sensational and false lies to be used in the *Conspiracyland* smear campaign. Defendants Rich, Sines, Mueller and Capone's knowingly and with full awareness substantially aided the wrongful conduct of Isikoff and Verizon.

170. Defendants Isikoff and Verizon aided and abetted Defendants Rich, Sines, Capone and Mueller in committing tortious acts, including Defamation, Defamation Per

Se, Intentional Infliction of Emotional Distress and False Light by providing Rich, Sines, Capone and Mueller a platform with a national reach on which to disseminate their attacks on and lies about Plaintiff. Defendants Isikoff and Verizon knowingly and with full awareness substantially aided the wrongful conduct of Rich, Sines, Mueller and Capone.

171. NPR aided and abetted all other Defendants by providing them with a further national broadcast with an even greater reach that *Conspiracyland* itself to promote their lies about Couch.

172. As a result of the Defendants' aiding and abetting the commission of the above-mentioned torts, Plaintiff suffered professional, reputational, and emotional harm, as outlined in the previous causes of action.

## SEVENTH CAUSE OF ACTION
## INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS
### (Against all Defendants)

173. Plaintiff repeats and realleges each and every foregoing allegation.

174. Defendants all knew that Plaintiff is a journalist and an independent investigator and that spreading smears, slurs, and lies about Plaintiff would damage his business relations with sources of funding, investigative colleagues, and journalistic contributors, among others.

175. Defendants intentionally and improperly interfered with Plaintiff's relationship with his sources of funding and contributors, among others, knowingly spreading lies about Plaintiff that would cause reasonable people to fear association with a "sickening" individual such as Plaintiff.

176. Plaintiff suffered significant damage as a result of Defendants' interference with his business relations.

177. Defendants engaged in conduct that was wanton and in reckless and knowing disregard of Plaintiff's rights.

## EIGHTH CAUES OF ACTION
### NEGLIGENT SUPERVISION AND RETENTION
### (Against Verizon and NPR)

178. Plaintiff repeats and realleges each and every foregoing allegation.

179. Isikoff is the Chief Investigative Journalist for *Yahoo! News*, which is wholly-owned by Verizon and, therefore, Isikoff and Verizon have an employer-employee relationship.

180. Verizon knew or should have known of the tortious propensities of Isikoff prior to his tortious conduct with respect to Plaintiff because Isikoff's role in the dissemination of the Trump Russia hoax and the Brennan Conspiracy Theory had been widely publicized by the time of Isikoff's *Conspiracyland* podcast. An employer using minimum due diligence would have known that Isikoff is not an "investigative" reporter, but a stenographer indifferent to truth and falsity, who simply repeats what his preferred sources tell him, regardless of the financial, emotional and professional consequences to innocent third parties.

181. Isikoff engaged in tortious conduct against Plaintiff on Verizon's premises and/or using property of Verizon.

182. In the alternative to Verizon's vicarious liability for its employees' and/or agents' intentional torts against Plaintiff, Verizon is directly liable for its negligent supervision and/or retention of Isikoff.

183. Plaintiff is entitled to damages as a result of Verizon's negligent supervision and/or retention of Isikoff.

184. Terry Gross is the host of the popular radio show Fresh Air that appears on NPR and, on information and belief, has an employee/employer relationship with NPR.

185. NPR is aware that Terry Gross invites guests onto her show who may make claims that harm the reputation and livelihoods of innocent parties.

186. Even if Terry Gross is not a direct employee of NPR but is an independent contractor, it was reasonably foreseeable that an interview format in which a partisan reporter would appear on Fresh Air and repeat sensational allegations made on a separate program could lead to the repetition, republication and rebroadcasting of defamatory statements made on the separate program.

187. NPR had a duty to supervise Terry Gross to ensure that guests who appear on her show are not free to make up or repeat lies that damage the well-being, reputation and livelihood of innocent parties.

188. Isikoff is notorious for his highly partisan views and his hatred of Donald Trump. A company such as NPR that operates with public funding has a heightened duty to ensure that political partisans do not use its facilities and allocated spectrum to spread lies about innocent third parties.

189. NPR breached its duty to supervise Terry Gross by failing to perform any oversight or due diligence on the *Conspiracyland* podcast, failing to cite check any of the most outrageous claims, including the false and absurd claim that Couch had accused Joe Capone of meeting with Hilary Clinton's aides in the days before Seth Rich's murder and permitting Terry Gross to give Isikoff a new platform to disseminate his hurtful and made-up attacks on Couch.

190. Plaintiff is entitled to damages as a result of NPR's negligent supervision of Couch.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief against all Defendants, jointly and severally, as follows:

a) An award against all Defendants to compensate for all economic damages sustained as a result of their tortious conduct in an amount to be determined at trial, but estimated to be no less than $15,000,000;

b) An award against all Defendants to compensate for all presumed and actual reputational damages sustained as result of their tortious conduct in an amount to be determined at trial, but estimated to be no less than $25,000,000;

c) An award against all Defendants to compensate for all presumed and actual

damages resulting from mental anguish and emotional distress sustained as a result of

their tortious conduct in an amount to be determined at trial but estimated to be no less

than $35,000,000;

d) An award against all Defendants for an award of punitive damages;

e) Attorney's fees and costs;

f) Injunctive relief, including but not limited to the removal of the false and

defamatory materials from any websites, podcasts or publications over which Defendants

have control.

g) Any and all other relief that the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a jury trial on all issues on all issues of fact and damages

stated herein.

Dated: August 6, 2020

By:  /s/ Eden P. Quainton
       EDEN P. QUAINTON

QUAINTON LAW PLLC
1001 Avenue of the Americas, 11th Fl.
New York, NY 10018
Tel: 212-813-8389
equainton@gmail.com

- 50 -