## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

<table>
<tr><td>

Matthew Couch,

   Plaintiff,

v.

Verizon Communications, Inc.,
Michael Isikoff,
National Public Radio, Inc.,
Aaron Rich,
Deborah Sines,
Joe Capone,
and
Mark Mueller,

   Defendants.

</td><td>

Case No. 20-cv-02151-RJL


<u>Oral Argument Requested</u>

</td></tr>
</table>

## <u>OPPOSITION TO MOTIONS TO DISMISS UNDER RULE 12(b)(5) AND 12(b)(6) AND CONSENT TO MOTION TO TAKE JUDICIAL NOTICE OF DEFENDANTS VERIZON COMMUNICATIONS, INC., AND MICHAEL ISIKOFF</u>

EDEN P. QUAINTON, ESQ. (DC Bar No. NY0318)
DUNNINGTON, BARTHOLOW & MILLER LLP
230 Park Avenue, 21st Floor
New York, New York 10169
Tel: (212) 682-8811
Fax: (212) 661-7769
E-mail: equainton@dunnington.com
*Attorneys for Plaintiff Matthew Couch*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT……………………………………………………………………1

STATEMENT OF FACTS……………………………………………………………………..3

STANDARD OF REVIEW……………………………………………………………………6

ARGUMENT…………………………………………………………………………………7

I.  DEFENDANTS WRONGLY ASSERT THAT SEVERAL OF THE IMPLICATIONS OF ISIKOFF'S STATEMENTS ARE NOT REASONABLE AS A MATTER OF LAW……...7

II.  THE ISIKOFF COMMENTS ARE NOT PROTECTED BY THE FAIR COMMENT DOCTRINE…………………………………………………………………………...14

III.  THE DEFAMATORY STATEMENTS CONTAIN VERIFIABLE STATEMENTS OF FACT…………………………………………………………………………….....18

IV.  THE DEFAMATORY STATEMENTS ARE NOT PROTECTED HYPERBOLE……...20

V.  DEFENDANTS' CLAIMS OF SUBSTANTIAL TRUTH ARE WRONG AND IN ANY EVENT UNRIPE FOR ADJUDICATION AT THE MOTION TO DISMISS STAGE………...21

VI.  THE STATEMENTS DEFENDANTS CLAIM LACK DEFAMATORY MEANING ARE IN FACT CENTRAL TO DEFENDANTS' DEFAMATORY, EVIDENCE-FREE, SMEARS…………………………………………………………………………...24

VII.  THE COURT SHOULD REJECT DEFENDANTS' ACTUAL MALICE ARGUMENTS. ……………………………………………………………………………………26

    A.  Plaintiff Adequately Alleges Actual Malice…………………………………………26

    B.  Plaintiff's Pleadings are Sufficient to Raise an Inference of Actual Malice………...27

    C.  If There is Any Doubt as to Sufficiency of the Allegations of Actual Malice, Plaintiff Should be Entitled to Submit an Amended Pleading………………………………..34

VIII.  PLAINTIFF'S ADDITIONAL CLAIMS DO NOT FAIL………………………………37

    A.  Intentional Infliction of Emotional Distress, False Light, Tortious Interference with Business Relations………………………………………………………………...37

    B.  Conspiracy, Aiding and Abetting, Negligent Supervision…………………………...38

        1.  Conspiracy…………………………………………………………………...38

2.  Aiding and Abetting……………………………………………………......40

3.  Negligent Supervision………………………………………………………..40

IX.    TO THE EXTENTTHERE IS A CORPORATE ENTITY OTHER THAN VERIZON
THAT IS RESPONSIBLE FOR THE CONDUCT OF DEFENDANT ISIKOFF, PLAINTIFF
SHOULD BE ENTITLED TO SUBMIT AN AMENDED PLEADING WITH THE PROPER
DEFENDANT RELATING BACK TO THE FILING OF THE COMPLAINT………………..41

X.    PLAINTIFF INCORPORATES BY REFERENCE HIS OPPOSITION TO THE 12(B)(5)
MOTION FILED BY DEFENDANT NPR……………………………………………………..42

XI.    PLAINTIFF HAS NO OBJECTION TO DEFENDANTS' MATERIALS PROFFERED
FOR JUDICIAL NOTICE AND ASKS THE COURT TO CONSIDER THE SIMILAR
MATERIALS HE HAS SUBMITTED…………………………………………………………42

CONCLUSION………………………………………………………………………………..43

# **TABLE OF AUTHORITIES**

Page(s)

FEDERAL CASES

*Alford v. Wang, Inc.*,
    11 F. Supp. 3d 584 (D.S.C. 2014) ....................................................................... 19

*Arpaio v. Zucker*,
    414 F. Supp. 3d 84 (D.D.C. 2019) ...................................................................... 23

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).............................................................................................6

*Bayatfshar v. Aeronautical Radio, Inc.*,
    934 F. Supp. 2d 138 (D.D.C. 2013) ............................................................... 41, 42

*Boley v. Atl. Monthly Grp.*,
    950 F. Supp. 2d 249 (D.D.C. 2013) .................................................................... 21

*Browning v. Clinton*,
    292 F.3d 235 (D.C. Cir. 2002) ........................................................................... 21

*Carroll v. Fremont Inv. & Loan*,
    636 F. Supp. 2d 41 (D.D.C. 2009) ..................................................................... 40

*Chau v. Lewis*,
    771 F.3d 118 (2d Cir. 2014) ............................................................................... 14

*Chin-Teh Hsu v. New Mighty U.S. Tr.*,
    No. CV 10-1743 (JEB), 2020 WL 588322 (D.D.C. Feb. 6, 2020) ....................... 34

*Cianci v. New Times Pub. Co.*,
    639 F.2d 54 (2d Cir. 1980) ................................................................................ 16

*Deppner v. Spectrum Health Care Res., Inc.*,
    325 F. Supp. 3d 176 (D.D.C. 2018) ................................................................ 1, 43

*Deripaska v. Associated Press*,
    282 F. Supp. 3d 133 (D.D.C. 2017) .................................................................... 21

*Eramo v. Rolling Stone, LLC*,
    209 F. Supp. 3d 862 (W.D. Va. 2016)................................................................. 19

*Farah v. Esquire Magazine*,
    736 F.3d 528 (D.C. Cir. 2013) ........................................................................... 12

*Gilmore v. Jones*,
  370 F. Supp. 3d 630 (W.D. Va. 2019), *motion to certify appeal granted*, No.
  3:18-CV-00017, 2019 WL 4417490 (W.D. Va. Sept. 16, 2019) .......................................... 18

*Hettinga v. United States*,
  677 F.3d 471 (D.C. Cir. 2012) ...................................................................................6

*Kahl v. Bureau of Nat'l Affairs, Inc.*,
  856 F.3d 106 (D.C. Cir. 2017) ............................................................................. 7, 29

*Lane v. Random House, Inc.*,
  985 F. Supp. 141 (D.D.C. 1995) .............................................................................. 14

*Liberty Lobby, Inc. v. Rees*,
  667 F. Supp. 1 (D.D.C. 1986), aff'd, 852 F.2d 595 (D.C. Cir. 1988) ................................... 19

*Lohrenz v. Donnelly*,
  350 F. ............................................................................................................... 35, 36

*Masson v. New Yorker Magazine, Inc.*,
  501 U.S. 496 (1991) ............................................................................................. 14

*Mattiaccio v. DHA Grp., Inc.*,
  20 F. Supp. 3d 220 (D.D.C. 2014) ........................................................................... 39

*McFarlane v. Sheridan Square Press, Inc.*,
  91 F.3d 1501 (D.C. Cir. 1996) .......................................................................... 35, 36

*Meredith v. United Air Lines*,
  41 F.R.D. 34 (S.D.Cal.1966) .................................................................................. 42

*Milkovich v. Lorain Journal Co.*,
  497 U.S. 1 (1990) ............................................................................................. 19, 21

*Moldea v. New York Times Co.*,
  15 F.3d 1137 (D.C. Cir. 1994) (*Moldea I*)......................................................... 16, 18, 21

*Moldea v. New York Times Co.*,
  22 F.3d 310 (D.C. Cir. 1994) (*Moldea II*) .................................................................16,35

*Newton v. National Broadcasting Co., Inc.*,
  930 F.2d 662 (9th Cir. 1990) ......................................................................... 35, 36, 37

*Nunes v. WP Co. LLC*,
  No. 20-CV-01403 (APM), 2020 WL 7668900 (D.D.C. Dec. 24, 2020) .................................7

*Ollman v. Evans*,
  750 F.2d 970 (D.C.Cir.1984) (*en banc*), *cert. denied*, 471 U.S. 1127 (1985) ......................34

*Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*,
    81 F. Supp. 3d 1 (D.D.C. 2015) ................................................................12

*Palin v. New York Times Co.*,
    940 F.3d 804 (2d Cir. 2019) ...................................................................7

*Paulin v. George Washington Univ. Sch. of Med. & Health Scis.*,
    878 F. Supp. 2d 241 (D.D.C. 2012) ........................................................8

*Plummer v. Safeway, Inc.*,
    934 F. Supp. 2d 191 (D.D.C. 2013) ...............................................38, 40

*Rosenblatt v. Baer*,
    383 U.S. 75 (1966) .................................................................................13

*S. Air Transp., Inc. v. Am. Broad. Companies, Inc.*,
    670 F. Supp. 38 (D.D.C. 1987), *on reconsideration*
    678 F. Supp. 8 (D.D.C. 1988), *aff'd*, 877 F.2d 1010 (D.C. Cir. 1989) ..................................12

*Sec. & Exch. Comm'n v. RPM Int'l, Inc.*,
    282 F. Supp. 3d 1 (D.D.C. 2017) ............................................................43

*Sickle v. Torres Advanced Enter. Sols., LLC*,
    884 F.3d 338 (D.C. Cir. 2018) .................................................................6

*St. Amant v. Thomson*,
    390 U.S. 727 (1968) ...............................................................................26

*Stoppelman v. Owens*,
    580 F.Supp. 944 (D.D.C.1983) ..............................................................41

*Taj Mahal Travel, Inc. v. Delta Airlines, Inc.*,
    164 F.3d 186 (3d Cir. 1998) ...................................................................14

*Tavoulareas v. Piro*,
    763 F.2d 1472 (D.C. Cir. 1985) ....................................................*passim*

*Time, Inc. v. Pape*,
    401 U.S. 279 (1971) ...............................................................................35

*Trudeau v. FTC*,
    456 F.3d 178 (D.C. Cir. 2006) .................................................................6

*In re Vitamins Antitrust Litig.*,
    No. MISC 99-197 (TFH), 2000 WL 1475705 (D.D.C. May 9, 2000), *clarified*
    *on denial of reconsideration sub nom. In re Vitams Antitrust Litig.*, No. MISC.
    99-197 (TFH), 2000 WL 34230081 (D.D.C. July 28, 2000) ...............................22

*Weyrich v. New Republic, Inc.*,
  235 F.3d 617 ................................................................................................38

*Zimmerman v. Al Jazeera Am., LLC*,
  246 F. Supp. 3d 257 (D.D.C. 2017) ............................................................26

### STATE CASES

*MacElree v. Philadelphia Newspapers, Inc.*,
  544 Pa. 117 (1996) ......................................................................................19

### FEDERAL STATUTES

18 U.S.C.A. § 1621 ...........................................................................................2

### RULES

Fed. R. Civ. P. 15(c) ...............................................................................41, 42

Federal Rule of Evidence 902(5) .....................................................................20

Rule 12(b)(5) ..............................................................................................1, 42

Rule 12(b)(6) .......................................................................................1, 6, 17, 22

Rules 12(b)(6) and 12(b)(5) .............................................................................43

### CONSTITUTIONAL PROVISIONS

First Amendment .....................................................................................12, 36, 37

## PRELIMINARY STATEMENT

Plaintiff Matthew Couch ("Plaintiff" or "Couch") submits this memorandum of law in opposition to the Motions to Dismiss under Rule 12(b)(6) (the "MTD) and Rule 12(b)(5)(the "Second MTD") of Defendants Verizon Communications, Inc. ("Verizon") and Michael Isikoff ("Isikoff"). Dkt 45 and Dkt. 46. Plaintiff also submits this memorandum to consent to Defendants' Motion requesting the Court to take judicial notice of portions of the *Conspiracyland* Podcast and the portions of the Mueller Report. Dkt. 47. Plaintiff respectfully requests that the Court also take judicial notice of certain materials annexed to the Declaration of Eden P. Quainton, dated March 4, 2021 (the "Quainton Decl.").[1]

Defendants cast their hatchet job on Matthew Couch, in which they repeatedly accuse him and people "of his ilk" of "polluting" the national dialogue, engaging in "sickening" conduct, and deliberately "tormenting" "innocent" third parties as merely "occasional, "constrained chastisement," MTD at 23, and "minor provocations," MTD at 42. A cursory glance at the materials Defendants have filed with their request for judicial notice shows that there is nothing "restrained" about Defendants' full-throated attack on Plaintiff. Indeed it is apparent that a prime goal of *Conspiracyland* was to destroy Plaintiff thoroughly and tarnish his reputation irreparably, apparently on the well-known principle that it is okay to kick a dog when he is down. As the court knows, plaintiff in the case of *Rich v. Butowsky*, 18-cv-0681 has moved to withdraw his case with prejudice against Couch, 18-cv-0681. Dkt. 286. Meanwhile, Plaintiff in this action has voluntarily dismissed his claims with prejudice against Aaron Rich and

---

[1] In the interest of judicial economy, Plaintiff is not submitting a separate motion with respect to these materials, as the Court has the power to consider judicially noticeable matter on a motion to dismiss without additional motion practice. *Deppner v. Spectrum Health Care Res., Inc.*, 325 F. Supp. 3d 176, 184 (D.D.C. 2018).

Deborah Sines. Dkt. 42. However, Defendants attempt to poison the well with the blatantly false assertion that Plaintiff admitted he "lied" because he now believes certain information he was previously given is false. MTD at 25. Stating that Plaintiff has admitted he lied is deliberately inflammatory. A lie is a statement that the speaker knew to be false at the time it was made. *See, e.g.*, 18 U.S.C.A. § 1621 (perjury is the making of a statement not believing it to be true); https://www.merriam-webster.com/dictionary/lie (defining a lie as an untrue statement made with intent to deceive). Nothing in the language cited by Defendants supports their slur. But Defendants willingness to use their motion to continue their attack on Plaintiff underscores that their smears are not an isolated, minor inconvenience, but a deliberate, concerted attempt to inflict the maximum damage possible on him. The "gist and sting" of *Conspiracyland* is that Plaintiff is a cruel, "sickening," lying bully "tormenting" innocent parties to advance dangerous, "alt-right," criminal, knowingly false conspiracy theories to enrich himself and advance an extreme conservative agenda. This is not permissible "hyberbole" or protected "opinion," but the impermissible use of speech as a cudgel to destroy those who challenge the mainstream narrative about Seth Rich. None of the doctrines invoked by Defendants – opinion, hyberbole, fair comment, substantial truth, or gist and sting – justify their conduct.

This is not just a case about an isolated, small-time ex-salesman from Arkansas who got on the wrong side of some of the most powerful forces in the United States of America. Rather, at stake here are the rights of the myriad independent voices – many of them women, , African-Americans, people of color – who have been excluded from the halls of informational power and have turned to the Internet as a liberating way to participate in civic dialogue and enrich our

national conversation.[2] These smaller, often poorly funded voices, will occasionally make mistakes or rely on information that turns out to be false. But if the cost of an error is the kind of relentless attack reporters of the ilk of Michael Isikoff – employed by the most powerful corporations in America – feel free to direct at independent voices, such speech will eventually be driven from the public square altogether. Ultimately, only a handful of corporate-sponsored voices will remain to repeat endlessly an "official" narrative from which dissent is forbidden. Such was never the promise of America.

## STATEMENT OF FACTS

This lawsuit has its origins in two separate events: the disclosure by WikiLeaks in June 2016 that it was in possession of compromising material relating to Hilary Clinton, in the run-up to the 2016 presidential election, and the tragic killing of Seth Rich, a young DNC staffer in July 2016. Complaint filed on August 6, 2020, Dkt. 1 (the "Complaint") ¶¶ 1, 23. Plaintiff Mathew Couch took an interest in both issues, although he never suggested the two were linked. Complaint ¶ 3. At the same time, the political establishment has worked tirelessly to promote a now debunked narrative that the leaking of materials to WikiLeaks was part of a conspiracy

---

[2] Among many other independent writers of this type, "entrepreneurial" journalists who rely on funding by the public include Imari Scarbrough, https://imarijournal.com/, https://www.patreon.com/imariscarbrough; Laurie Pennyhttps://pennyred.medium.com/ https://www.patreon.com/lauriepenny; Egberto Willies, https://politicsdoneright.com/, https://www.patreon.com/politicsdoneright] Zav Shalev; https://narativ.org/, https://www.patreon.com/narativ; Mel Buer, https://www.patreon.com/coldbrewedtool; Judd Legum, https://popular.info/; Oliver Willis, http://oliverwillis.com/, https://www.patreon.com/owillis; Asher Elbein, http://www.asherelbein.com/, https://www.patreon.com/asherelbein; James Corbett; https://www.corbettreport.com/ https://www.patreon.com/corbettreport; Kevin Mahoney, https://ragingchickenpress.org/ https://www.patreon.com/rcpress; Shadowproof, https://shadowproof.com/, https://www.patreon.com/shadowproof.

between Donald Trump and Vladimir Putin to steal the 2016 election. Complaint ¶ 2. This conspiracy theory was fueled by a cartoonish collection of reports on Donald Trump and his campaign known as the "Steele Dossier" or simply, the "Dossier." Complaint ¶¶ 25, 26. The Trump/Putin conspiracy theory was seeded in the US intelligence community and promoted by members of the press, most notably, Defendant Michael Isikoff ("Isikoff"), the Chief Investigative Reporter for *Yahoo! News*, a division within a group of companies controlled by Defendant Verizon Communications, Inc. ("Verizon"). Complaint ¶¶ 7, 8, 26-28. The Dossier-fueled, Isikoff-promoted conspiracy theory has been debunked by Special Counsel Robert Mueller, who concluded, after a lengthy investigation memorialized in a March 2019 report known as the "Mueller Report," that there was no basis to charge anyone in the Trump campaign, and least of all Donald Trump, with conspiring with Vladimir Putin or the Russian government to influence the 2016 election. *See* Request for Judicial Notice, Dkt. 47 (the "Request for Judicial Notice"), Ex. C at 180-181. The Mueller Report also asserts, without providing any evidence, that Julian Assange had "falsely implied" Seth Rich as the source of the compromising material provided to WikiLeaks even though the Mueller Report pointedly states that it "cannot rule out" that the DNC materials were provided to WikiLeaks by "intermediaries." Request for Judicial Notice, Ex. C at 47-48. This of course means that neither the CIA, nor the FBI, nor Mueller has actual proof that the "big file" allegedly transferred by Guccifer 2.0, the improbable star of the Intelligence Community's theory that Russian hackers had transferred emails to WikiLeaks, was actually a file of any use to WikiLeaks or contained the compromising material that was published by WikiLeaks. Request for Judicial Notice, Ex. C. 46; Complaint ¶ 34. Because of the internal inconsistency in the Mueller Report, it became increasingly imperative to plug the obvious "plot holes" by destroying anyone who challenged the orthodox view that the Russian hacker groups "Cozy Bear" and "Fancy Bear" had arranged for the transfer

4

of DNC files through Guccifer 2.0 to WikiLeaks. Complaint ¶ 39. Defendants' six-part *Conspiracyland* podcast is an integral part of this effort. Complaint ¶¶ 1, 41.

Integral to Defendants' strategy is to associate anyone who raises questions about the official narrative with wild, insane-sounding conspiracy theories, most notably the theory that Hilary Clinton ordered the assassination of Seth Rich as part of a scheme to prevent the disclosure of damaging information about her. Complaint ¶ 108; Request for Judicial Assistance, Ex. B, 15:18-19 ("let's not forget this all began with a Russian disinformation plant"). This "first" Hilary Clinton assassination conspiracy theory, allegedly used by Russians to sow division in the lead-up to the 2016 election, is one that Isikoff comes back to again and again, in Episode 1, Quainton Decl. Ex. A  25:6-25, Quainton Decl. Ex. B. 16:11-24, 17:1-15; Request for Judicial Notice, Ex. B, 15:18-19.

Plaintiff Matt Couch is of course well-known for his investigations into the Seth Rich murder and for certain controversial statements, now retracted, about the source of the compromising material relating to Hilary Clinton and the DNC leaked to WikiLeaks. Complaint ¶ 3; Request for Judicial Notice, Ex. D. In connection with the retraction of the statements, the plaintiff in the matter of *Rich v. Butowsky*, 18-cv-0861 has moved for dismissal with prejudice of his action and Couch has dismissed his claims against Aaron Rich and Deborah Sines with prejudice. Dkt. 41. The goal of the *Conspiracyland* podcast remains intact: the thorough destruction of Couch's reputation and the attempt to link him to the Russian disinformation behind the conspiracy theory that Hilary Clinton had plotted to assassinate Seth Rich. Episode 6 of the *Conspiracyland* podcast and the Episode 6 bonus episode attempt to achieve this goal by making, endorsing or promoting a series of false claims about Couch, namely that Couch is an "Internet bully," Complaint ¶136(o), an "Internet troll," Complaint ¶1, a "conspiracy entrepreneur," Complaint ¶¶42, 43, an Internet "crankster," Complaint ¶ 126,  a "Ozark

5

mountain" dweller, Complaint ¶43, a member of the "alt-right," Complaint ¶114, who operates

with a "confederate," Complaint ¶ 74, the promoter of a theory that Hilary Clinton was secretly

conspiring with Seth Rich's acquaintances, with obvious implication that this was part of the

secret Clinton assassination plot, Complaint ¶106, and a person responsible for "doxing" an

innocent third party and his family, Complaint ¶ 114, attempting to burglarize innocent victims,

*id.*, and spreading images linking Seth Rich witnesses with a notorious serial murderer Jeffrey

Dahmer, *id.*, all because of a "sickening," Complaint ¶ 127, viciousness. Complaint ¶ 114.

Complaint Request for Judicial Notice, Ex. B. These statements are all false and defamatory.

## STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint. *Sickle*

*v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 344 (D.C. Cir. 2018). "To survive a motion

to dismiss, a complaint must contain sufficient factual matter . . . to state a claim to relief that is

plausible on its face." *Id.* at 344–45 (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009)). A claim is plausible on its face "when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Iqbal*, 556 U.S. at 678. When evaluating a motion under Rule 12(b)(6), the court must

"accept the plaintiff's factual allegations as true," *Sickle*, 884 F.3d at 345, and "construe the

complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be

derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012)

(internal quotation marks omitted). In determining whether a complaint fails to state a claim

under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents either

attached to or incorporated in the complaint, and matters of which the court may take judicial

notice. *See Trudeau v. FTC*, 456 F.3d 178, 183 (D.C. Cir. 2006). With respect to documents

outside the pleadings, "[a] district court may consider documents attached to a motion to dismiss,

without converting the motion into a motion for summary judgment, if those documents' authenticity is not disputed, they were referenced in the complaint, and they are 'integral' to one or more of the plaintiff's claims." *Nunes v. WP Co. LLC*, No. 20-CV-01403 (APM), 2020 WL 7668900, at *3 (D.D.C. Dec. 24, 2020). It is true that the Supreme Court has directed district courts to adjudicate defamation claims "expeditiously," as Defendants argue, citing *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017). MTD at 6. But *Kahl* is a summary judgment case and District Courts should be wary of an overly zealous application of the Supreme Court's language. *See Palin v. New York Times Co.*, 940 F.3d 804, 813 (2d Cir. 2019)(reversing district court that had relied on the same principles proffered by Defendant).

## LEGAL ARGUMENT

1.   **Defendants Wrongly Assert that Several of the Implications of Isikoff's Statements are Not Reasonable as a Matter of Law**.

Defendants begin their legal analysis with a false statement. Defendants assert that nowhere in the *Conspiracyland* podcast do the words "alt-right" or "Internet bully" occur. MTD at 9. This is simply false. The terms appear several times, such opening episode where "alt-right" websites are portrayed as amplifying the Internet "cranksters" and "trolls", Quainton Decl., Ex. A, 5:2-6, and in Episode 6 at approximately the 25:55 mark, where Matt Couch is explicitly connected with the "alt-right." The transcript Defendants have provided replaces "alt-right" with "outright" exactly at the moment Matt Couch is identified as a perpetrator of the attacks on Mark Mueller. Request for Judicial Intervention, Ex. A, 23:3, 23:7.[3]  Defendants reliance on false

---

[3] The audio of the episode makes clear Mark Mueller is speaking of "alt-right" individuals and then immediately references Matt Couch, with no push-back whatsoever from Isikoff. Defendants' error highlights the inappropriateness of resolving this case on a motion to dismiss, when even the words used on the podcast are disputed.

statements as a defense to a claim of defamation is ironic, to say the least.[4] More importantly, Defendants use of false statements in a motion to dismiss points up a fundamental flaw in their entire approach. On a motion to dismiss, all properly pleaded facts must be taken as true. *Paulin v. George Washington Univ. Sch. of Med. & Health Scis.*, 878 F. Supp. 2d 241, 247 (D.D.C. 2012)(facts plead ***must*** be taken as true at pleading stage)(emphasis in original). But the documents Defendants themselves offer in support of their motion only highlight factual disputes that would make summary judgment difficult, while ducking the real issue: whether established members of the press such as Defendant Isikoff are free to falsely broadcast, without evidence, that their target is a member of the "alt-right" or an "Internet bully."

Rather than addressing this issue, Defendants make a series of easily dismissed arguments. Defendants first assert that Isikoff's false statements about Plaintiff's claims relating to Aaron Rich rest on unreasonable implication. This is wrong. First, much of the MTD is focused on statements relating to Aaron Rich and Deborah Sines, which are now moot. Second, Defendants' claim that Plaintiff is "making up out of whole cloth" Isikoff's implication that Plaintiff was spreading the conspiracy theory that Hilary Clinton had caused Seth Rich to be murdered. MTD at 10. Defendants admit that if Isikoff ***had*** falsely implied that Plaintiff was spreading a conspiracy theory relating to Hilary Clinton's involvement in murdering Seth Rich such an implication ***would be*** defamatory. The only question at this point in the litigation is whether the claimed implication is reasonable or whether the court can conclude, ***as a matter of law***, that such an implication cannot reasonably follow from Isikoff's statements. MTD at 8. On this question, there can be no doubt that Plaintiff's defamation claim must stand.

---

[4] The term "bully" also appears several times, including in Quainton Decl., Ex. A, 7:12-13 (referencing the "Internet bullies" of whom Matt Couch was alleged to be the prime representative, who harassed and targeted Seth Rich's friends and neighbors, *see infra* at 13-14).

Defendants have submitted to the Court a copy of the complaint in the matter of *Aaron Rich v. Edward Butowsky*, et al, 18-cv-0681 (the "Rich Complaint"). Request for Judicial Notice, Ex. E. The Rich Complaint makes no secret of the Plaintiff's desire in that case to link Matthew Couch with the most ludicrous conspiracy theories surrounding the death of Seth Rich:

> Seth was murdered on Washington, D.C. ("D.C.") on July 10, 2016. Politically-motivated conspiracy theories about Seth's murder began to swirl shortly after the murder. Because Seth had worked at the DNC, the theories held, his murder could not have been random— instead, the conspiracy theorized that Seth had decided to be a whistleblower and the DNC itself, perhaps even the Democratic Nominee for President, Hillary Clinton, had ordered Seth's murder as retaliation.

Rich Complaint ¶ 2.

Isikoff himself has publicly stated his view of the central importance of the theory that Hilary Clinton ordered the assassination of Seth Rich and its origins in Russian disinformation, as he made clear in his interview on National Public Radio on July 11, 2019. Complaint, 109-110. Isikoff promotes this conspiracy theory throughout *Conspiracyland*. *See supra* at 5; Complaint ¶108, Request for Judicial Notice, Ex. A, 33:20-25, Ex. B, 15:18-25. And Isikoff explicitly links Matt Couch to the promotions of a conspiracy involving Hilary Clinton and the last person known to have seen Seth Rich alive, Joe Capone. The Complaint cites Isikoff's use of Joe Capone to serve Isikoff's purpose of connecting Matt Couch and a Hilary Clinton conspiracy theory.

> Isikoff (speaking about a visit to the White House several days before the Seth Rich murder Capone does not deny making): So your name shows up on the [White House] visitors logs and someone saw it. Who saw it and what did they do with it?:
> > Capone: There's one guy, I'm totally blanking on his name . . . .
> Matt Couch.
> > Isikoff: Yup, we know him.
> > Capone: He assumes a bunch of things . . .
> Isikoff: ***What was Matt Couch saying*** was the significance of the fact that you had been to the White House on July 6?
> > Capone: That there were secret meetings going on.
> > Isikoff: Secret meetings with who?

9

> Capone: Hilary. . . You know . . .
> Isikoff: ***That you were conspiring with Hilary Clinton*** or?
> Capone: Must have been right?
> Isikoff: Or aides to Hilary Clinton?
> Capone: Yeah. . .I've never met Hilary. . I've never seen any of these
> people.

Complaint ¶¶ 105-06 (emphasis added).

Here, Isikoff is explicitly asserting that Matt Couch stated publicly that Joe Capone conducted secret meetings with Hilary Clinton and conspired with the Democratic candidate for the presidency. Isikoff's assertions are false and defamatory on their own terms, as Plaintiff never made any such statements. But the implication here is not that Joe Capone and Hilary Clinton were secretly conspiring to watch I Love Lucy re-runs. In the context of *Conspiracyland*, and its entire premise that Russian intelligence services promoted the theory that Hilary Clinton conspired to order the assassination of Seth Rich, the listener has no doubt that the secret conspiracy Couch is allegedly accusing Hilary Clinton of participating in is the conspiracy to murder Seth Rich—Isikoff's *pièce maitresse* for an illustration of the dangers of "conspiracy entrepreneurs" such as Matt Couch.[5]

---

[5] A leading website that hosts the *Conspiracyland* podcast has no difficulty summarizing Isikoff's themes as follows:

Episode 1: "The last days of Seth Rich"
Rich's friends and family remember the idealistic political staffer and the last few days of his life. The shooting of Rich at 4:19 on Sunday morning, July 10, 2016, was viewed by Washington, D.C., police as the result of a botched . . . ***And yet, three days after his death, the first fake story appeared: a wild claim on an obscure website that the former DNC staffer was gunned down by a squad of assassins dispatched by Hillary Clinton.***
https://podcasts.apple.com/us/podcast/episode-1-the-last-days-of-seth-rich/id1471037693?i=1000444030784
Episode 2: "The Russia connection"
Julian Assange fans the conspiracy flames, implying Rich could have been a source of the DNC leaked emails. Russia's propaganda outlets and its notorious troll farm pump out the story, and "alt-right" websites latch onto it. Deborah Sines, the prosecutor in charge of the case, digs into where the conspiracy claims are coming from and makes a

When Isikoff states that "Capone found himself a target of suspicion by the conspiracy theorists," he is clearly implying, based on his explicit references to Math Couch, that Plaintiff was "targeting" Joe Capone on "suspicion" of participating in a "conspiracy" with Hilary Clinton. Isikoff cleverly weaves his defamation of Matt Couch by falsely linking him to wild conspiracy theories that "poison" discourse with claims of "secret meetings with Hilary Clinton" that are themselves explicitly related to "assassinations," as Isikoff makes clear at the end of Episode 6:

> DEBORAH SINES: Add assassination language, Russia, add all those buzzwords. . .
> THE NARRATOR (Isikoff):  The wild conspiracy theories have complicated the job of police and prosecutors. The stories have penetrated to the streets, poisoning the well of potential witnesses.

Request for Judicial Notice, Ex. A, 32:16-23.

The listener to the Isikofff podcast has no doubt that the central villain of the culminating Episode 6 of *Conspiracyland* is Matt Couch. In making Matt Couch the mouthpiece for a Hilary-Clinton conspiracy theory, he is making Matt Couch the divisive American symbol of the virus spread by Russian intelligence services.

Without a trace of irony, Isikoff, the master conspiracy theorist who weaves tales about his enemies that have no basis in fact, concludes *Conspiracyland* with an attack on his perceived enemies that applies perfectly to *Yahoo! News*, the prime exemplar of "this brave new world . . .

---

startling discovery: ***The original website report about Rich's being assassinated by a Clinton hit squad was planted by the Russian SVR, the country's version of the CIA, infecting social media*** with an operation that a former top CIA official calls a "100 percent continuation of active measures" — the term used to describe Soviet disinformation operations during the Cold War.
https://podcasts.apple.com/us/podcast/episode-1-the-last-days-of-seth-rich/id1471037693?i=1000444030784

where we're in today, where all sorts of wild, crazy and defamatory things get said about people all the time with no accountability." Request for Judicial Notice, Ex. B, 14:20-24.

For purposes of the MTD, there is no basis to conclude, at the pleading stage, that the defamatory implications of Isikoff's statements are unreasonable ***as a matter of law***. *See S. Air Transp., Inc. v. Am. Broad. Companies, Inc.*, 670 F. Supp. 38, 44 (D.D.C. 1987), *on reconsideration*, 678 F. Supp. 8 (D.D.C. 1988), *aff'd*, 877 F.2d 1010 (D.C. Cir. 1989)(even at summary judgment phase, the "Court is unwilling to hold, as a matter of law, that such an inference is unreasonable or could not lead to a finding of defamatory meaning"); *cf. Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*, 81 F. Supp. 3d 1, 15 (D.D.C. 2015) (Court cannot determine, as a matter of law, that interpretation of is unreasonable as a matter of law).[6]

Defendants fare no better with their claims about statements relating to Mark Mueller. MTD at 11. First, Defendants assert that the Podcast does not reasonably imply that Plaintiff: "is the one who published information about Mark Mueller's siblings and neighbors." MTD at 11. This is nonsense. The ***only*** person who is named in connection with the publication of the allegedly stolen personal information relating to Mr. Mueller and his family is Matt Couch. Complaint. ¶ 116. Likewise, the ***only*** person who is named in connection with the vile superimposing of Jeffrey Dahmer's head on Mr. Mueller's body is Matt Couch. *Id*. Finally, the ***only*** person who is named in connection with the attempt to gain access illegally to Mr. Mueller's effects is Matt Couch. *Id*.

---

[6] As the DC Circuit has stated: "the First Amendment demands that the court assess . . . disputed statements in their proper context. Context is critical because it is in part the settings of the speech in question that makes their ... nature apparent, and which helps determine the way in which the intended audience will receive them." *Farah v. Esquire Magazine*, 736 F.3d 528, 535 (D.C. Cir. 2013)(internal citations and quotations omitted).

It is false to claim, as Defendants tendentiously do, that Mr. Couch is only being accused of harming Mr. Mueller emotionally and not of committing the specific reprehensible acts identified above. Compare MTD at 11. The Complaint is very clear – and Isikoff leaves no doubt in the listener's mind – that it is people "like Matt Couch" who have committed the despicable acts targeted at Mueller and that have forced Mr. Mueller to take action to protect himself. Complaint ¶¶ 116-17; Request for Judicial Notice, Ex. A, 23:4-7. The phrase "like Matt Couch" does not mean that there is a generic group of trolls who have harmed him, but rather, that out of that general group of trolls, there is one person, Matt Couch, who sticks out as particularly responsible for the reprehensible actions of which he complains.[7] Even if a defamatory charge were implicit, the Plaintiff could "show by extrinsic proofs that the statement referred to him." *Rosenblatt v. Baer*, 383 U.S. 75, 81 (1966). There is no basis to exclude the very possibility that Mueller was spreading, Isikoff was endorsing, and Verizon (or a subsidiary) was promoting the view that Matt Couch was one of the people responsible for the vicious attacks on an innocent person—as Defendants are asking this Court to do.

It cannot possibly be said that no reasonable jury would connect Matt Couch with the statements that are flat lies as applied to him—which Isikoff knew or should have known—when the only person mentioned as being responsible for the "doxing" of Mr. Mueller, or the dissemination of vicious pictures linking him to Jeffrey Dahmer, or the attempts to gain access to his affairs illegally is Matt Couch.

---

[7] *See, e.g., infra* at 29 (as applied to Isikoff) and 33 and Note 12 for the everyday use of "like" to mean "such as."

From a narrative perspective, it helps Isikoff to have a villain on whom he can pin responsibility for behavior he genuinely finds outrageous. And there is no doubt that Isikoff is endorsing the Mueller's attribution of liability to Mr. Couch. Isikoff claims to have reviewed thousands of emails relating to Seth Rich;[8] he is the chief investigative reporter for *Yahoo! News*; he is publishing a podcast on the abuse of the Internet by individuals promoting claims for which they have no evidence and he himself has no evidence whatsoever connecting Matt Couch to any of these allegations. Isikoff does not ask Mueller for any evidence; does not ask him how he knows Couch is responsible; does not ask to review any tweets or Facebook posts; does not qualify or distance himself in any way from Mueller's statements; does not caution that these are unverified allegations, that they have not been corroborated, that he has seen no evidence backing them up; he simply nods his head in approval and allows the claims to be broadcast, unfiltered, unqualified, on a show that is meant to be about the truth, leaving the reasonable listener with the unshakable impression that the claims made about Matt Couch are true. This is textbook defamation. *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510-511 (1991); *Chau v. Lewis*, 771 F.3d 118, 131 (2d Cir. 2014). False attributions of criminality, such as those alleged here, are also actionable. *Taj Mahal Travel, Inc. v. Delta Airlines, Inc.*, 164 F.3d 186, 189 (3d Cir. 1998).

**2.    The Isikoff Comments are Not Protected by the Fair Comment Doctrine.**

Defendants correctly state the black letter law on fair comment. Under *Lane v. Random House, Inc.*, 985 F. Supp. 141, 150 (D.D.C. 1995), "the common law privilege of fair comment applies where the reader is aware of the factual foundation for a comment and can therefore judge independently whether the comment is reasonable." By Isikoff's own account of the

---

[8] *See infra* at 33.

presence of "disinformation" on social media networks, it is difficult for listeners and readers to

have an independent awareness of the factual foundation of a reporter's comments. When Isikoff

accuses Matt Couch of alleging that Joe Capone and Hilary Clinton are engaging in a conspiracy,

the listener is completely at Isikoff's mercy to assess the truth or falsity of this attack. Similarly,

when Isikoff publishes as true facts the allegations that people such as Matt Couch are

responsible for the disgusting and illegal abuse of Mark Mueller, the reader cannot possibly have

any independent knowledge of the truth of these accusations and cannot possibly think Isikoff is

simply offering an "opinion." In the present case, nothing in the *Conspiracyland* podcast

suggests or even hints at the notion that Isikoff is simply presenting "interpretations" from which

the "reader is free to draw his or her own conclusions." On the contrary, the allegations that Matt

Couch claimed Joe Capone and Hilary conspiracy were engaged in a conspiracy – against the

backdrop of Isikoff's insistence that the vilest and most damaging conspiracy theory relating to

Seth Rich was that Hilary Clinton ordered Seth's assassination – or that people such as Mach

Couch were committing horrible acts of doxing private citizens, portraying them as mass

murderers and seeking to obtain information from them illegally, are all unmistakably presented

as facts. Isikoff is not commenting – let alone fairly – on Matt Couch's purported statements and

conduct: he is presenting these statements and conduct as facts seen from Isikoff's authoritative

position as "chief investigative reporter" at *Yahoo! News*. Defendants' reliance on *Moldea I* is

curious, as the DC Circuit held that the *NY Times'* conduct in that case, very similar to that of

Verizon/Isikoff here, was the "archetypical" example of defamatory speech. As the DC Circuit

Court of Appeals held:

> The review attacks Moldea's competence as a practitioner of his chosen profession, a
> matter archetypically addressed by the law of defamation. We hold that some of the
> challenged characterizations of interference are sufficiently factual that a jury could
> meaningfully determine their truth or falsity. Further, while some of the review's
> characterizations are irrefutably true and thus not actionable, the accuracy of other

statements in the review is sufficiently open to dispute that we cannot hold as a matter of law that no reasonable juror could find them to be false.

*Moldea v. New York Times Co.*, 15 F.3d 1137, 1140 (D.C. Cir.) )(*Moldea I*), *modified*, 22 F.3d 310 (D.C. Cir. 1994)(*Moldea II*)

With respect to statements such as that Mr. Couch is an "Internet bully," "conspiracy entrepreneur, "Internet crankster" or "Internet troll," these descriptions of Mr. Couch can also not be viewed as "fair comment." First, "fair comment" only applies if the disclosed facts to which the comments apply are true. *Cianci v. New Times Pub. Co.,* 639 F.2d 54, 66 (2d Cir. 1980). There are no disclosed facts that are consistent with Couch being a "bully." As noted, allegations that Couch had any connection to the "bullying" treatment of Mark Mueller are a flat lie and cannot form the basis an "Internet bully" charge. Similarly, there is no factual basis for the claim that Couch actually asserted there was a conspiracy between Joe Capone and Hilary Clinton — those are Isikoff's words, not those even of his interviewee. As to Couch's response to demands that he stop investigating the Seth Rich WikiLeaks allegations, receiving a demand letter and then being <u>subject</u> to suit cannot be viewed as "bullying." With respect to the characterization of Couch as a "conspiracy entrepreneur," the underlying "factual" claim appears to be that Couch is attempting to profit off the dissemination of conspiracy theories. For "fair comment" to apply, Defendants would have to prove that Couch disseminated "conspiracies" for profit. There are no facts to support this charge. Couch is an entrepreneur and self-funds his investigations. Defendants concede that this is a legitimate and even worthy approach to investigating murders. Complaint ¶ 90. That Couch is raising funds to promote "conspiracy theories," particularly in light of the manner in which Isikoff uses Seth Rich "conspiracy theories" to encompass wild claims involving Hilary Clinton, cannot be determined at the pleading stage and is, on its face, highly defamatory for an individual who relies on public funding.

Smearing Couch as an "Internet crankster" also has no factual basis. The factual claim underlying this smear would that Couch engages in behavior similar to that of a person who sends a "crank letter" (defined as an "irrational, fanatical, or hostile")[9] or a "crank call" (defined as something done anonymously "as a joke or prank" that is usually "wacky" and "makes little sense."[10] Couch has admitted that the statements he made about Aaron Rich were based on false information given to him largely by a single source. Request for Judicial Notice, Ex. D. There is nothing even remotely resembling a factual claim that Couch was joking or fanatical or irrational. To the extent Defendants believe the underlying statements about Aaron Rich were "fanatical or irrational" as a factual matter, they would need to establish the truth of this belief with evidence, not simply with conclusory statements in Rule 12(b)(6) motion. Finally, Isikoff attempts to hide behind "fair comment" in smearing Couch as an "Internet troll." The relevant entry in Wikipedia states:

> In Internet slang a troll is a person who starts flame wars or intentionally upsets people on the Internet. This is typically done by posting inflammatory and digressive, extraneous, or off-topic messages in an online community (such as a newsgroup, forum, chat room, or blog), with the intent of provoking readers into displaying emotional responses and normalizing tangential discussion. This is typically for the troll's amusement, or to achieve a specific result such as disrupting a rival's online activities or manipulating a political process.

https://en.wikipedia.org/wiki/Internet_troll.

There is no factual underpinning for slurring Couch in this manner. That Couch has admitted he made incorrect statements about Aaron Rich based on false information provided to him cannot "fairly" serve as an excuse for him to be smeared as a "troll" engaged in "flaming" or offensive,

---

[9] https://www.dictionary.com/browse/crank-letter#:~:text=An%20irrational%2C%20fanatical%2C%20or%20hostile%20letter%20or%20telephone,employs%20crank%20in%20the%20sense%20of%20%E2%80%9Cirrational%20person.%E2%80%9D)

[10] https://idioms.thefreedictionary.com/crank+call

profane, insulting behavior. Under *Moldea I*, fair comments are not actionable "[b]ecause the reader understands that such supported opinions represent the writer's interpretation of ***the facts presented***, and because the reader is free to draw his or her own conclusions based upon those facts"). *Moldea I* 15 F.3d at 1144. MTD at 11-12. Where no facts are presented, there can be no "fair comment."

3.    **The Defamatory Statements Contain Verifiable Statements of Fact**.

As a general proposition, Defendants position that none of their statements contain verifiable statements of fact is nonsense. Isikoff's baseless accusation that Matt Couch had alleged Joe Capone and Hilary Clinton were engaged in a conspiracy contains the clearly verifiable facts of whether Matt Couch made any such statement and whether any such conspiracy in fact existed. Likewise, it is easily verifiable to determine whether Matt Couch ever "doxxed" Mark Mueller or any members of his family, ever distributed photographs or images linking Mark Mueller and Jeffrey Dahmer, or ever sought to or did actual rent or gain access to Mueller's basement apartment. In addition, the words "bully," "troll," "crankster" have a sufficient factual core that they can be factually verified by asking whether Couch ever used force or the threat of force to obtain evidence for his investigations, whether he ever sought information as a joke or anonymous, whether he ever sought to start "flame wars" or make deliberately inflammatory comments. Falsely labeling Couch as "alt-right" or a man with "confederates" also has a factual core that can be verified. While correctly using a descriptive term to describe a person's political ideology cannot be defamatory, courts have held that falsely labelling a person a member of the "deep state" is defamatory. *Gilmore v. Jones*, 370 F. Supp. 3d 630, 674 (W.D. Va. 2019), *motion to certify appeal granted*, No. 3:18-CV-00017, 2019 WL 4417490 (W.D. Va. Sept. 16, 2019). Pure expressions of opinion generally are not "subject to

objective verification." *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 876 (W.D. Va. 2016).

If "a reasonable factfinder could conclude that the statements ... imply an assertion [of fact]," the

statements are not protected. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990).

This Court has held that the use of certain loaded terms such as "Nazi" and "anit-semite"

can give rise to liability in defamation. *See Liberty Lobby, Inc. v. Rees*, 667 F. Supp. 1, 5–6

(D.D.C. 1986), aff'd, 852 F.2d 595 (D.C. Cir. 1988). The dictionary definition of "alt-right" is "a

right-wing, primarily online political movement or grouping based in the U.S. whose members

reject mainstream conservative politics and espouse extremist beliefs and policies typically

centered on ideas of white nationalism." *See* https://www.merriam-webster.com/dictionary/alt-

right. Merriam-Webster further gives examples of members of the "alt-right" who "make it a

badge of honor to be called 'racist, 'homophobic,' and 'sexist'" and quotes commentators who

define the "al-right" as a sprawling coalition of reactionary conservatives who have lobbied to

make the United States more "traditional," more "populist" and more "white."

The common denominator in the "alt-right" label is not the presence of conservative or

even extreme right-wing views, but of racism and in particular white nationalism or white

supremacy. There is a factual core to the attack on Couch as a member of the alt-right, namely

whether he has ever espoused racist, white supremacist or white nationalist ideas. Couch has

tweeted hundreds of thousands of times and Defendants should know that it is objectively false

to label him a member of the racist, white-supremacist alt-right. In today's culture, a false

accusation of racism is one of the most devastating charges imaginable that can permanently

destroy a person's future. *See Alford v. Wang, Inc.*, 11 F. Supp. 3d 584, 596 (D.S.C.

2014)(sustaining defamation claim against defendant who labelled plaintiff a racist); *MacElree*

*v. Philadelphia Newspapers, Inc.*, 544 Pa. 117, 127 (1996)(a charge of racism "clearly" could

"harm the reputation of another as to lower him in the estimation of the community.") Here, the

alt-right label has taken on connotations of being dangerous and threatening to democracy. *See* https://www.fbi.gov/news/testimony/confronting-white-supremacy.[11] Moreover, in claiming that Couch has a "confederate" who assist him in his endeavors, Isikoff is plainly attempting to link Plaintiff, a Southerner, with outlaw opponents of the U.S. government engaged in illegal activity.

Defendants ludicrously misconstrue Plaintiff's argument and would have the court believe that Couch is complaining of being depicted as a "grey uniformed" soldier. MTD at 23. This is absurd. Isikoff is obviously using the loaded term such as "confederate" to fit in with the alt-right, white nationalist, picture he is attempting to paint of Couch, as though Couch were the type of person who marched at Charlottesville with a Confederate flag. There is, of course, zero evidence that Couch was present at Charlottesville or has ever paraded with a confederate flag. To Defendants, however, this is irrelevant. The goal is to create a Southern villain, an Internet monster, facts be damned.

**4.     The Defamatory Statements are Not Protected Hyperbole.**

As a threshold matter, it is evident that the statements and conduct relating to Capone and Mueller are not "hyperbole." Isikoff really wants the reader to believe that Couch was accusing Capone and Hilary Clinton of conspiring together for nefarious purposes. Isikoff really wants his listener to believe that Matt Couch is one of the people responsible for specific acts targeting Mark Mueller. The "general tenor" of the *Conspiracyland* podcast leaves no doubt that Isikoff did not intend to use terms such as "Internet bully," "Internet troll," "Internet crankster" "conspiracy entrepreneur" in a hyperbolic or figurative manner that are designed to "negate" the core picture of Couch as a vicious harassing purveyor of false conspiracy theories being peddled

---

[11] The Court can take judicial notice of this publication as an official publication of the United States. See Federal Rule of Evidence 902(5).

for profit. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21, 110 S. Ct. 2695, 2707, 111 L. Ed.

2d 1 (1990); *Moldea I*, 15 F.3d at 1144 ("general tenor" of article did not suggest that it was

intended to be hyperbolic or figurative). There is nothing to suggest that Isikoff intends his

attacks as merely "extravagant exaggerations," such as "mile-high ice cream cones." See

https://www.merriam-webster.com/dictionary/hyperbole. To find derogatory and demeaning

attacks to be protected "hyperbole" courts in the D.C. District look for verbal "cues" or other

indicia that the speaker or author is using the language at issue in a "loose," "imaginative" way.

*See Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 147 (D.D.C. 2017)(highlighting that the

word "basically" signals to the reader that the specific charge being made is intended to be

"loose" or "hyperbolic");   *Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 260 (D.D.C.

2013)(labelling plaintiff as "evil" not actionable because good and evil are loose terms that

cannot be objectively verified); *Browning v. Clinton*, 292 F.3d 235, 248 (D.C. Cir. 2002)(generic

adjectives with no specific content such as "scurrilous," "garbage," "salacious" not actionable);

*Moldea II*, 22 F.3d at 313 n. 2 (underscoring the "importance of context" in identifying

hyperbole).

5.   **Defendants' Claims of Substantial Truth are Wrong and in Any Event Unripe for Adjudication at the Motion to Dismiss Stage.**

Defendants argue that their smears and slurs are protected because several are

"substantially true." MTD at 24-27. Defendants begin this portion of their Motion with the

correct, but irrelevant, statement that Plaintiff has the burden of proving falsity. MTD at 24. This

observation would be germane at the summary judgment phase, but has nothing to do with the

issues before the Court on a motion to dismiss. Indeed, Defendants unwittingly highlight a

crucial issue that cuts against them: the moving party in making a motion to dismiss bears a

heavy burden in attempting to convince a judge to close the courthouse doors to a plaintiff.

*In re Vitamins Antitrust Litig.*, No. MISC 99-197 (TFH), 2000 WL 1475705, at *8 (D.D.C. May 9, 2000), *clarified on denial of reconsideration sub nom. In re Vitams Antitrust Litig.*, No. MISC. 99-197 (TFH), 2000 WL 34230081 (D.D.C. July 28, 2000)("Rule 12(b)(6) imposes a substantial burden of proof upon the moving party. . .and a court may not dismiss a complaint unless the movant demonstrates beyond doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle [him] to relief"(internal quotations and citations omitted)).

Beyond their irrelevant opening invocation of a summary judgment issue, Defendants' substantial truth arguments are further irrelevant because, as Plaintiff has stated, he is not pressing his claims for statements concerning Aaron Rich.[12] With respect to the two remaining issues raised by Defendants, "substantial truth" does not apply. First, Defendants claim that it is substantially true to smear Couch as a "conspiracy entrepreneur" because Plaintiff has admitted he raises money to finance his investigative and journalistic work. MTD at 27. This standard would make every journalist everywhere in the world a "conspiracy entrepreneur" because all journalists need money to finance their work. Defendants appear to believe that because Couch made a fundraising request after he was threatened with a lawsuit by Aaron Rich, that means he is seeking to raise funds to finance his "conspiracies." *Id.* The defamatory core of the charge is not that Couch is an "entrepreneur" but that he is raising money to fund investigation or promotion of "conspiracies." Isikoff's own use of Couch's words undermines his claims. Isikoff quotes Couch as asking for contributions to his GoFundMe account and then asks, in horror, "So he is fundraising off the letter?" The letter in question is a threatening "cease and desist" letter. "Fundraising off this letter" – even crediting that disparaging characterization – does not

---

[12] Plaintiff is not conceding that the statements made about him were not defamatory. However, he has decided not to pursue these claims and to focus on the other uncontestable lies about him that Defendants have promoted.

substantially support the charge that he is "peddling" "conspiracies" for profit, but rather that he is seeking funds to protect himself from potential litigation, which targets of cease and desist letter without funds to pay for their own lawyers frequently do.

Beyond this issue, however, the question of whether it is "substantially true" that Couch promotes "conspiracy theories" is a fact question that is not appropriate for resolution on a motion to dismiss. It would be highly damaging to Couch's professional reputation and totally wrong for the Court to conclude as a matter of law that the nature of the matters that Couch investigates or discusses on the pages of the DC Patriot are "conspiracy" theories without the introduction of any evidence to this effect. Where a court has found "substantial truth" as a matter of law, there have been actual incontestable facts that, as a matter of public record, cannot be disputed. For example, in *Arpaio v. Zucker*, 414 F. Supp. 3d 84, 90 (D.D.C. 2019), the court found that CNN's reference to former sheriff Joseph *Arpaio* as an "ex-felon" was "substantially true" because Mr. Arpaio had been held in contempt and criminally convicted, even though the actual punishment was a misdemeanor, not a felony. Here, without evidence and analysis the Court cannot conclude as a matter of law that Couch is "peddling" "conspiracy theories." Even with respect to Couch's retraction and apology relating to Aaron Rich, Couch has admitted that he made incorrect statements because he was given false information. Such an admission, without more, does not transform Couch's views into "conspiracy theories," particularly where the complaint making that very allegation has now been withdrawn with prejudice as to Couch and America First Media. *Rich v. Butowsky*, 18-cv-0681, Dkt. 286. For the Court to make a determination as a matter of law as to Couch's other publications and investigations – without any evidentiary hearing – would stretch the "substantial truth" doctrine well beyond its intended function illustrated by the *Arpaio* case above.

Defendants' claim that it is "substantially true" that Plaintiff operates with at least one "confederate," MTD at 27, is patently false. First, the term has obviously loaded connotations, namely that Couch is the type of alt-right, white nationalist Southerner who could be seen carrying a confederate flag at Charlottesville-type protests. In the popular imagination, and in the mainstream press, whenever an event is meant to be signaled as particularly horrific, accounts of the incident are invariably accompanied by protesters waving Confederate flags. There is nothing remotely, let alone "substantially," true about lumping Couch in with the Confederate flag waving white nationalists excoriated by the press and being pursued by the FBI. Even leaving aside these connotations – which are the reason Isikoff chose the word in the first place – the word itself is not "substantially true" as a matter of law as applied to Couch. No evidence has been submitted by Defendants that Couch has ever been convicted or even accused of a crime. To the extent, by Defendants' own admission, "confederate" means "accomplice" the word denotes an ally in illegal activity, for which, again, there is no evidence whatsoever, and certainly no basis for a finding of substantial truth as a matter of law. The word "confederate" simply has no "neutral" uses: it is always used to signify that the "confederate" is engaged in illegal or subversive or wrongful activity. Defendants may be able to present evidence to support such a negative view of Couch, but it simply cannot be said, as a matter of law, that such a characterization is "substantially true."

**6.    The Statements Defendants Claim Lack Defamatory Meaning are In Fact Central to Defendants' Defamatory, Evidence-Free Smears**.

Defendants claim that there is nothing defamatory about a false claim that Couch asserted Joe Capone had a meeting with Hilary Clinton. MTD at 29. This is a dubious enough assertion, but of course is not the ***actual*** smear made by Isikoff. Isikoff very clearly claims Matt Couch stated Joe Capone met Hilary Clinton in secret meetings to engage in a conspiracy with her.

Complaint ¶ 106. Even unadorned, in the context of Isikoff's claims that Couch is a conspiracy theorist, indeed a "conspiracy entrepreneur," having an alleged "conspiracy theorist" make wild claims about Hilary Clinton engaging in a "conspiracy" – something Isikoff has made up out of thin air – tarnishes Couch's reputation based on pure fabrication. But as discussed above, the purpose of claiming that Couch is accusing Hilary Clinton of engaging in secret meetings to carry out a conspiracy is to link Couch to the true Seth Rich conspiracy theory – that Hillary Clinton plotted to assassinate Seth Rich – a conspiracy theory Isikoff promotes as being Russian disinformation that fueled the entire Seth Rich story, making Couch an avatar for dangerous Russian enemies of the country exploiting a death for the vilest anti-democratic ends.

As applied to Couch, this is all complete and utter nonsense. Worse, it is incredibly damaging to his reputation, his work prospects, the standing in the community, his status as an upstanding citizen — indeed, it is hard to imagine a worse smear to level at an independent investigator and reporter, particularly when Isikoff knows because he admits he has reviewed thousands of Seth Rich-related emails[13] – the charge is totally and completely false. There is an Alice in Wonderland quality to Defendants' flight of fancy in claiming that Isikoff's deliberate smear and damaging falsehood cannot have a defamatory meaning.

As to tarring Couch with the "confederate" brush, Defendants simply ignore both the plain meaning and the connotations of the word, that in context and as applied, clearly imply that Couch, at a minimum, is engaged in shady, wrongful activities, and at worst that he can be assimilated to the Charlottesville or January 6 extremists whose actions caused the loss of innocent life. The Court should not conclude, as a matter of law, that Defendants' use of loaded

---

[13] *See infra* at 33.

language incapable of any "neutral" non-disparaging meaning is not defamatory as a matter of law.

**7.     The Court Should Reject Defendants' Actual Malice Arguments.**

1.   Plaintiff Adequately Alleges Actual Malice.

A public figure plaintiff may prevail on a defamation claim only if he offers proof that the statement was made with actual malice—that is, with "knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 280–81 (D.D.C. 2017)) (citing *Sullivan*, 376 U.S. at 280). A defendant acts with reckless disregard if "the defendant in fact entertained serious doubts as to the truth of his publication[,]" or acted "with a high degree of awareness of probable falsity." *St. Amant v. Thomson*, 390 U.S. 727, 731 (1968)(internal quotation marks omitted). Here, the pleadings expressly allege that Isikoff acted with actual malice in making false allegations about Couch's statements relating to Joe Capone and Hilary Clinton:

> This entire exchange is based on a total fabrication. Both Isikoff and Capone know that Couch ***never*** stated or even suggested that Capone was conspiring with Hilary Clinton or aides to Hilary Clinton. Isikoff uses leading questions to elicit the answer he wants, ***knowing these answers to be false, knowing they will harm Couch, and knowing they are defamatory*** (emphasis in Complaint).

Complaint ¶ 107.

Similarly, in promoting Mueller's accusations against Matt Couch, the Complaint clearly alleges that Isikoff acted with actual malice.

> The only problem, which both Defendant [Isikoff] and Mueller know, is that, ***as applied to Matt Couch, all these statements are complete and total lies***. Couch never superimposed Mr. Mueller's photo on Jeffrey Dahmer's or Dexter's picture; Couch never doxed Mr. Mueller's family and neighbors; Couch never sought to rent out a room in Mr. Mueller's basement in an attempt to steal documents; Couch is not an "Internet troll" and is not "alt-right." Each and everyone of these statements applied to Couch, the only person named in connection with them, is a lie, ***which both Isikoff or Mueller know or should know***.

Complaint ¶ 117 (emphasis in last line added).

As the Complaint puts in, in expressly and falsely stating that Matt Couch had made claims about Joe Capone and Hilary Clinton conspiring together – with the implication, barely *sotto voce*, that the "secret meetings" and conspiring with Hilary Clinton were part of the assassination of Seth Rich:

> Isikoff then departs completely from reality and credits the wildest claims about Couch without any independent verification, presenting absurd and vicious claims about Plaintiff as though they were facts.

Complaint ¶ 103.

In the specific count of the Complaint alleging damage for all the defamatory statements made by Isikoff, Couch underscores that:

> In publishing the statements, Defendants acted with knowledge of the falsity of their statements, or with reckless disregard for the truth of their statements.

Complaint ¶ 137.

It is true that Isikoff has not left a tidy note for the files admitting that he had no basis to make or endorse the defamatory statement relating to Plaintiff. But the Complaint viewed as a whole states sufficient facts from which a plausible inference of actual malice can be made.

### 2.   Plaintiff's Pleadings are Sufficient to Raise an Inference of Actual Malice

The Complaint alleges that the defamatory statements about Couch were made as part of a six-part series devoted to the murder of Seth Rich. Complaint ¶ 1. The six-part series was prepared under the aegis of Michael Isikoff, the "Chief Investigative Journalist" for *Yahoo! News*. Complaint ¶ 8. Right off the bat, it is a fair inference that the Chief Investigative Journalist for an entire news division of one of the most prominent online sources of information, who prepared and put together a multi-part investigative series of podcasts, would have done ***some*** diligence to assess whether the statements he was making, the words he was putting in the mouths of others, or the smears he was endorsing had ***any*** basis in fact. In zeroing in on Matt Couch and making Couch the central villain of Episode 6, he ***knew***, at a minimum, that he had

no evidence to back up the outrageous claim that Matt Couch accused Joe Capone and Hilary Clinton of conspiring together in secret meetings or that Matt Couch had anything to do with the doxing of Mark Mueller and his family, the attempts to gain access to Mueller's property impermissibly, or the superimposition of Jeffrey Dahmer's face on Mueller's body. He knew this because no such evidence exists, as the simplest research on any statement or tweet or post Matt Couch ever made about Joe Capone or Mark Mueller would reveal.

Isikoff knows that Matt Couch has never made any alt-right or white nationalist posts, has never been seen with a confederate flag, or in the presence of anyone who uses the confederate flag as a rallying symbols. Isikoff offers no evidence whatsoever, in Episode 6 or elsewhere, to support his attacks. Rather, he wants the listener to make the leap from his view that Matt Couch has been wrong about Seth Rich and has admitted his statements relating to Aaron Rich were based on false information to the belief in the veracity of defamatory claims that ***do not flow at all*** from the truth or falsity of the Rich brothers' involvement in leaking DNC emails to WikiLeaks. To claim that a reporter lacks "actual malice" because something ***might*** exist of which he is unaware and for which he has no evidence sets *Sullivan* on its head. As Judge McKinnon stated in an opinion in which then Judge Scalia concurred:

> Media advocates, like those who have filed an amicus brief in support of rehearing, should take a hard look at the evidence in this case before attempting to come to the defense of the Post's so-called "investigative reporting" as it appears in this transcript. It is not normal "investigative reporting."

*Tavoulareas v. Piro*, 763 F.2d 1472, 1473 (D.C. Cir. 1985)

Replace "the Post" with *Yahoo! News* and Judge McKinnon's comments encapsulate a reasoned critique of Isikoff's abnormal "investigative reporting" designed to destroy reputations rather than present the truth.

The Complaint alleges that Isikoff is one of the most prominent conspiracy theorists in the country to promote the baseless claim that Donald Trump and Vladimir Putin conspired to

28

steal the 2016 election, relying on the now thoroughly debunked "Steele dossier." Complaint ¶¶ 2, 27. Indeed, Complaint details Isikoff's voluminous writings promoting a thoroughly discredited conspiracy theory. Complaint ¶¶ 28-30. According to the Complaint, Isikoff has staked his professional career on the truthfulness of the debunked and partisan anti-Trump conspiracy theory. Complaint, ¶ 30. Isikoff had every motive to lie about individuals who were perceived to stand in the way of his theories, particularly in the lead-up to the 2020 election, when a Trump victory could have been fatal to the careers of journalists like Isikoff. Complaint ¶ 35. Defendants themselves have asked the Court to take judicial notice of the findings of Robert Mueller, concluding that his sprawling multi-million dollar investigation had not found sufficient evidence to support the existence of a conspiracy between Donald Trump and Vladimir Putin. Request for Judicial Notice, Ex. C at 181. The notion that Donald Trump and Vladimir Putin conspired to steal the election is so absurd that the Mueller Report does not even bother to address this claim. Yet Isikoff has promoted this theory widely and is invested in its truthfulness. Complaint ¶ 2. Courts are entitled to look at the defendant's own conduct in assessing whether an inference of actual malice is appropriate. *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 116 (D.C. Cir. 2017)("Actual malice may be inferred through circumstantial evidence, including the defendant's own actions or statements, the dubious nature of his sources, or the inherent improbability of the story").

As one of the main promoters of the dominant false narrative about Vladimir Putin and Donald Trump, Isikoff's willingness to promote falsehoods about anyone associated with the counter-narrative can readily be inferred, particularly when Isikoff pointedly fails to provide any evidence to support his accusations or those he promotes and endorses (such as a tweet or post or any comment from Matt Couch claiming that Hilary Clinton and Joe Capone were conspiring or

any tweet or post connecting Matt Couch with the Mueller/Dahmer imagery or white nationalism or "trolling" or making "crank" posts).

The Isikoffian syllogism itself – Matt Couch made false statements about Aaron Rich, Aaron Rich is a grieving brother, therefore the most counterfactual, verifiably false claims about Couch can be made with impunity – itself supports an inference of actual malice, of reckless disregard for the truth. But Isikoff himself, the Chief Investigative Journalist for *Yahoo! News*, in speaking to Joe Capone about Couch's alleged statements relating to a Hilary Clinton conspiracy, offers up in response to Capone's mention of Couch's name, "Yup, we know him." Complaint ¶ 106. Coming from Isikoff, this affirmation that he "knows" Couch fairly implies that he has done some level of investigation on Couch and is not simply taking the most random gossip at face value. Indeed, it is ***Isikoff himself*** who offers up that Couch had stated Joe Capone and Hilary Clinton were conspiring. Assuming as we must at the motion to dismiss stage that it is false Matt Couch ever made this claim, it is impossible for Isikoff to have made this allegation in the absence of reckless disregard for the truth. The listener hears how Isikoff's personal and emotional investment in debunking an alleged Russian-sourced conspiracy theory about Hilary Clinton ordering the assassination of Seth Rich has led Isikoff to volunteer a false statement about Matt Couch that his interviewee then adopts. This exchange is emblematic of Isikoff's "reporting" style: rather than presenting facts, he determines what he wants facts to be and then either puts words in his interviewee's mouths, endorses what they say, or, failing that, simply makes up language that he wants to be true.

Given that Isikoff admits he "knows" Couch, which from an investigative reporter can only be understood to mean that he has actually conducted some level of independent investigation into Couch, and given that Isikoff feels comfortable enough in his knowledge of Couch to volunteer language that Couch himself ostensibly used, Isikoff's promotion of

Mueller's outrageous, false, and readily falsifiable claims that Matt Couch was one of the people responsible for the "tormenting" behavior Mueller complains of – which a normal, reasonable listener hears in shock and horror – likewise can only have been made either with knowledge of the falsity of the allegations or reckless disregard for their truth. This is not simply the case of an investigative reporter deliberately refusing to do any investigation – which is the only plausible explanation for his endorsement of false and easily verifiable claims – which, under the circumstances is sufficient to warrant an inference of actual malice. It is the case of an agenda-driven partisan operative taking very specific accusations with respect to very specific matters and allowing a specific individual to be tarred as responsible with no evidence and no pushback whatsoever.

With respect to Mark Mueller, Defendants claim that the statement, "like Matt Couch" does not mean Couch is being personally fingered as responsible. MTD at 11. Defendants' reading is that people who were not Matt Couch, but were sufficiently similar to Matt Couch, were the ones actually being accused of the reprehensible acts of which Mueller complains. But this is not a fair reading in context. In context, it is clear that Mueller is offering up the name of Matt Couch, not in the sense that there exist people who were somehow similar to Matt Couch, but in the sense of "such as." Mueller is saying "people *such as* Matt Couch were harassing him, people *such as* Matt Couch were disseminating private information and trying to get access to my personal information, people *such* as Matt Couch were connecting me to mass murderer Jeffrey Dahmer." At the very least, the way in which a reasonable listener would understand the phrase "like Matt Couch" cannot be determined on a motion to dismiss and is a quintessentially factual issue. *Tavoulareas*, 763 F.2d at 1475 (interpretation of injurious language resolved by testimony at trial).

31

Defendants do not attempt to argue that the attacks on Matt Couch relating to Mark Mueller are "substantially true." *See* MTD at 24-27. If these statements are so obviously false that Defendants do not even attempt to argue for their substantial truth, can the Chief Investigative Reporter for *Yahoo! News* permit them to be made unexamined, unchallenged, unverified? Does this not get at the very abuse that Judges McKinnon and Scalia were concerned with in *Tavoulareas v. Piro*? Is it not the act of deliberately ignoring the actual or probable falsity of outrageous attacks that would cause any reasonable person to apply a modicum of scrutiny textbook "reckless disregard?"

The *Tavoulareas* court identified a number of factors that bear on the actual malice analysis, including the awareness of harm, the lack of time pressure and the cumulative nature of the evidence. *Tavoulareas*, 764 F2d at 1477-78. These factors support reasonable inference of actual malice here. First, Isikoff cannot but know that stating, promoting or endorsing lies about Couch's statement and conduct – which Defendants characterize as "sickening" – will have an incredibly damaging effect on Couch—indeed that is the goal.

As the court stated in *Tavoulareas*:

A small amount of support would presumably suffice to render an apparently innocuous statement immune from a finding of actual malice. A reporter's interview with a single unidentified person claiming to have been a witness would be adequate, one supposes, to immunize the statement that Mr. Tavoulareas wore a dark suit and a blue tie at a certain public event. To say that similarly slim support would immunize the statement that Mr. Tavoulareas tried to assassinate the president is to ignore the fact that the requisite degree of care (and hence the existence of recklessness) depends, in this area of tort law as elsewhere, upon the perceived danger of harm

*Tavoulareas*, 763 F.2d at 1477.

Second, the *Conspiracyland* podcast is not "hot news." The events being discussed in the podcast were more than two years old. *See* Request for Judicial Notice, at 2 (Episode 6 aired on

August 6, 2019); Ex. A, 8:16-17  (May 2017 date of heightened interest in Seth Rich story).[14] There was ample time for Defendants to have familiarized  themselves with Couch, whom Isikoff admitted he "knew" and to have subjected the lies about him to some minimum  degree of editorial scrutiny. *Tavoulareas* 763 F.2d at 1477 (D.C. Cir. 1985)(absence of time pressure is evidence a jury can fairly consider in assessing "actual malice").

Third, the lies about Couch are not isolated instances but permeate the entire podcast, from Isikoff's false statement in paragraph 43 of the Complaint, that Mr. Couch is from the Ozarks, with its connotations  of backwards, uneducated hillbillies and shady characters engaged in criminal activity,[15]  to his use or acceptance of loaded language such as "confederate" and "alt-right" that falsely connect Couch with dangerous white nationalism,  to his effacing of the Sy Hersh report as described in paragraph 53 of the complaint, to his deliberately  false state statement that Couch was promoting  conspiracy theories about Hilary Clinton, to his endorsement of Mark Mueller's vile slander without the slightest trace of investigative  curiosity or rigor — notwithstanding  his review of what he describes as a  "relentless wave of Seth Rich tweets and retweets" and his specific review of  more than 2,000 Seth Rich-related tweets" sent out by just one account useful to Isikoff's narrative. Quainton Decl., Ex. A, 12:16-18.  The cumulative effect of Isikoff's anti-investigative "yellow" journalism is to paint a self-portrait of himself as a hack who will stop at nothing  to destroy his victims, despite the lack of evidence in the thousands of tweets Isikoff claims to have reviewed, and his unabashed bragging  about his

---

[14] The Complaint  inadvertently  identified  the date of Episode 6 at August 6, 2020. Complaint  ¶ 1.

[15] *See* https://en.wikipedia.org/wiki/Ozark_(TV_series)(describing  plot revolving  around well-heeled but crooked Chicago family encountering in-bred opium growers like the Snells and impoverished  trailer-park dead-enders such as the Langmores on the lake of the Ozarks).

33

"investigation,"  Quainton  Decl., Ex. B 24:9-12,  even at the cost of causing  health problems,

financial  suffering  and death threats, Complaint  ¶ 118.

This case requires the Court to perform "the delicate and sensitive  task of

accommodating  the First Amendment's  protection of free expression of ideas with the common

law's protection of an individual's  interest in reputation."  *Ollman v. Evans*, 750 F.2d 970, 974

(D.C.Cir.1984) (*en banc*), *cert. denied*, 471 U.S. 1127 (1985).  While censorship runs counter to

the principles  of free speech on which our republic  is founded,  the common law of defamation,

which does not silence, but imposes  costs on those who would abuse their rights,  stands as a firm

testament to the value our system places on "an individual's  interest in his or her reputation

[which] is of the highest  order." *Id.* at 974. As the D.C. Circuit has emphasized,  "the protection

of one's reputation  is an eloquent  expression of the respect historically  afforded the dignity  of the

individual  in Anglo-American  legal culture.  A defamatory statement may destroy an individual's

livelihood,  wreck his standing  in the community,  and seriously  impair his sense of dignity  and

self-esteem." *Tavoulareas*, 764 F.2d at1474.  In today's  day and age, when slanderous  attacks and

smears such as those disseminated by Defendants can threaten the very life of their targets, the

common  law should  temper the too frequent abuses of free speech by news organizations  with no

meaningful  check on their power other than a tradition  as old and as venerable as the right to

speak one's mind—the  right to protect one's reputation.

3.  If There is Any Doubt as to the Sufficiency  of the Allegations  of Actual Malice,
    Plaintiff  Should  be Entitled  to Submit  an Amended Pleading.

As a general matter, the granting  of a motion to dismiss should  be without  prejudice.  An

order of dismissal with prejudice  should  only be granted in the extreme case in which there is no

possible  universe  of facts that could support a defamation claim against the defendant. *Chin-Teh*

*Hsu v. New Mighty U.S. Tr.*, No. CV 10-1743  (JEB), 2020 WL 588322,  at *8 (D.D.C. Feb. 6,

2020)(court should dismiss action without leave to re-plead only where re-pleading could not possibly correct the defects in the party's claim). This is obviously not the case here. Even if the Court were not convinced that the complaint before it adequately states a claim for defamation and related relief, the dismissal should not be with prejudice.

Defendants expends considerable energy attempting to convince the Court otherwise. MTD at 36-37. In support of this aggressive position, Verizon cites to *Time, Inc. v. Pape*, 401 U.S. 279, 289-90 (1971), *Moldea II*, 22 F.3d at 315, *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1509 (D.C. Cir. 1996), *Lohrenz v. Donnelly*, 350 F.ed 1272,1285 (D.C. Cir. 2003), and *Newton v. National Broadcasting Co., Inc.*, 930 F.2d 662, 686 (9th Cir. 1990). These cases are not germane. *Pape* came before the US Supreme Court after a series of lower court decisions and appeals and a trial on the merits—nothing like the posture of the case before the Court today. Moreover, the Court only held that on the narrow facts of that case, involving a national report on police brutality, the omission of the word "alleged" did not create a jury question as to actual malice. *Time v. Pape*, 401 U.S.at 640.

*Moldea II* is even further afield. In that case, the Court reversed its earlier decision – after grappling with the difficult issues that arise in the context of book reviews – and found that allegations a writer had engaged in "sloppy journalism" were not actionable because the book review genre is one in which a genre in which "readers expect to find spirited critiques of literary works that they understand to be the reviewer's description and assessment of texts that are capable of a number of possible rational interpretations." *Moldea II*, 22 F.3d at 311. Here Verizon and Isikoff were not presenting an interpretation among a number of possible rational interpretations. They were clearly maintaining that Plaintiff was a conspiracy theorist spouting "lies," with the deliberate intent of inflicting cruelty, not simply claiming that his journalism was "sloppy."

35

*McFarlane* is a summary judgment case in which the court held that the plaintiff had not produced sufficient evidence of a subjective disregard for the truth to raise a jury question as to actual malice. *McFarlane* at 1509. To extend *McFarlane* to the motion to dismiss context and to hold – before any discovery – that it is impossible as a matter of law for Plaintiff to produce any evidence of Defendants' disregard for the truth would create an insurmountably high bar for any plaintiff to clear. Under Defendant's proposed extension of *McFarlane*, even if Isikoff knew his sources were lying, he should be given a pass. This approach would send a wrecking ball through decades of First Amendment jurisprudence. While the *McFarlane* court found, based on a close analysis of the evidence produced at summary judgment, that the evidence would not support a finding of actual malice, Defendant would have the court dismiss the complaint with prejudice, effectively holding that no evidence could ever be produced or allegations made that Defendants recklessly ignored the truth in putting together, speaking on and promoting the *Conspiracyland* podcast.

*Lohrenz v. Donnelly* is also a summary judgment case and holds, like *McFarlane*, that the plaintiff failed to meet her burden of producing evidence sufficient to raise a triable issue of fact following extensive discovery. *Lohrenz*, 350 F.3d. at 1286. Applying a summary judgment standard to a motion to dismiss is nonsensical. Finally, Defendants fare no better in venturing outside of the D.C. Circuit.

In *Newton v. National Broadcasting Co., Inc*., at the conclusion of a 37-day trial, the jury returned a verdict for the plaintiff. *Newton*, 930 F.2d at 667. In setting aside the jury's verdict on appeal, the court noted that the role of appellate courts in defamation cases required greater scrutiny of jury findings than in the typical case because of the importance of the First Amendment issues involved. *Newton* 930 F.2d at 669. The court felt it necessary to "state in some detail the evidence on the actual malice issue" in order to conduct the "independent review

36

mandated by New York Times, *Bose*, and *Harte–Hanks*—a review in which we give special deference to the jury's and district court's credibility determinations but conduct a more searching review of other evidence germane to the actual malice determination." *Id.* at 672. While appellate review of factual determinations is more rigorous in cases implicating the First Amendment than in other contexts, there is no suggestion anywhere in *Newton* or any of the cases cited therein that the First Amendment should be used to prevent a plaintiff from developing a factual record or even, as Verizon and Isikoff would have it, locking the courthouse door to a plaintiff with no possibility of returning with a sharper key. Defendants have failed to justify the extreme relief they seek.

**8.      Couch's Additional Claims do Not Fail**

Defendants argue that Couch's "ancillary" claims for intentional infliction of emotional distress, false light, interference in business relations, conspiracy, aiding and abetting, negligent supervision should also be dismissed. MTD at 38-39. Defendants' arguments are without merit.

1.      <u>Intentional infliction of emotional distress, false light, tortious interference with business relations.</u>

Defendants do not address the substance of any of allegations in Plaintiff's Third, Fourth and Seventh causes of action for intentional infliction of emotional distress, false light, tortious interference with business relations. As a result, Defendants are now barred from raising any such arguments on reply. Defendants have staked their entire argument on their assertion of legal insufficiencies with Plaintiff's defamation claims. Accordingly, assuming the Court finds that Plaintiff's defamation claims may proceed, his intentional infliction, false light and tortious interference claims may necessarily proceed as well.

However, even if the Court rules against Plaintiff on his defamation claims, this does ***not*** mean these other claims fail. First, the D.C. Circuit has made clear that the contours of false light

and defamation are not identical and that the trial court must make a separate inquiry into the nature of the speech at issue. *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 628 (D.C. Cir. 2001(reminding District Court that, before finding that a statement is not actionable, because it is not reasonably capable of defamatory meaning, it must also satisfy itself that the statement does not arguably place appellant in a highly offensive false light). Here, casting Couch in the light of someone who would claim Hilary Clinton was engaged in a conspiracy with Joe Capone (in the broader context of Isikoff's promotion of the Hilary Clinton assassination conspiracy theory as emblematic of Russian-generated, right-wing disseminated disinformation); who would dox an innocent third party, associate that person with a mass murderer, and seek to burglarize his home; and who is an "alt-right," "Internet troll" and "Internet bully" with a nefarious "confederate" in the backwaters of the Ozarks, is obviously "highly offensive" and casts Couch in a false light. With respect to intentional infliction of emotional distress and tortious interference, since Constitutional "actual malice" is irrelevant to the causes of action, these claims clearly survive if the Court bases its ruling on actual malice. But even in that circumstance, the Court should not dismiss these claims with prejudice for the reasons described above.

      2.   <u>Conspiracy, Aiding and Abetting, Negligent Supervision</u>.

      a.   <u>Conspiracy</u>. With respect to conspiracy, Defendants advance two arguments. Defendants claim, first, that there is no independent tort of "civil conspiracy." MTD at 38-39. Second, Defendants assert that the conspiracy claim fails if the defamation claim fails. MTD at 39. Defendants are incorrect on both counts. It is unclear why Defendants are speaking of an "independent tort" of civil conspiracy, a concept generally applied to dismiss cases where the plaintiff is essentially accusing a corporate entity of conspiring with itself. *Plummer v. Safeway, Inc.*, 934 F. Supp. 2d 191, 198 (D.D.C. 2013). To the extent Mueller, Capone or NPR

defame Plaintiff, if Plaintiff establishes all the legal elements of a conspiracy between Isikoff and any of these parties, Defendants can obviously be liable for a conspiracy to defame. *Mattiaccio v. DHA Grp., Inc.*, 20 F. Supp. 3d 220, 231 (D.D.C. 2014)(dismissing claim not because conspiracy to defame cannot be stated under DC law, but because Plaintiff had failed to establish the existence of an agreement). Defendants have **_not_** challenged the sufficiency of the pleadings with respect to the existence of an agreement with Mueller, Capone or NPR and the count cannot be dismissed on this ground. Even if Isikoff did not defame Couch directly, if he agreed with Capone, Mueller and/or NPR for **_these parties_** to defame Couch, Defendants could be liable on a conspiracy theory. *Id*. As to the absence of any underlying defamation, this is wrong on three counts. First, of course, defamation **_has_** been properly alleged. Even if the Court rules against Plaintiff, any such decision should be without prejudice, and the conspiracy and other claims will also survive to the same extent. Second, Defendants claim that they do not have independent liability for Mark Mueller's statements, because, in their telling, these statements were "volunteered" by Mark Mueller. MTD at 11, 27. Leaving aside that the Complaint adequately demonstrates the falsity of this "volunteering" theory, in particularly by highlighting Isikoff's interviewing technique by which he puts words in the mouths of his interviewees, and even supplies words for them, Defendants do not actually contest that Mueller's statements are defamatory. Rather they simply argue the statements are "volunteered." MTD at 27. The Complaint raises a plausible inference that Isikoff pre-arranges his interviews and has a pre-determined plan he has worked out with his interviewees in advance. Again, the best example of this is Isikoff's interview with Capone. *See supra* at 10. Thus, to the extent Mueller is defaming Couch and Isikoff has entered into an agreement to permit Mueller to defame Couch, Isikoff is liable for conspiracy to defame. Third, Defendants do not even attempt to discuss NPR's liability

for defamation. Given that Defendants do not contest the existence of a conspiracy, they have waived any argument that they did not conspire with NPR.

        b.    <u>Aiding and abetting</u>. The foregoing arguments apply equally to Couch's claims for aiding and abetting. Defendants again make the curious argument that there is no "independent tort" of aiding and abetting, MTD at 40, and cite to *Carroll v. Fremont Inv. & Loan*, 636 F. Supp. 2d 41, 53 (D.D.C. 2009), which relied on the "independent tort" concept to hold, non-controversially, that a corporation cannot conspire with or aid and abet itself. This point is inapposite. Here, the allegation is that Defendants are aiding and abetting others – Mueller, Capone, NPR – in <u>their</u> defamation of Plaintiff, or that others like NPR are aiding and abetting Isikoff and his employer in their smears of Couch. Defendants do not contest that the legal elements of an aiding and abetting have been properly stated. Again, Defendants argument boils down to the proposition that no-one has defamed Couch and that, therefore, Defendants cannot be liable. But Defendants make this expansive claim without establishing that Mueller and NPR did not defame Plaintiff. As a result, their aiding and abetting arguments necessarily fail. To the extent the separately defamatory nature of other parties' statements has not been made clear, Plaintiff should be afforded an opportunity to submit an amended complaint. Defendants reliance on *Plummer*, 934 F. Supp. 2d at 198 is misplaced. In that case leave to amend with respect to a claim of aiding and abetting fraud was denied not because aiding and abetting fraud cannot be stated – which of course it can – but because Plaintiff had alleged no facts remotely supporting a fraud claim was only complaining of the conduct of and had only sued a single defendant that, by definition, cannot conspire with or aid and abet itself. *Id.*

        c.    <u>Negligent Supervision</u>. Defendants offer no substantive argument in support of their motion to dismiss Plaintiff's negligent supervision claim. Defendants rest their case entirely on the position that Plaintiff has failed to state a substantive claim against Isikoff

under any theory and that Plaintiff could not allege any facts to establish liability over Isikoff.

Plaintiff has set forth in detail the reasons why this position is wrong. It is important to note that

Defendants concede that if there is an actionable defamation or other claim against Isikoff, his

supervisors are responsible.[16]

9.    **To the Extent There is a Corporate Entity other Verizon that is Responsible for the Conduct of Defendant Isikoff, Plaintiff Should be entitled to Submit an Amended Pleading with the Proper Defendant Relating Back to the Filing of the Complaint.**

Defendants argue that Verizon is not the appropriate corporate defendant and that

Plaintiff should have sued Oath, Inc. MTD at 42. This is not apparent from Verizon's most

recent annual reports filed on Form 10-K. *See* Quainton Decl. Ex. C. Assuming the Court

determines that Plaintiff has stated or could state viable claims, Plaintiff intends to seek leave to

file an amended pleading pursuant to Fed. R. Civ. P. 15(c) for the purpose of substituting Oath,

Inc. as a defendant in lieu of Verizon.  Such an amendment would properly relate back to the

date of the original filing against Verizon:

> Under Rule 15(c), an amendment to a pleading relates back to the date of the original pleading if the amendment changes the party or the naming of the party against whom a claim is asserted, if the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out or attempted to be set out in the original pleading, and if, within 120 days of service, the party to be added: (i) received such notice of the action that it would not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity. Fed.R.Civ.P. 15(c).

*Bayatfshar v. Aeronautical Radio, Inc.*, 934 F. Supp. 2d 138, 143 (D.D.C. 2013); *see also*

*Stoppelman v. Owens*, 580 F.Supp. 944, 946 (D.D.C.1983) ( "Although Rule 15(c) only refers to

---

[16] Defendants were not required to argue in this fashion. They could have claimed, for example, that even if Isikoff was guilty of defamation or false light invasion of privacy, or conspiring with or aiding and abetting Capone, Mueller and/or NPR, the corporate entity responsible for Isikoff could not be liable for any number of reasons. Defendants did not make, and have now forfeited, any such argument.

an amendment 'changing the party,' the Court concludes that 'the word "changing" must be given a sensible and practical construction,' *Meredith v. United Air Lines*, 41 F.R.D. 34, 39 (S.D.Cal.1966), and a party may be added when the requisite notice and identity of interests showings are made.") (quoting 3 J. Moore, Moore's Federal Practice § 15.15 [4.–2] (2d ed. 1982)). In *Bayatfshar*, the Court permitted the plaintiff to substitute a parent corporation for a subsidiary corporation, and in this case the Plaintiff seeks permission to substitute a subsidiary for the parent. Oath, Inc. would have learned about the Plaintiff's claims at the same time as Verizon insofar as the Plaintiff sued both the parent corporation and a senior employee of Oath. The requirements of Rule 15(c) are therefore satisfied. *Bayatfshar*, 934 F. Supp. 2d at 143.

## 10. Couch Incorporates by Reference His Opposition to the 12(b)(5) Motion Filed by Defendant NPR.

As the Court knows, Defendant National Public Radio has filed a motion under Rule 12(b)(5) (the "NPR MTD") asserting that the Complaint should be dismissed because of a two-day delay in service in the middle of the Covid-19 pandemic. Dkt. 28. Couch has opposed this motion. Dkt. 38. Defendants Verizon and Isikoff now advance their own Motion to Dismiss under Rule 12(b)(5)(the "Second MTD"). In opposition, Plaintiff will not burden the Court with elaborate argument and hereby incorporates by reference the facts and arguments set forth in his opposition to the NPR MTD, which apply with equal force to the Second MTD. The slight two-day delay in service was triggered by factors surrounding the pandemic and it strains credulity to maintain that Defendants are prejudiced by a *de minimis*, two-day delay in service of a timely-filed complaint. Dkt. 37 at 6-13.

## 11. Plaintiff Has No Objection to Defendants' Materials Proferred for Judicial Notice and Asks the Court to Consider the Similar Materials He Has Submitted.

Plaintiff does not oppose Defendants' Request for Judicial Notice, Dkt. 47, and requests that the Court take judicial notice of the materials appended to the Quainton Decl. These

materials are certified transcripts of additional episodes of the *Conspiracyland* podcast and a link to the 2019 and 2020 Verizon 10-K filed with the Securities Exchange Commission (the "SEC"). The Court can take judicial notice of the former for the same reasons offered by Defendants in support of their Request for Judicial Notice. The Verizon 10-K, for its part, are public records filed with the SEC. *Sec. & Exch. Comm'n v. RPM Int'l, Inc*., 282 F. Supp. 3d 1, 11 (D.D.C. 2017)(court may take judicial notice of public records, including SEC filings). Accordingly, the Court may take judicial notice of these items without converting the motion to dismiss to a motion for summary judgment. *Deppner*, 325 F. Supp. 3d at 184.

## CONCLUSION

For the reasons set forth above, the Court should deny Defendant's Motion to dismiss Plaintiff's Complaint under Rules 12(b)(6) and 12(b)(5), taking judicial notice of the materials submitted by both Defendants and Plaintiff. If the Court were to grant any portion of the MTD, such an order should be without prejudice to Plaintiff's right to seek leave to file an amended complaint.

Dated: March 4, 2021

/s/ Eden Quainton_____
EDEN P. QUAINTON, ESQ. (D.C. Bar No. NY0318)
DUNNINGTON, BARTHOLOW & MILLER, LLP
230 Park Avenue, 21st Floor
New York, NY 10169
Telephone: (212) 682-8811
E-mail: equainton@dunnington.com
*Attorneys for Plaintiff Matthew Couch*

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on March 4, 20201, the foregoing document was filed through the CM/ECF system and thereby served electronically on counsel for National Public Radio.

**DUNNINGTON, BARTHOLOW & MILLER, LLP**

/s/ Eden Quainton_____
EDEN P. QUAINTON, ESQ.
230 Park Avenue, 21st Floor
New York, New York 10169
Telephone: (212) 682-8811
E-mail: equainton@gmail.com
Attorneys for Plaintiff Matthew Couch

44