# EXHIBIT G

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 14, 2020　　　Decided March 19, 2021

No. 19-7132

CHRISTIANA TAH AND RANDOLPH MCCLAIN,
APPELLANTS

v.

GLOBAL WITNESS PUBLISHING, INC. AND GLOBAL WITNESS,
APPELLEES

———

Consolidated with 19-7133

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:18-cv-02109)

———

*Rodney A. Smolla* argued the cause for appellants/cross-appellees. With him on the briefs was *Arthur V. Medel.*

*Chad R. Bowman* argued the cause for appellees/cross-appellants. With him on the briefs were *David A. Schulz*, *Mara J. Gassmann*, and *Maxwell S. Mishkin.*

*Gregory M. Lipper* was on the brief for *amici curiae* Non-Governmental Organizations in support of appellees/cross-appellants.

2

*Bruce D. Brown* and *Katie Townsend* were on the brief for *amici curiae* Reporters Committee for Freedom of the Press and 26 Media Organizations in support of appellees/cross-appellants.

Before: SRINIVASAN, *Chief Judge*, TATEL, *Circuit Judge*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Opinion dissenting in part filed by *Senior Circuit Judge* SILBERMAN.

TATEL, *Circuit Judge*: In this defamation action, two former Liberian officials allege that Global Witness, an international human rights organization, published a report falsely implying that they had accepted bribes in connection with the sale of an oil license for an offshore plot owned by Liberia. The district court dismissed the complaint for failing to plausibly allege actual malice. For the reasons set forth in this opinion, we affirm. The First Amendment provides broad protections for speech about public figures, and the former officials have failed to allege that Global Witness exceeded the bounds of those protections.

## I.

Because this appeal comes to us from a dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), "[w]e accept facts alleged in the complaint as true and draw all reasonable inferences from those facts in the plaintiffs' favor." *Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511, 513–14 (D.C. Cir. 2016).

The dispute in this case traces its roots to an Atlantic Ocean plot owned by Liberia and thought to have potentially significant oil reserves. Compl. ¶ 18. The National Oil

3

Company of Liberia (NOCAL), responsible under Liberian law for awarding oil licenses, first issued a license for the plot, known as "Block 13," in 2007 to a company called Broadway Consolidated PLC (BCP). *Id.* ¶¶ 19–21. That transaction was marred by "rumors of corruption," and when BCP failed to fulfill its obligations under its production sharing contract, Liberia began arranging to sell Block 13 to a different oil company. *Id.* ¶¶ 21–22.

ExxonMobil, a multinational oil company, was interested in purchasing Block 13 but wary of buying the license directly from BCP given the rumors of corruption surrounding the 2007 transaction. Accordingly, Exxon got a third-party, Canadian Overseas Petroleum Limited, to buy the Block 13 license and resell it to Exxon. In exchange, Exxon paid $120 million, of which $50 million went directly to Liberia—the most Liberia had ever received in a single natural resources deal. *Id.* ¶ 22. Unlike in the BCP transaction, Liberia was represented in these negotiations by the Hydrocarbon Technical Committee (HTC), a six-member government entity created to "superintend [] negotiations" between oil companies and NOCAL. *Id.* ¶¶ 23–24. Plaintiffs Christiana Tah and Randolph McClain, Liberia's Minister of Justice and NOCAL's CEO respectively, were HTC members during the transaction.

After the deal was consummated, the Liberian President directed NOCAL's board to pay bonuses to those responsible for the new agreement as a "reward for exceptionally well-done service." *Id.* ¶¶ 25–26, 28. But before the board determined the size of the bonuses, McClain "asked two of the HTC members, the President's Legal Advisor, Seward Cooper, and Minister of Justice, Christiana Tah, if payment of such bonuses would be legally permissible." *Id.* ¶ 26. Cooper and Tah "concluded" that they were legal for "two . . . independent reasons." *Id.* ¶ 28. First, the pertinent Liberian anti-corruption law had "expired

4

and was no longer legally operative." *Id*. And second, even had the law remained in force, the bonuses would still pass muster because they "had come at the initiative of [the] President" and "[n]o prospective recipient of the bonuses claimed to have demanded any such bonus payments." *Id.*

NOCAL's board then authorized "approximately $500,000" worth of bonuses. *Id*. ¶ 29. Each "member[] of the HTC, including . . . Tah and . . . McClain, received . . . $35,000," and each of "five consultants were . . . sent bonuses of $15,000." *Id.* The rest of the funds were split among the remaining NOCAL employees, including drivers and custodial workers. *Id*. The $35,000 payments to Tah and McClain are the focus of this case.

According to Global Witness's report, *Catch me if you can*, the organization first learned of Exxon's Block 13 deal from the Liberian Extractive Industries Transparency Initiative (LEITI), a semi-autonomous Liberian agency that publishes information about payments made by energy companies to the Liberian government. Because of NOCAL's "tarnished track record of corrupt deals, Global Witness saw there was a risk of bribery and began its investigation." *Catch me if you can* ("Report") at 9; *see also* Compl. ¶ 42. Global Witness focused on Block 13 in order to highlight the "critical information" provided by section 1504 of the Dodd-Frank Act, *see* 15 U.S.C. § 78m(q), which "[l]ike LEITI, . . . requires all oil, gas, and mining companies to report the payments they make to governments." Report at 9.

*Catch me if you can* addresses Block 13's background and the corruption surrounding the BCP deal. For example, it states BCP was "likely part-owned by [now-former Liberian] government officials with the power to influence the award of oil licenses," and that the award of Block 13 to BCP therefore

5

violated Liberian law. *Id.* at 12. The report also claims that the BCP license was approved due to bribery. It then explains how Exxon structured its transaction to alleviate its concerns about the BCP deal.

The report principally addresses the $35,000 payments in a section titled "Monrovia, 2013: Awash in Cash." *Id.* at 30–31. This section discusses what are repeatedly described as "unusual, large" payments made to HTC members, referencing Tah and McClain by name. *Id.* at 30. It states that NOCAL characterized the payments as "bonuses," using scare quotes whenever it repeats the word "bonus," and claims that the payments "appear . . . to be linked to the HTC's signing of Block 13." *Id.*

In support of its claim that the payments were "large" and "unusual," the report states that "there is no sign of equivalent bonuses during" the surrounding years, "except for smaller yearly bonuses paid shortly before Christmas[;]" that "the payments represented a 160 percent increase on the reported highest salary paid to a Liberian minister[;]" and that one HTC member who was supposedly working for free nonetheless received a payment. *Id.* The report then gives the definition of bribery under Liberian law and references some of the corruption surrounding the 2007 BCP deal—specifically, payments NOCAL made to members of the Liberian legislature to ensure approval of that earlier license, which NOCAL deemed "lobbying fees," and which the Liberian Government's General Auditing Commission later "classified as bribes." *Id.*

A few weeks before Global Witness issued the report, it sent letters to HTC members informing each that "we believe that the payment made by NOCAL to you was most likely a bribe, paid as a reward to ensure that [Block] 13 was negotiated successfully," and asking for a response. Compl. ¶¶ 91–92.

6

Several HTC members, including Tah, denied that the payments were bribes, insisting they were bonuses authorized by NOCAL's board that were "appropriately earned given the extraordinary success of the Exxon negotiations," and pointing out that all NOCAL employees received bonuses. *Id.* ¶¶ 93–95. Global Witness included excerpts from these denials in the report. Report at 30.

The report also discusses Exxon's relationship to these payments. It characterizes them as evidence of Exxon's possible "complicit[y]" in "Liberia's corrupt oil sector," declaring that "Exxon should have known better." *Id.* at 32–33. According to the report, "Exxon . . . knew it was buying a license with illegal origins" and the payments were "in effect . . . likely made with Exxon's money." *Id.* Although stating that "Global Witness believes that Exxon should have considered it possible that money the company provided to NOCAL could have been used as bribes in connection with Exxon's Block 13 deal," the report acknowledges that "Global Witness has no evidence that Exxon directed NOCAL to pay Liberian officials, nor that Exxon knew such payments were occurring." *Id.* at 31–32.

Lastly, Global Witness called on the Liberian government to investigate the payments and, in the event such investigation uncovers unlawful behavior, urged the U.S. Department of Justice "to determine if the company violated the [Foreign Corrupt Practices Act]." *Id.* at 32. Global Witness sent copies of the report to the U.S. Attorney General and the Chairman of the Securities and Exchange Commission. Compl. ¶¶ 100–02.

Following the report's publication, the Liberian government investigated the payments and concluded that they did not "constitute[] bribe[s] within the context of [Liberian] law" and were not "made so [the HTC] could undertake [an]

7

official act." *Id.* ¶ 81 (internal quotation marks omitted). The Liberian government nonetheless recommended that the HTC members return the payments. *Id.* ¶ 83. Tah and McClain refused, asserting that the payments were above-board bonuses for a job well done. *Id.*

Believing that *Catch me if you can* falsely impugns their integrity and reputations, Tah and McClain sued Global Witness for defamation and false light invasion of privacy. They dispute none of the facts contained in the report but argue that Global Witness falsely "communicated [through implication] . . . that . . . each took a bribe in exchange for their roles in the Exxon purchase of Block 13." *Id.* ¶ 31 (emphasis omitted).

Global Witness responded with a special motion to dismiss under the District of Columbia's anti-SLAPP (strategic lawsuits against public participation) statute, which seeks to protect speakers from lawsuits "filed by one side of a political or public policy debate aimed to punish or prevent the expression of opposing points of view." *Competitive Enterprise Institute v. Mann*, 150 A.3d 1213, 1226 (D.C. 2016) (internal quotation marks omitted). To defeat such a motion, the plaintiff must "demonstrate[] that the claim is likely to succeed on the merits," even as the act severely limits discovery. D.C. Code § 16-5502(b). A prevailing defendant may seek an award of attorney's fees. *Id.* § 16-5504(a). Global Witness also filed a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), arguing that the complaint failed to plead defamation by implication, that any defamatory implication was protected opinion, and that, in any event, the complaint failed to plead actual malice as required under the First Amendment.

8

The district court denied Global Witness's special motion because, in its view, the D.C. anti-SLAPP statute did not apply in federal court. *Tah v. Global Witness Publishing, Inc*., No. 18-cv-2109 (D.D.C. June 19, 2019). The court, however, granted Global Witness's Rule 12(b)(6) motion, finding that "the contents of the report are protected speech under the First Amendment and cannot sustain a defamation claim." *Tah v. Global Witness Publishing, Inc.*, 413 F. Supp. 3d 1, 3–4 (D.D.C. 2019).

Tah and McClain appeal, arguing, as they did in the district court, that their allegations are sufficient to state a plausible case of actual malice because Global Witness (1) began its investigation with a preconceived story line, (2) received denials from some of those involved, (3) harbored ill-will toward Exxon, and (4) omitted Seward Cooper from the list of payment recipients. Global Witness cross-appeals, arguing that the anti-SLAPP statute applies in federal court and that the district court's denial of the special motion to dismiss deprived it of the ability "to recover the expenses it has incurred in defending against this meritless attack." Appellees' Br. 67. Like the district court, we begin with the anti-SLAPP issue.

## II.

Under the Supreme Court's decision in *Shady Grove Orthopedic Associates., P.A. v. Allstate Insurance Co.*, to decide whether a state (or district) law or rule—in this case the D.C. anti-SLAPP statute—applies in a federal court exercising diversity jurisdiction, we "first determine whether [a federal rule of civil procedure] answers the question in dispute." 559 U.S. 393, 398 (2010). If it does, the federal rule "governs . . . unless it exceeds statutory authorization or Congress's rulemaking power." *Id.*

9

Applying the *Shady Grove* test, our court held in *Abbas v. Foreign Policy Group, LLC* that the D.C. anti-SLAPP act does not apply in federal court. 783 F.3d 1328, 1334–37 (D.C. Cir. 2015). Without controlling guidance from the D.C. Court of Appeals—at the time that court had yet to interpret the anti-SLAPP act—we construed the statute's "likely to succeed on the merits" standard literally, finding that it "is different from and more difficult for plaintiffs to meet than the standards imposed by Federal Rules 12 and 56." *Id.* at 1335. Accordingly, we concluded that the D.C. anti-SLAPP statute impermissibly "conflicts with the Federal Rules by setting up an additional hurdle a plaintiff must jump over to get to trial." *Id.* at 1334.

Global Witness argues that the D.C. Court of Appeals's subsequent decision in *Competitive Enterprise Institute v. Mann* effectively abrogates *Abbas*. There, interpreting the anti-SLAPP statute's special motion to dismiss provision for the first time, the Court of Appeals held, contrary to *Abbas*, that the "D.C. Anti-SLAPP Act's likelihood of success standard . . . simply mirror[s] the standards imposed by Federal Rule 56," and that to decide a special motion to dismiss, the court "must assess the legal sufficiency of the evidence" as it currently stands at the time of the motion. *Mann*, 150 A.3d at 1236, 1238 n.32 (internal quotation marks omitted).

Even with this development, however, *Abbas* remains circuit law and controls this case. The reason comes from *Mann* itself, in which the Court of Appeals "agree[d] with *Abbas* that the special motion to dismiss is different from summary judgment" in two respects. *Id.* at 1238 n.32.

First, the special motion to dismiss "imposes the burden on plaintiffs." *Id.* Once a defendant makes a prima facie showing that the lawsuit in question qualifies as a SLAPP, the burden shifts to the plaintiff to defeat the special motion to

10

dismiss. *Id.* at 1237. By contrast, even a "movant" defendant on a Federal Rule 56 summary judgment motion retains some initial "burden of showing that there is no genuine issue of fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

Second, the Court of Appeals observed that, unlike a summary judgment motion, a special motion to dismiss will usually be decided "before discovery is completed." *Mann*, 150 A.3d at 1238 n.32. By contrast, under Federal Rule 56, summary judgment is typically "premature unless all parties have had a full opportunity to conduct discovery." *Convertino v. DOJ*, 684 F.3d 93, 99 (D.C. Cir. 2012) (internal quotation marks omitted). According to Global Witness, however, the allowance for discovery under the anti-SLAPP statute is identical to that under Federal Rule 56. The D.C. Court of Appeals's recent decision in *Fridman v. Orbis Business Intelligence Ltd.*, 229 A.3d 494 (D.C. 2020), forecloses this argument. There, the court addressed the provision of the anti-SLAPP act that stays discovery whenever a special motion to dismiss is filed, except for "[w]hen it appears likely that targeted discovery will enable the plaintiff to defeat the motion and that the discovery will not be unduly burdensome." D.C. Code § 16-5502(c)(2). That standard, the court explained, "is difficult to meet," because the party requesting discovery must show that it is actually "likely" that "targeted discovery will enable him to defeat the special motion to dismiss." *Fridman*, 229 A.3d at 512–13. Thus, "discovery normally will not be allowed." *Id.* at 512. This differs from Federal Rule 56, under which full discovery is the norm, not the exception.

Although *Mann* may undermine some of *Abbas's* reasoning, the bottom line remains: the federal rules and the anti-SLAPP law "answer the same question about the

11

circumstances under which a court must dismiss a case before trial . . . differently," and the anti-SLAPP law still "conflicts with the Federal Rules by setting up an additional hurdle a plaintiff must jump over to get to trial." *Abbas*, 783 F.3d at 1333–34 (internal quotation marks omitted). Accordingly, the district court properly applied *Abbas* to this case and denied the special motion.

### III.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "We assume the truth of all well-pleaded factual allegations and construe reasonable inferences from those allegations in a plaintiff's favor." *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

In a defamation by implication case under D.C. law, "the courts are charged with the responsibility of determining whether a challenged statement is capable of conveying a defamatory meaning." *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990) (internal quotation marks omitted). A plaintiff must show first that the "communication, viewed in its entire context, . . . conveys materially true facts from which a defamatory inference can reasonably be drawn," and second, that "the communication, by the particular manner or language in which the true facts are conveyed, supplies additional, affirmative evidence suggesting that the defendant intends or endorses the defamatory inference." *Armstrong v. Thompson*, 80 A.3d 177, 184 (D.C. 2013) (emphasis omitted) (quoting *White*, 909 F.2d at 520). Where, as here, plaintiffs qualify as public officials—as Tah and McClain concede they

12

do—the First Amendment requires that they also allege that the defamatory statement "was made with actual malice." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964) (internal quotation marks omitted). The First Amendment, the Supreme Court long ago observed, enshrines "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Id.* at 270. The actual malice standard reflects the cornerstone First Amendment principle that "speech relating to public officials and public figures, as distinct from private persons, enjoys greater protection." *Jankovic v. International Crisis Group* (*Jankovic III*), 822 F.3d 576, 584 (D.C. Cir. 2016).

The actual malice standard is famously "daunting." *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996). A plaintiff must prove by "clear and convincing evidence" that the speaker made the statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *Jankovic III*, 822 F.3d at 589–90 (second part quoting *New York Times Co.*, 376 U.S. at 279–80). "[A]lthough the concept of reckless disregard cannot be fully encompassed in one infallible definition," the Supreme Court has "made clear that the defendant must have made the false publication with a high degree of awareness of probable falsity," or "must have entertained serious doubts as to the truth of his publication." *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989) (alteration omitted) (internal quotation marks omitted); *see also id.* at 688 (using these formulations interchangeably). The speaker's failure to meet an objective standard of reasonableness is insufficient; rather the speaker must have actually "harbored subjective doubt." *Jankovic III*, 822 F.3d at 589.

The dissent thinks this is an easy case. "In Global Witness's story," the dissent asserts, "Exxon was the briber,"

13

Dissenting Op. at 1, yet the report admits that "Global Witness ha[d] no evidence that Exxon directed NOCAL to pay Liberian officials, nor that Exxon knew such payments were occurring," Report at 31.

Critically, however, neither Tah nor McClain advances this theory—in their briefing to us, they never even mention the sentence on which the dissent relies. They make four specific arguments in support of their claim that Global Witness possessed actual malice, *supra* at 8, not one of which is that Global Witness had no evidence that Exxon was the briber, and for good reason. At most, the report implies that NOCAL, not Exxon, was the briber, thus rendering any lack of evidence as to Exxon's direction or knowledge of the payments totally irrelevant. *See* Report at 32 (stating that Exxon "knew the risk" and "should have considered it possible that money the company provided to *NOCAL* could have been used as bribes in connection with Exxon's Block 13 deal" (emphasis added)); *id.* (noting that Global Witness asked Exxon for comment on any "safeguards the company may have put in place to prevent the possible misuse of its funds *by NOCAL*" (emphasis added)). Contrary to the dissent, *see* Dissenting Op. at 6, a generic statement accusing someone of acting with reckless disregard—here, Tah and McClain's claim that "Global Witness subjectively *knew* that it had not been able to determine whether the payments of $35,000 to Christiana Tah and Randolph McClain were corrupt bribery payments," Appellants' Br. 36—simply cannot be read to shoehorn in every conceivable actual malice theory. Indeed, when our dissenting colleague surfaced his theory at oral argument, it was so foreign to appellants' counsel that our colleague had to spoon-feed him after he failed to get the initial hint. *See* Oral Arg. Tr. at 10 ("Well, no, it's worse. Isn't it stronger than that, counsel? We have no evidence."). As our dissenting colleague himself has made clear, "we do not consider arguments not

14

presented to us." *Diamond Walnut Growers, Inc. v. NLRB*, 113 F.3d 1259, 1263 (D.C. Cir. 1997) (en banc). Or put another way, "appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983).

We turn, then, to the "legal questions presented and argued" by Tah and McClain. They advance what the district court described as "several interlocking theories to support the allegation of actual malice." *Tah*, 413 F. Supp. 3d at 12. We agree with the district court that these theories fail to support a plausible claim that Global Witness acted with actual malice.

Tah and McClain first allege that Global Witness began their investigation with "a preconceived story line" that they argue "is plainly probative of actual malice." Appellants' Br. 19 (emphasis omitted). In support, they point out that the letters in which Global Witness asked for comment state that the $35,000 payments were "most likely" bribes. Compl. ¶¶ 91–92.

Our court, however, has made clear that "preconceived notions" or "suspicion[s]" usually do "little to show actual malice." *Jankovic III*, 822 F.3d at 597. After all, virtually any work of investigative journalism begins with some measure of suspicion. Thus, "concoct[ing] a pre-conceived storyline" by itself is "not antithetical to the truthful presentation of facts." *Id.* at 597 (internal quotation marks omitted). Moreover, because Global Witness sent the letters toward the end of its investigative process and just a few weeks before publication, the letters provide no support at all for the notion that Global Witness's conclusion was preconceived. As the district court correctly observed, "[t]hat Global Witness had arrived at its conclusion, right or wrong, by the time it reached out for

15

comment and shortly before publication is commonplace and no surprise." *Tah*, 413 F. Supp. 3d at 13. Finally, seeking comment in advance of publication is a standard journalistic practice. *See, e.g.*, *Responses*, Associated Press, http://www.ap.org/about/news-values-and-principles/telling-the-story/responses ("We must make significant efforts to reach anyone who may be portrayed in a negative way in our stories, and we must give them a reasonable amount of time to get back to us before we move the story."). Drawing a pernicious inference from adherence to such professional standards would turn First Amendment case law on its head. In any event, even an "extreme departure from professional standards" is insufficient to prove actual malice on its own. *Harte-Hanks*, 491 U.S. at 665.

Next, Tah and McClain seek to draw an inference of actual malice from Global Witness's failure to credit their denials. This too finds no support in our First Amendment case law. A publisher "need not accept 'denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.'" *Lohrenz v. Donnelly*, 350 F.3d 1272, 1285 (D.C. Cir. 2003) (quoting *Harte-Hanks*, 491 U.S. at 691 n.37). Although consistent with each other, the denials contain no "evidence that could be readily verified" of the sort that would provide "obvious reasons to doubt the veracity of [Global Witness's] publication." *Id.* (internal quotation marks omitted). As the district court pointed out, the denials "fail" even to "contest the facts that are [stated] in the Report." *Tah*, 413 F. Supp. 3d at 13.

According to the dissent, our description of the law is "obviously fallacious," Dissenting Op. at 10, an odd accusation given that we have done nothing more than quote from our

16

court's decision in *Lohrenz*. Undaunted, the dissent attempts to distinguish *Lohrenz* on the ground that Global Witness "had 'no evidence'—and no witnesses—to contradict the six denials." *Id.* at 11 (quoting Report at 31). But that quotation comes from the same sentence in *Catch me if you can* that the dissent relies on for the proposition—irrelevant to the arguments made by Tah and McClain, *see supra* at 13—that Global Witness had no evidence that *Exxon* had paid bribes.

Contrary to the dissent, moreover, nothing in the six denials comes close to the kind of "readily verifi[able]" evidence, *Lohrenz* 350 F.3d at 1285, needed to support a plausible—and we emphasize the word plausible—case that Global Witness published with a "high degree of awareness of probable falsity," *Harte-Hanks*, 491 U.S. at 688 (alteration omitted) (internal quotation marks omitted). *See* Dissenting Op. at 12. To be sure, as the dissent points out, the denials state that more than 140 others, such as NOCAL drivers and janitors, also received bonuses. But as the report explains, "the vast majority of these payments were smaller . . . by two orders of magnitude" and "were not made to people who signed the Exxon deal." Report at 32. Indeed, the denials themselves characterized the payments the HTC received as rewards for those "who performed exceptionally in conducting the negotiations on the Exxon Contract," a rationale obviously inapplicable to payments to other company employees. Compl. ¶ 93 (quoting Tah's denial); *see also id.* ¶ 94 (quoting McClain's denial, which stated "[a]ny bonus given by our superiors was in acknowledgement of the Team's extraordinary work after the completion of the landmark Contract"). It is also true that the denials explain, as does the report, that the pot of money used to make the payments was "negotiated" as part of the larger Exxon deal, Dissenting Op. at 12; Report at 32, but we fail to see how that contradicts the idea that the payments were bribes from NOCAL. The dissent refers

17

to the NOCAL board resolution approving the payments, presumably because the denials claim that the payments were "authorized by NOCAL's Board of Directors." Compl. ¶ 93 (quoting Tah's denial). But according to the report, Global Witness "requested, but had not yet received" a copy of the board resolution, and the complaint alleges nothing to the contrary. Report at 31.

Tah and McClain next argue that Global Witness harbored ill-will and desired "to catch Exxon and [CEO Rex] Tillerson in scandal." Appellants' Br. 25. In support, they rely on the fact that the report is critical of Exxon and that Global Witness subsequently sent letters reiterating the report's conclusions to the Department of Justice and the Securities and Exchange Commission. Our court, however, has made clear that evidence of ill will "is insufficient by itself to support a finding of actual malice." *Tavoulareas v. Piro*, 817 F.2d 762, 795 (D.C. Cir. 1987) (en banc); *see also Harte-Hanks*, 491 U.S. at 665 ("Petitioner is plainly correct in recognizing . . . that a newspaper's motive in publishing a story . . . cannot provide a sufficient basis for finding actual malice."). Regardless, neither the report's critical nature nor the letters sent to the Attorney General and the SEC plausibly supports an ill-will theory. As the district court aptly put it, the report's "conclusion is not evidence of its conception." *Tah*, 413 F. Supp. 3d at 13.

The implications of Tah and McClain's theory are breathtaking: they would find support for an inference of actual malice in a wide swath of investigative journalism that turns out to be critical of its subject. "It would be sadly ironic for judges in our adversarial system to conclude . . . that the mere taking of an adversarial stance is antithetical to the truthful presentation of facts." *Tavoulareas*, 817 F.2d at 795.

18

Finally, Tah and McClain argue that "the stunning failure of Global Witness to include . . . Seward Cooper, as among the [HTC] members who received a $35,000 bonus" reveals actual malice because Cooper, along with Tah, determined that the payments were legal. Appellants' Br. 34. We do not see how this omission shows awareness of falsity or reckless disregard for the truth. If anything, that one of the lawyers responsible for conducting a legal analysis of the payments was himself in line to receive one makes the payments even more suspicious.

For all these reasons, Tah and McClain have failed to plausibly allege that Global Witness acted with actual malice. This deficiency proves fatal not only to their defamation claims but to their false light claims as well. *See Farah v. Esquire Magazine*, 736 F.3d 528, 540 (D.C. Cir. 2013) (explaining that a "plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim" and that "[t]he First Amendment considerations that apply to defamation therefore apply also to [plaintiffs'] counts for false light" (internal quotation marks omitted)).

**IV.**

We affirm the district court's dismissal of the complaint, as well as its denial of the anti-SLAPP motion.

*So ordered.*

SILBERMAN, *Senior Circuit Judge*, dissenting in part: Global Witness (Appellee) falsely insinuated that former Liberian officials (Appellants) took bribes from Exxon. It admitted that it had *no evidence* that Exxon had contacted Appellants, directly or indirectly, with respect to the alleged payments. And the evidence Global Witness did have suggested the payments at issue were proper staff bonuses, not bribes. Nevertheless, the Majority creates a whole new theory of the case—one not advanced by any Party—that the Appellants were bribed not by Exxon, but by their *own* principal, the National Oil Company. According to the Majority, its new narrative is so unassailable that, even at the 12(b)(6) stage, it precludes an inference that Global Witness harbored subjective doubts as to the implied accusation of bribery.

## I

As Global Witness explained, "this is a story of bribery." J.A. 58. Bribery, as it is commonly understood, involves a *quid pro quo*. *See McDonnell v. United States*, 136 S. Ct. 2355, 2372 (2016); *accord* J.A. 82 ("[A] payment given so a public servant will undertake an official act."). As such, bribery has three necessary components: A briber, a bribee, and an exchange. In Global Witness's story, it seems obvious that Exxon was the briber, Appellants were the bribees, and the trade was $35,000 to ensure the deal goes through. Without one element, there is obviously no bribery. In other words, if no briber—or no bribe—then no bribee.

In its cross-appeal, Global Witness contends that its Report was not even defamatory—it simply raised questions. Of course, Appellants disagree, claiming that the Report, *Catch me if you can*, falsely insinuated that they took bribes from Exxon to approve the Block 13 deal.

The district court easily determined that Global Witness's story contained the defamatory implication that

2

Appellants took bribes from Exxon. *Tah v. Glob. Witness Publ'g, Inc.*, 413 F. Supp. 3d 1, 10 (D.D.C. 2019) ("[T]he import of the Report [is] that there was bribery—either by [the National Oil Company], Exxon, or both—in connection with the post-negotiation payments to Liberia's chief representatives."); *id.* at 9 (Global Witness's Report "literally [drew] a line between Exxon's money, the bonuses, and the sale of the license for Block 13"); *accord* Appellant Br. 15 ("The story was that Exxon . . . brazenly engineered a Liberian oil purchase through bribery.").   According to Global Witness, Exxon's payment to the National Oil Company and the subsequent bonuses were "unusual" and "suspicious." J.A. 82, 83, 85.   Exxon, as Global Witness saw it, "was under no obligation to pay most of the money" it transferred to the National Oil Company; "$4 million of its $5 million payment was characterized as a '*bonus*.'" J.A. 84 (emphasis in original). And, as Global Witness reminds its readers, the National Oil Company has a record of bribing officials on behalf of oil companies.   The "bonuses" then paid to the officials were, Global Witness wrote, "unusual, large payments to officials who signed the Exxon deal." J.A. 85.   Global Witness further noted that these individual "bonuses" were likely derived from the same bank account into which Exxon paid the initial $4 million "bonus" to the National Oil Company.

The court explained how Global Witness "tied ExxonMobil's payments [to the National Oil Company] for the acquisition of rights in Block 13 with how [the Company] shared some of that money with its negotiators, including Plaintiffs." *Tah*, 413 F. Supp. 3d at 9.   One chart in the Report tracked payments from Exxon to the National Oil Company to members of the Hydrocarbon Technical Committee, including Appellants Christiana Tah and Randolph McClain.   The district court noted that this chart, listing the amount of each official's bonus, "had the effect of literally drawing a line between Exxon's money, the bonuses, and the sale of the license for Block 13." *Id.*

3

The Report also connected Exxon to the bribes by making repeated parallels to the 2003 transaction. In that deal, Global Witness asserted that the National Oil Company paid bribes to legislators on behalf of the Broadway Consolidated oil company to secure ratification of its purchase. J.A. 68; *see also* J.A. 84 (noting that the National Oil Company had also paid bribes on behalf of Oranto Petroleum). And now, Exxon was stepping into Broadway's shoes. As the district court explained, "a reasonable reader easily could have understood the Report to imply that the [earlier legislative] bribes and the 2013 [Technical Committee] bonuses were of a piece." *Tah*, 413 F. Supp. 3d at 9. And, the district judge noted, "[i]f that were not the case, the Report would have *no reason* to advocate for an investigation" (since there is no direct evidence of bribery). *Id*. at 10 (emphasis added).

The court also rejected the Appellee's argument that its story actually negated any inference of bribery because it expressly stated that "Global Witness has no evidence that Exxon directed [the National Oil Company] to pay Liberian officials, nor that Exxon knew such payments were occurring." *Id*. (quoting J.A. 83). After the Report repeatedly insinuated bribery, this disclaimer "did not negate the inference that ExxonMobil's money was, in part, paid as bribes to [Company] representatives who signed the lease agreement." *Id*. This statement merely "admit[ed] that the Global Witness suspicions and calls for investigations of ExxonMobil and [the National Oil Company] lacked *any* evidence that the former had involvement in monies paid to employees of the latter." *Id*. (emphasis in original).

## II

My disagreement with the district court is limited to the actual malice question (my disagreement with the Majority is much broader). In *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), the Supreme Court set forth the well-known rule that, to hold a defendant liable for defaming a public figure, a

4

plaintiff must prove the defendant acted with "actual malice." *Id.* at 279–80. That is, with knowledge that the statement was false or with reckless disregard for the truth. *Id.* at 280. As the Supreme Court saw it, this scienter requirement appropriately balanced (as a policy matter) the vindication of reputational harms with the need to protect unintentional falsehoods that inevitably arise as part of vibrant debate. *Id.* at 271–72. The actual-malice rule makes the speaker's state of mind the constitutional gravamen in any defamation case brought by a public figure.

The Majority emphasizes that actual malice is a subjective test. Majority Op. 12 (citing *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 589 (D.C. Cir. 2016)). But it is important not to confuse what a plaintiff must ultimately show with the kind of evidence he may use to make that showing. It is the rare case in which a defendant will confess his state of mind and thus allow the plaintiff to prove actual malice with direct evidence. Accordingly, as the Appellee concedes, actual malice "is ordinarily inferred from objective facts." *Washington Post Co. v. Keogh*, 365 F.2d 965, 967 (D.C. Cir. 1966); *accord* Appellee Br. 50.

In *St. Amant v. Thompson*, the Supreme Court listed three examples of objective circumstances that permit a subjective inference of actual malice: (1) "where a story is fabricated by the defendant . . . or is based wholly on an unverified anonymous telephone call;" (2) "when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation;" and (3) "where there are obvious reasons to doubt" the basis for the story. 390 U.S. 727, 732 (1968); *see also Tavoulareas v. Piro*, 817 F.2d 762, 790 (D.C. Cir. 1987) (en banc). So even in the absence of contradictory evidence, a story may be so facially implausible or factually flimsy that the jury may infer that it must have been published with reckless disregard for the truth. *See Hunt v. Liberty Lobby*, 720 F.2d 631, 646 (11th Cir. 1983). And even assuming a plausible story, the question remains

5

whether "the cumulative force of the evidence to the contrary" should give the publisher obvious reasons for doubt. *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1514 (D.C. Cir. 1996); *see Jankovic*, 822 F.3d at 597.  If the publisher moves forward without reasonably dispelling his doubts, actual malice may be inferred.  *Lohrenz v. Donnelly*, 350 F.3d 1272, 1284 (D.C. Cir. 2003).

*St. Amant*'s examples thus suggest a straightforward framework for evaluating contentions of actual malice.  We first assess the inherent plausibility of a defendant's story as well as the facts in support.  And if we find the story objectively plausible, we then ask whether evidence to the contrary creates obvious reasons for doubt.

\*        \*        \*

I turn to whether Global Witness's accusation that Exxon bribed the Appellants—the case before us—is facially plausible.  Appellants claim that Global Witness knew it lacked any support for insinuating that the payments to Tah and McClain were bribes.  Thus, a jury could infer that Global Witness subjectively doubted the truth of its Report.

I agree.  In my view, because Global Witness's story is obviously missing (at least) one necessary component of bribery, it is inherently improbable.  Although it accused Appellants of taking bribes from Exxon, Global Witness admits that it had "*no evidence* that Exxon directed the [National Oil Company] to pay Liberian officials, nor that Exxon knew such payments were occurring." J.A. 83 (emphasis added).  In other words, despite all its investigating, Global Witness uncovered *nothing* to demonstrate that Exxon was the briber and *nothing* to even suggest there was an agreed upon exchange.  *Accord Tah*, 413 F. Supp. 3d at 10 ("Global Witness's suspicions and calls for investigations of ExxonMobil and [the National Oil Company] lacked *any* evidence that the former had involvement in monies paid to employees of the latter.")

6

(emphasis in original).  And with no privity between Exxon and the Technical Committee members, it is bizarre to accuse Appellants of taking a bribe.  As *St. Amant* teaches, it is sufficient to infer—on this basis alone—that Appellee acted with knowing disregard for the veracity of its publication.

The Majority's assertion that this argument was never made by the Appellants leads me to wonder whether we received the same briefs.  In my copy, Appellants argue that "Global Witness subjectively *knew* that it had not been able to determine whether the payments of $35,000 to Christiana Tah and Randolph McClain were corrupt bribery payments.  Yet . . . Global Witness proceeded to present to readers the defamatory message that in fact [] Tah and [] McClain had taken bribes."  Appellant Br. 36 (emphasis in original).  That sounds to me a whole lot like accusing Global Witness of publishing its story with no evidence to back it up.  The Majority, moreover, faults me for assessing the inherent (im)plausibility of Global Witness's story, without a specific request from Tah and McClain to do so.  But (as discussed) "inherently implausible" is a *legal standard* by which we assess Appellants' *arguments*—not an argument to be advanced.  *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991); *cf. Eldred v. Ashcroft*, 255 F.3d 849, 853 (D.C. Cir. 2001) (Sentelle, J., dissenting) ("Merely because the parties fail to advance the proper legal theory underlying their claim does not—indeed cannot—prevent a court from arriving at the proper legal disposition.").

To be sure, Appellants did not quote the "no evidence" paragraph in their brief; it was "the Court" at oral argument that focused on this damning language.  But it is hardly a new argument; it is only evidence—although powerful evidence—supporting Appellants' argument.  Apparently, the Majority also recognizes the significance of the passage and wishes to rule it out of order.  But the Appellee itself injected this statement into the controversy when it brandished it as supposedly exculpatory evidence.  Appellee Br. 19, 35.

7

Global Witness points to other facts that support its story, but none amount to a hill of beans. It emphasizes the obvious point: Payments were made to Appellants. Then it notes these payments were "likely" sent from the same account where Exxon deposited its $4 million "bonus" to the National Oil Company itself. Although a sly suggestion of wrongdoing, when you think about it, it's a non sequitur. If that were support for a bribe, any investment banker's commission could be illegal.

Next, Global Witness justifies its story based on a past "history" of bribery by the National Oil Company. The Company had previously, in connection with the 2003 bid, paid out bribes to legislators on behalf of another oil company in order to ratify a transaction. Our situation is quite different; in this case, the recipients of the "bribes" were the National Oil Company's own agents and employees. And connecting bribery to the 2013 circumstances from the wholly separate 2003 bid—in which Tah and McClain were not even involved—is a grossly unfair inference. Global Witness attempts to tar the conduct of two parties to a transaction with the prior bad acts of entirely different people. That is entirely illegitimate.

It is significant, moreover, that the National Oil Company paid out bonuses to *all* those involved in the negotiations—including American consultants—as well as low-ranking employees. Yet the story focuses on members of the Technical Committee as if they were special transgressors. But for Global Witness's story to be true, Exxon was somehow spreading bribes left and right like Johnny Appleseed. The much more obvious explanation is that the "bonuses" were in fact bonuses paid for outstanding performance. Certainly at the 12(b)(6) stage, Appellants are entitled to that inference (Global Witness is not entitled to its speculative inference to the contrary). *See Palin v. New York Times Co.*, 940 F.3d 804, 815 (2d Cir. 2019).

8

The timing and manner of the payments are further indications of bonuses, not bribes.  Recall that in connection with Broadway's 2003 bid for Block 13, Global Witness explained that the National Oil Company supposedly paid most of Broadway's bribes to legislators *before* approval of the deal.  In contrast, the 2013 payments from the National Oil Company to its own negotiators, staff, and consultants occurred *after* the deal was completed.  J.A. 67.  The latter payments—as Global Witness knew—were only initiated after the approval of a board resolution authorizing up to $500,000 in bonuses.  And, as Global Witness also acknowledges, the board had the full legal authority to take this action.  These payments, openly made, are also indicia of proper bonuses; bribes, which are illegal everywhere, are typically made in the dark.  *See DiBella v. Hopkins*, 403 F.3d 102, 117 (2d Cir. 2005) (defendant knew that payments to plaintiff were not surreptitious, which supported the jury's conclusion that the defendant made a bribery accusation with actual malice).

For all these reasons, I consider Global Witness's Report inherently improbable.  On its face, it's a house of cards: With "no evidence" supporting Exxon as a briber, Tah and McClain could not be Exxon's bribees.  Nor is there any evidence—not a shred—that the bonuses paid by the National Oil Company to Appellants were themselves bribes.  There is no indication that the National Oil Company had a corrupt motive, nor that Appellants were asked to perform an illegal or improper task.  I would therefore conclude, based on the foregoing alone, that it is sufficient to infer actual malice at the 12(b)(6) stage since the story is *inherently* improbable.

*          *          *

There is more:  Global Witness had additional, "obvious reasons" to doubt its Report, which would also support an inference of actual malice.  *St. Amant*, 390 U.S. at 732 (example three).  *All* the eyewitnesses to the transaction that responded to Global Witness explained precisely *why it was wrong*.  And

9

Global Witness had no facts that would cause it to discount these explanations.

Six individuals—four members of the Technical Committee and two consultants—responded to Global Witness's accusations of bribery. Each denied that bribery occurred. At least four offered specific, fact-based explanations as to why Global Witness was wrong. Christiana Tah (a Yale Law School graduate)[1] explained that bonus payments were made to *all* National Oil Company staff *after* the Exxon deal was concluded. Robert Sirleaf, a Technical Committee member and chair of the Company's Board of Directors, similarly explained that bonuses were paid to the entire company after the Parties concluded the contract and exchanged consideration. And, he added, a bonus was called for: Liberia received a signing payment fifteen times larger than in any prior transaction. Natty Davis, another Committee member and the Chair of the National Investment Commission, added that the decision to pay the bonuses was approved by a formal resolution of the Company's board. Randolph McClain noted that the Exxon contract was "extraordinary enough to be used as a model for all future contracts of this nature." J.A. 44.

Two American consultants—not mentioned by the Majority and not targeted by Global Witness's story—also told Global Witness that its Report was false. Each received $15,000 bonuses. One consultant, Jeff Wood, explained that Exxon's payment to the National Oil Company was not "voluntary" as Global Witness reported—it was negotiated as part of the transaction. J.A. 45. Moreover, Wood noted, it made no sense to equate legislative bribes paid following Broadway's 2003 bid to the National Oil Company's 2013 payments to its own staff. Wood again explained that all the employees of the National Oil Company received payments, not just those that signed the deal. Last, Wood wrote that it was

---

[1] That surely is not inculpatory.

10

absurd to infer bribery because no similar bonuses had been paid in recent years.  Since no other deals had been concluded, there was no success to reward.

The Majority, however, asserts that a publisher "need not accept denials, however vehement" as a matter of law. Majority Op. 15 (quoting *Lohrenz*, 350 F.3d at 1285); *see also* Appellee Br. 54 ("[D]enials do not and cannot constitute 'evidence' as a matter of law.").  This proposition is obviously fallacious.[2]  It of course depends on the substance and context of the denial.  If denials were legally irrelevant, then any response of the target could be ignored.[3]  Indeed, the Supreme Court—even while professing in dicta that the mere *existence* of a denial need not be considered—has evaluated the *contents* of denials to determine whether a publisher acted with actual malice.  *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 691–92 (1989).  And it has noted that certain key denials should reasonably be expected to kill stories.  *Id.* at 682.

To be sure, we discounted the probative value of the denials in *Lohrenz v. Donnelly*.  350 F.3d 1272.  *Lohrenz* involved a publication that questioned the competence of a

---

[2] The Majority protests that it has "done nothing more than quote" from *Lohrenz*.  Majority Op. 15–16.  But those quotations (strung together out of order) do not give an accurate impression of our holding in that case.  In *Lohrenz*, we held at the summary judgment stage that "[u]nlike evidence that could be readily verified, *the Navy's denials* did not give [the defendant] 'obvious reasons' to doubt the veracity of her publication."  350 F.3d at 1285 (emphasis added and internal citations omitted).  This was because, as we explained, *those* denials were mere assertions contradicted by other evidence.  *Id.*

[3] Suppose a reporter plans to accuse X of robbery in New York City on December 1st.  But X denies the allegation, explaining that he was in Los Angeles on that date.  Obviously, this denial would need to be considered and verified by a responsible reporter.

11

female fighter pilot.  According to the story, the pilot was substandard, should not be flying, and was only assigned to the F-14 program on account of a "politically driven policy."  *Id.* at 1284.  The publisher's source was one of the pilot's former training officers, who we characterized as "a knowledgeable, non-anonymous source."  *Id.*  Furthermore, the publisher had obtained additional information from the Navy that confirmed the training officer's claims—namely, that the pilot had received a number of accommodations during training, which other officers agreed were "excessive."   J.A.  1285.  Nevertheless, the Navy denied the story, and officials told the publisher that its conclusions were inaccurate.

But as we explained, the fact of a denial, *in itself,* "hardly alert[s] the conscientious reporter to the likelihood of error."  *Lohrenz*, 350 F.3d at 1285 (quoting *Harte-Hanks*, 491 U.S. at 691 n.37).  Rather, the specific content of a denial may well give the publisher obvious reasons to doubt the veracity of the publication.  *See id.*; *Montgomery v. Risen*, 197 F. Supp. 3d 219, 263 (D.D.C. 2016), *aff'd,* 875 F.3d 709 (D.C. Cir. 2017).  So in *Lohrenz*, we reasoned that the Navy's denials were contradicted by the publisher's interview with the flight instructor.  350 F.3d at 1285.  In light of the evidence on both sides of the question, the *Lohrenz* publisher did not have any obvious reason to doubt its story.

Global Witness, however, did not have evidence on both sides of the issue.  It had "no evidence"—and no witnesses—to contradict the six denials.  The cumulative balance of the evidence thus gives Global Witness obvious reasons for doubt.  *See McFarlane*, 91 F.3d at 1514.

I am dumbfounded by the Majority's assertion that the denials in our case contain "no readily verifiable information . . . that would provide 'obvious reasons to doubt.'"  Majority Op. 15.  The denials were specific, and it was within Global Witness's power to easily inquire into whether other employees received bonuses, the content of the

12

Board's resolution approving the bonuses, and whether the $4 million to the National Oil Company was negotiated as part of the purchase price (etc.).

The Majority discounts these facts by weighing the evidence and drawing inferences against Tah and McClain. *See* Majority Op. 17 ("[T]he dissent refers to the NOCAL board resolution approving the payments . . . . *But* . . . Global Witness 'requested, but had not yet received' a copy . . . *and* the complaint alleged nothing to the contrary.") (emphases added); *id*. at 16 (discounting the fact that bonuses were paid to all employees because the largest bonuses were paid to the Technical Committee). Such weighing of the evidence is, of course, impermissible at the 12(b)(6) stage. As the Second Circuit recently reiterated in another defamation case, "[I]t is not the [] court's province to dismiss a plausible complaint because it is not as plausible as the defendant's theory." *Palin*, 940 F.3d at 815.

\*     \*     \*

In sum, the dramatic indication of actual malice is the statement in Global Witness's story to which we have previously referred. J.A. 83 (Global Witness had "*no evidence* that Exxon directed the [National Oil Company] to pay Liberian officials, nor that Exxon knew such payments were occurring.").[4] As we noted, Global Witness raised this point itself in a futile effort to rebut defamation. But Global Witness is hoist on its own petard. As I have explained, rarely does he

---

[4] Perhaps the lack of evidence explains why the district court was confused as to whether the bribes came from Exxon—which is the obvious import of the story—or the National Oil Company—which makes no sense. *See Tah*, 413 F. Supp. 3d at 10 ("[T]he import of the Report [was] that there was bribery—either by [the National Oil Company], Exxon, or both—in connection with the post-negotiation payments to Liberia's chief representatives."). Of course, "both" implies that even though the National Oil Company may have paid out the bribes, it did so on Exxon's behalf.

13

who defames another actually admit doubts as to the truth of the accusation. This statement comes as close as it gets to such a concession. In light of that admission, Global Witness's story is not just implausible, it's ridiculous.

Circumventing the devastating impact of this statement, the Majority creates a new narrative: The Global Witness Report accused *only* the National Oil Company—*not* Exxon—of paying bribes. With all due respect, the Majority is employing judicial jiu-jitsu. At no time did the Appellee even hint—in its briefs or oral argument—that was its defense. The Appellee argues the district court erred in finding the Report defamatory for only three reasons: because (1) it calls for investigations, Appellee Br. 31–34; (2) it includes a disclaimer that Global Witness had not determined the payments were improper, Appellee Br. 34–35; and (3) the Report never uses the word "bribe" to describe the payments, Appellee Br. 35–36. The Majority's judicial refashioning of the defamatory implication is entirely illegitimate. *See Diamond Walnut Growers, Inc. v. NLRB*, 113 F.3d 1259, 1263 (D.C. Cir. 1997) (en banc).

The Majority cloaks its improper fashioning of a wholly new argument by accusing me of doing the same. But if I'm misreading Global Witness's Report to imply that Exxon bribed Appellants, I'm in quite good company. After all, the district court endorsed my reading. *Tah*, 413 F. Supp. 3d at 10. So did the Appellant. Appellant Br. 15, 23–24. And the Liberian government. *See* J.A. 42. Even the Appellee assumes that if the Report contains a defamatory implication, it would be that Exxon bribed Tah and McClain. Otherwise, the Appellee would not have argued its disclaimer, that "Global Witness has no evidence that Exxon directed [the National Oil Company] to pay Liberian officials," is somehow exculpatory. Appellee Br. 34–35. As the Majority recognizes, this statement is irrelevant if one assumes that the *National Oil Company* was the briber. In sum, the Majority's theory not only falls out of the clear blue sky, but it is also a *sub silento* overruling of the

14

district judge.  After all, Exxon looms over the whole story.  It is impossible to visualize the article without Exxon playing the part of the evil genius, orchestrating the implied corruption. The Majority's theory is not just a new argument—it's a new case.

Perhaps the Majority's theory is not advanced by any Party because the theory makes even less sense than if Exxon were the briber.  In the revisionist view, the National Oil Company bribed its own agents and employees to do their jobs. Tellingly, the Majority offers no motive for a bribe.  After all, the Liberian government *ordered* the sale of the Block 13 license for failure to make any progress in developing potential oil reserves.  J.A. 69.  So there is no reason to think that the Appellants had the authority to hold up the transaction.  Nor is there a reason to believe the National Oil Company would have benefitted from the delay.

In any event, the Majority's narrative is procedurally inappropriate.  At the 12(b)(6) stage, we accept all reasonable defamatory readings of the Report advanced by the plaintiff. *See Weyrich v. New Republic, Inc.*, 235 F.3d 617, 627 (D.C. Cir. 2001).  As the district court ably explained, there can be no doubt that one defamatory implication of the Report is that Exxon bribed Appellants.  That allegation—actually pressed by Tah and McClain—must be analyzed for actual malice.

*        *        *

The Majority's opinion creates a profoundly troubling precedent.  By fashioning a different defamatory implication on its own, the Majority embraces a telling example of judicial "creativity."  Still, its approach seems *sui generis*; I rather doubt we will ever see its like again.  On the other hand, the Majority's misunderstanding of the doctrinal framework of *New York Times v. Sullivan*'s actual malice concept is profoundly erroneous.  And that will distort our libel law.  But perhaps most troublesome is the conflict it creates with the

15

Second Circuit (not to mention the Supreme Court) concerning the role of a court when applying Rule 12(b)(6) in the libel context. "The test is whether the complaint is plausible, not whether it is less plausible than an alternative explanation." *Palin*, 940 F.3d at 815.

## III

After observing my colleagues' efforts to stretch the actual malice rule like a rubber band, I am prompted to urge the overruling of *New York Times v. Sullivan*. Justice Thomas has already persuasively demonstrated that *New York Times* was a policy-driven decision masquerading as constitutional law. *See McKee v. Cosby*, 139 S. Ct. 675 (2019) (Thomas, J., concurring in denial of certiorari). The holding has *no relation* to the text, history, or structure of the Constitution, and it baldly constitutionalized an area of law refined over centuries of common law adjudication. *See also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 380–88 (1974) (White, J., dissenting). As with the rest of the opinion, the actual malice requirement was simply cut from whole cloth. *New York Times* should be overruled on these grounds alone.

Nevertheless, I recognize how difficult it will be to persuade the Supreme Court to overrule such a "landmark" decision. After all, doing so would incur the wrath of press and media. *See* Martin Tolchin, *Press is Condemned by a Federal Judge for Court Coverage*, New York Times A13 (June 15, 1992) (discussing the "Greenhouse effect"). But new considerations have arisen over the last 50 years that make the *New York Times* decision (which I believe I have faithfully applied in my dissent) a threat to American Democracy. It must go.

Twenty-five years ago, I urged the overruling of a similarly illegitimate constitutional decision, *Monroe v. Pape*, 365 U.S. 167 (1961). Our court was confronted with the vexing question of whether qualified immunity shielded government

16

officials accused of constitutional torts from discovery into their motivations. *See Crawford-El v. Britton*, 93 F.3d 813, 815 (D.C. Cir. 1996) (en banc), *vacated*, 523 U.S. 574 (1998). In a concurring opinion, I suggested a solution to accommodate *Pape*: When a defendant offers a proper motive, we should allow an objective inquiry into only whether the proffered motive is pretextual. *Id.* at 834–35; *cf. Halperin v. Kissinger*, 807 F.2d 180, 188 (D.C. Cir. 1986). When *Crawford-El* reached the Supreme Court, four Justices agreed with my approach. 523 U.S. at 602 (Rehnquist, C.J., dissenting); *id.* at 612 (Scalia, J., dissenting).

But I went even further in my concurrence: I urged the Supreme Court to overrule *Pape* (and, while they're at it, *Bivens*[5] as well). 93 F.3d at 832. Justices Scalia and Thomas agreed with me. *Crawford-El*, 523 U.S. at 612 (Scalia, J. dissenting). Both *Pape* and *Bivens* are prime examples of rank policymaking by the High Court, not legitimate exercises of constitutional interpretation. *See also Hernandez v. Mesa*, 140 S. Ct. 735, 752 (2020) (Thomas, J., concurring) (continuing to call for the Court to abandon *Bivens*).

I recognized, however, that convincing the Court to overrule these precedents would be an uphill battle. As I wrote, the Court has committed itself to a constitutional Brezhnev doctrine.[6] That is, once the Court has "constitutionalized" a new area of the law, it will never willingly retreat. The long-

---

[5] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

[6] "When forces that are hostile to socialism try to turn the development of some socialist country towards capitalism, it becomes not only a problem of the country concerned, but a common problem and concern of all socialist countries." Leonid Brezhnev, *Remarks to the Fifth Congress of the Polish United Workers' Party* (Nov. 13, 1968). Thus, once a country has turned communist, it can never be allowed to go back.

17

term consequence of this policy is obvious:  An ever-expanding sphere of influence for the Judiciary at the expense of the policymaking branches.

In a short concurring opinion, Justice Kennedy lamented my criticism.  He warned that "[w]e must guard against disdain for the judicial system," *i.e.*, the Supreme Court.  *Crawford-El*, 523 U.S. at 601.  In his view, criticism of the Court is tantamount to an attack on the Constitution.  He cautioned, "if the Constitution is to endure, it must from age to age retain 'th[e] veneration which time bestows.'"  *Id.* (quoting *The Federalist* No. 49, at 314 (Madison) (C. Rossiter ed., 1961)).  Apparently, maintaining a veneer of infallibility is more important than correcting fundamental missteps.

To the charge of disdain, I plead guilty.  I readily admit that I have little regard for holdings of the Court that dress up policymaking in constitutional garb.  That is the real attack on the Constitution, in which—it should go without saying—the Framers chose to allocate political power to the political branches.  The notion that the Court should somehow act in a policy role as a Council of Revision is illegitimate.  *See* 1 *The Records of the Federal Convention of 1787*, at 138, 140 (Max Farrand ed., 1911).  It will be recalled that maintaining the Brezhnev doctrine strained the resources and legitimacy of the Soviet Union until it could no longer be sustained.

Admittedly, the context of the *Times* opinion made the Court's decision attractive as a policy matter.  The case centered on a full-page advertisement soliciting donations for the civil rights movement and legal defense of Dr. Martin Luther King, Jr.  376 U.S. at 256–57.  The advertisement claimed that civil rights proponents faced an "unprecedented wave of terror" from "Southern violators" denying constitutional guarantees to African Americans.  *Id.* at 256.  It described "truckloads of police armed with shotguns and tear-gas" that "ringed" a college campus in Montgomery, Alabama.  *Id.* at 257.  It further asserted that state authorities padlocked

18

the dining hall "in an attempt to starve [the students] into submission." *Id.* Various claims in the ad were inaccurate, and *The Times* eventually published a retraction. *Id.* at 261.

Sullivan sued, alleging the advertisement's false statements libeled him because, as commissioner of public affairs, he supervised the police department. *Id.* at 256, 262. After just two hours and twenty minutes of deliberation, an Alabama jury awarded Sullivan $500,000 (the largest libel judgment in Alabama history), and the state Supreme Court affirmed. Anthony Lewis, *Make No Law: The Sullivan Case and the First Amendment* 33, 45 (1991).

When the Supreme Court reversed, its decision was seen as a "triumph for civil rights and racial equality." *E.g.*, Geoffrey Stone, *New York Times Co. v. Sullivan*, in *The Oxford Companion to the Supreme Court of the United States* 586–87 (1992). The point of these suits had less to do with repairing reputations and more to do with deterring the northern press from covering civil rights abuses. Southern officials, as Anthony Lewis succinctly explains, had thus twisted "the traditional libel action . . . into a state political weapon to intimidate the press":

> The aim was to discourage not false but true accounts of libel under a system of white supremacy: stories about men being lynched for trying to vote, about cynical judges using the law to suppress constitutional rights, about police chiefs turning attack dogs on men and women who wanted to drink a Coke at a department-store lunch counter. It was to scare the national press—newspapers, magazines, the television networks—off the civil rights story.

Lewis, *Make no Law* at 35.

19

Indeed, the day after the Alabama court's verdict, the *Alabama Journal* (a Montgomery paper) celebrated the result. An editorial trumpeted that the case would cause the "reckless publishers of the North . . . to make a re-survey of their habit of permitting anything detrimental to the South and its people to appear in their columns." *Id.* at 34. "The Times was summoned more than a thousand miles to Montgomery to answer for its offense. Other newspapers and magazines face the same prospect." *Id.* Even before the Supreme Court issued the *Times* decision, a second suit filed by a mayor—based on the same ad—had already resulted in another $500,000 verdict against *The Times*. *Id.* at 35. And three additional suits remained pending. *Id.* CBS had similarly been sued for $1.5 million over a televised program that depicted the difficulties of African Americans in registering to vote. *Id.* at 36. By 1964, southern officials had filed almost $300 million in libel suits against the northern press. *Id.*

One can understand, if not approve, the Supreme Court's policy-driven decision.[7] There can be no doubt that the *New York Times* case has increased the power of the media. Although the institutional press, it could be argued, needed that protection to cover the civil rights movement, that power is now abused. In light of today's very different challenges, I doubt the Court would invent the same rule.

As the case has subsequently been interpreted, it allows the press to cast false aspersions on public figures with near

---

[7] It should be noted that precisely *what* should have been done is a matter of debate. *See, e.g.*, Richard A. Epstein, *Was New York Times v. Sullivan Wrong*, 53 U. CHI. L. REV. 782, 791 (1986); *see also* Lewis Green, *The New York Times Rule: Judicial Overkill* 12 VILLANOVA L. REV. 725, 735 (1967).

20

impunity.[8]  It would be one thing if this were a two-sided phenomenon.  *Cf. New York Times*, 376 U.S. at 305 (Goldberg, J., concurring) (reasoning that the press will publish the responses of public officials to reports or accusations).  *But see* Suzanne Garment, *The Culture of Mistrust in American Politics* 74–75, 81–82 (1992) (noting that the press more often manufactures scandals involving political conservatives).  The increased power of the press is so dangerous today because we are very close to one-party control of these institutions.  Our court was once concerned about the institutional consolidation of the press leading to a "bland and homogenous" marketplace of ideas.  *See Hale v. FCC*, 425 F.2d 556, 562 (D.C. Cir. 1970) (Tamm, J., concurring).  It turns out that *ideological* consolidation of the press (helped along by economic consolidation) is the far greater threat.[9]

---

[8] *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 769 (1985) (White, J., concurring):

> The *New York Times* rule thus countenances two evils:  first, the stream of information about public officials and public affairs is polluted and often remains polluted by false information; and second, the reputation and professional life of the defeated plaintiff may be destroyed by falsehoods that might have been avoided with a reasonable effort to investigate the facts.  In terms of the First Amendment and reputational interests at stake, these seem grossly perverse results.

[9] We once explained why major American cities lost their second mainframe papers due to market forces.  *See generally Michigan Citizens for an Indep. Press v. Thornburgh*, 868 F.2d 1285, 1288 (D.C. Cir.), *aff'd*, 493 U.S. 38 (1989).  That second paper was sometimes right of center, e.g., *The New York Herald Tribune* and *The Washington Star*, leaving the residual paper in a local monopoly position.  As large American cities became heavily Democratic Party

21

Although the bias against the Republican Party—not just controversial individuals—is rather shocking today, this is not new; it is a long-term, secular trend going back at least to the '70s.[10] (I do not mean to defend or criticize the behavior of any particular politician).   Two of the three most influential papers (at least historically), *The New York Times* and *The Washington Post*, are virtually Democratic Party broadsheets.  And the news section of *The Wall Street Journal* leans in the same direction.   The orientation of these three papers is followed by *The Associated Press* and most large papers across the country (such as the *Los Angeles Times*, *Miami Herald*, and *Boston Globe*).   Nearly all television—network and cable—is a Democratic Party trumpet.  Even the government-supported National Public Radio follows along.

As has become apparent, Silicon Valley also has an enormous influence over the distribution of news.   And it similarly filters news delivery in ways favorable to the Democratic Party.  *See* Kaitlyn Tiffany, *Twitter Goofed It*, The Atlantic (2020) ("Within a few hours, Facebook announced that it would limit [a *New York Post*] story's spread on its platform while its third-party fact-checkers somehow investigated the information.  Soon after, Twitter took an even more dramatic

---

bastions, so too did the local dominant paper.  *See* Gentzkow and Shapiro, *What Drives Media Slant? Evidence from U.S. Daily Newspapers*, 78 ECONOMETRICA 35 (Jan. 2010).

[10] Who can forget Candy Crowley's debate moderation?  *See, e.g.*, Noah Rothman, *Candy Crowley's Debate Moderation Exemplifies Why Americans Do Not Trust Their Media*, Mediaite (Oct. 17, 2012); Dylan Byers, *Crowley fact-checks Mitt*, Politico (Oct. 17, 2012).

22

stance:  Without immediate public explanation, it completely banned users from posting the link to the story.").[11]

It is well-accepted that viewpoint discrimination "raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 387 (1992).  But ideological homogeneity in the media—or in the channels of information distribution—risks repressing certain ideas from the public consciousness just as surely as if access were restricted by the government.

To be sure, there are a few notable exceptions to Democratic Party ideological control:  *Fox News*, *The New York Post*, and *The Wall Street Journal*'s editorial page.[12]  It should be sobering for those concerned about news bias that these institutions are controlled by a single man and his son.  Will a lone holdout remain in what is otherwise a frighteningly orthodox media culture?  After all, there are serious efforts to muzzle *Fox News*.  And although upstart (mainly online) conservative networks have emerged in recent years, their

---

[11] Of course, I do not take a position on the legality of big tech's behavior.  Some emphasize these companies are private and therefore not subject to the First Amendment.  Yet—even if correct— it is not an adequate excuse for big tech's bias.  The First Amendment is more than just a legal provision:  It embodies the most important value of American Democracy.  Repression of political speech by large institutions with market power therefore is—I say this advisedly—fundamentally un-American.  As one who lived through the McCarthy era, it is hard to fathom how honorable men and women can support such actions.  One would hope that someone, in any institution, would emulate Margaret Chase Smith.

[12] Admittedly, a number of Fox's commentators lean as far to the right as the commentators and reporters of the mainstream outlets lean to the left.

23

visibility has been decidedly curtailed by Social Media, either by direct bans or content-based censorship.

There can be little question that the overwhelming uniformity of news bias in the United States has an enormous political impact.[13]   That was empirically and persuasively demonstrated in Tim Groseclose's insightful book, *Left Turn: How Liberal Media Bias Distorts the American Mind* (2011). Professor Groseclose showed that media bias is significantly to the left.  *Id.* at 192–197; *see also id.* at 169–77.  And this distorted market has the effect, according to Groseclose, of aiding Democratic Party candidates by 8–10% in the typical election.  *Id.* at *ix*, 201–33.  And now, a decade after this book's publication, the press and media do not even pretend to be neutral news services.

It should be borne in mind that the first step taken by any potential authoritarian or dictatorial regime is to gain control of communications, particularly the delivery of news. It is fair to conclude, therefore, that one-party control of the press and media is a threat to a viable democracy.  It may even give rise to countervailing extremism.  The First Amendment guarantees a free press to foster a vibrant trade in ideas.  But a biased press can distort the marketplace.  And when the media has proven its willingness—if not eagerness—to so distort, it is a profound mistake to stand by unjustified legal rules that serve only to enhance the press' power.

---

[13] The reasons for press bias are too complicated to address here.  But they surely relate to bias at academic institutions.

# EXHIBIT H

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ──────────────────────────── ) | |
| **CHRISTIANA TAH**, *et al.*, ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 18-2109 (RMC)** |
| ) | |
| **GLOBAL WITNESS** ) | |
| **PUBLISHING, INC.**, *et al.*, ) | |
| ) | |
| **Defendants.** ) | |
| ──────────────────────────── ) | |

## ORDER

For the reasons stated in the Memorandum Opinion issued contemporaneously with this Order, it is hereby

**ORDERED** that Defendants' Motion to Dismiss, Dkt. 11, is **GRANTED** and Plaintiffs' Complaint is dismissed.

This is a final appealable Order.   *See* Fed. R. App. P. 4.  This case is closed.

Date:  September 27, 2019

_____
ROSEMARY M. COLLYER
United States District Judge

1

# EXHIBIT I

 **Matt Couch**
@RealMattCouch

BREAKING: NASCAR has banned the use of the Confederate Flag at its events and properties...

Do these folks even know who their audience is?

Stop being offended and cowering to the mob!

2:23 PM · Jun 10, 2020 · Twitter for iPhone 

 **Matt Couch**
@RealMattCouch

· · ·

The Democrat led house is now going to vote to remove Confederate Statues... Part of those statues were about healing a nation and agreed upon by both sides..

This is what socialists and communists do.. They try to erase history of nations.. They must to take over..

2:44 PM · Jul 22, 2020 · Twitter Web App

# EXHIBIT J



**Matt Couch** @RealMattCouch · Nov 10, 2018      ···
Replying to @RealMattCouch

6) **Capone** months later on under cover video and audio would tell multiple people that he was in fact not even at the bar the night that Seth Rich was murdered.

He claims now he was on vacation in Virginia with his family..

That's a hell of a conflicting story now isn't it?

 4           76          ♡ 161          ⬆



**Matt Couch** @RealMattCouch · Nov 10, 2018      ···
7) According to our Licensed Private Investigator, Homicide Detectives, LEO's, Former Agents, and Military Intel folks on our team, Joe **Capone** is now a **person of interest**.

What do you call someone who lies in a murder investigation? A **person of interest**. #HisNameWasSethRich

⬤ 4          ⬀ 81          ♡ 176          ⬆

 **Matt Couch** @RealMattCouch · Jun 11, 2017

28) Joe **Capone**, is also a **person of Interest** in the Seth Rich Murder Investigation. We've now put TWO pieces in place of this puzzle.

💬 2          ♻ 28          ♡ 37          ⬆

 **Matt Couch** @RealMattCouch · Jun 13, 2017

8) Joe **Capone** gave two conflicting stories on what happened on July 9th/10th with Seth Rich. He's a **person of interest** in investigation.

💬 1          ♻ 13          ♡ 13          ⬆

 **Matt Couch** @RealMattCouch · Jun 17, 2017

32) We know that Joe **Capone**, the owner of Lou's City Car is a **person of Interest**.. He's given conflicting stories now.

💬 3          ♻ 27          ♡ 40          ⬆

 **Matt Couch** @RealMattCouch · Jun 22, 2017     •••

1) Seth Rich according to Joe **Capone** and one **person of interest** was at Lou's City Bar on July 9th watching the UFC 200 PPV #SethRichMurder

  💬         ↻ 24         ♡ 37         ⬆

 **Matt Couch** @RealMattCouch · Jun 28, 2017     •••

12) So Joe **Capone** gave two stories of what happened that night, he is 100% a **person of interest** in the Seth Rich Murder Investigation.

  💬 3         ↻ 18         ♡ 33         ⬆

 **Matt Couch** @RealMattCouch · Sep 4, 2017     •••

Joe **Capone** is 100% a **person of Interest** in the Seth Rich case, & it's time Authorities and Detectives in DC looked at him as such! #SethRich

  💬 2         ↻ 32         ♡ 42         ⬆

 **Matt Couch** @RealMattCouch · Jun 19, 2017     •••

22) Let's put Joe **Capone**, the Bar Owner of Lou's City Bar as a **person of interest** in the Seth Rich Murder Investigation. #SethRichCoverup

  💬 1         ↻ 13         ♡ 27         ⬆



**Matt Couch** @RealMattCouch · Sep 13, 2017

Why did Joe **Capone** visit the **White House** on July 6th, 2016? #SethRich

2          10          13



**Matt Couch** @RealMattCouch · Jul 13, 2017

22) Joe **Capone** visited the **White House** on July 6th, 2016. WH Logs show he was there 12PM to 11:59PM that day. #HisNameWasSethRich

🗨 11          ⟲ 39          ♡ 51          ⬆

**Matt Couch** @RealMattCouch · Sep 17, 2017

Why did Joe **Capone**, GM of Lou's City Bar visit the **White House** on July 6th, 2016 just four days before Seth's murder? #SethRich

🗨 2          ⟲ 27          ♡ 28          ⬆

**Matt Couch** @RealMattCouch · Sep 7, 2017

Why did Joe **Capone** visit the **White House** on July 6th, just 4 days before Seth Rich was murdered? #SethRich

🗨 2          ⟲ 14          ♡ 18          ⬆

**Matt Couch** @RealMattCouch · Oct 13, 2017

119) Joe **Capone**, the GM of Lou's City Bar visited the **White House** on July 6th, 2016, just a few days before the murder. #SethRich

🗨 1          ⟲ 21          ♡ 19          ⬆



**Matt Couch** @RealMattCouch · Jun 9, 2017                          · · ·

24) Why did Joe **Capone** visit the **White House** on July 6th, 2016? **White House** Logs show he was there from 12pm to 11:59pm blanketed time.

💬 3            ⇄ 29            ♡ 30            ⬆️

---



**Matt Couch** @RealMattCouch · Sep 13, 2018                          · · ·

Replying to @RealMattCouch

How is Seth Rich the only Homicide since July 10th, 2016 to not have a YouTube video dedicated to it by Washington, D.C. Metropolitan Police? All other murders have a video, just go on YouTube and see for yourself America.. #HisNameWasSethRich

💬 6            ⇄ 51            ♡ 99            ⬆️

---

**Matt Couch** @RealMattCouch · Sep 13, 2018                          · · ·

Why did Lou's City Bar General Manager Joe **Capone** visit the **White House** on July 6th, 2016 just days before Seth Rich's Murder...

💬 6            ⇄ 29            ♡ 69            ⬆️



**Misgunception** @misgunception · May 21, 2017

Replying to @RealMattCouch @Therealbp65 and @JFlippo1327

You're cute when you're mad.

Got a link to this alleged entry in the WH logs?

💬 1          ⟲          ♡          ⬆

**Matt Couch** @RealMattCouch · May 21, 2017

The **White House** Logs are out there, that's a FACT. Joseph P **Capone** was at WH 4 days before murder, and left Country 2 days after..

💬 1          ⟲ 1          ♡ 1          ⬆

**Matt Couch** @RealMattCouch · Jul 2, 2017

11) Why did Joe **Capone** visit the **White House** on July 6th, Just 3 days before Seth Rich's murder.. #HisNameWasSethRich

💬 5          ⟲ 40          ♡ 55          ⬆

**Matt Couch** @RealMattCouch · Sep 4, 2017

Joe **Capone**, GM of Lou's City Bar visited the **White House** on July 6th, just 3 days before Seth Rich was murdered. #SethRich

💬 3          ⟲ 46          ♡ 42          ⬆

 **Matt Couch** @RealMattCouch · Aug 23, 2017                    ···
Joe **Capone** visited the **White House** on July 6th, 2016.. Just 3 days before
Seth's Murder.. #SethRich

 Fundraising for Politics and Public Office | Fundly
Check out Politics & Public Office fundraising
campaigns going on right now.
🔗 fundly.com

💬 6          ⟲ 54          ♡ 54          ⬆️

 **Matt Couch** @RealMattCouch · Sep 10, 2017                    ···
Why did Joe **Capone** delete off limit area's of the **White House** he took
pictures in off of his personal Facebook Page? #SethRich

💬          ⟲ 18          ♡ 15          ⬆️



**Matt Couch** @RealMattCouch · Dec 10, 2017                    ···

8) Records would show that Joe **Capone** would visit the **White House** on July 6, just a few days before the murder of Seth Rich. #SethRich #HisNameWasSethRich

💬 5          ↻ 44          ♡ 60          ⬆

Show this thread



**Matt Couch** @RealMattCouch · May 21, 2017                    ···

Joseph P **Capone** the bar owner that last saw Seth Rich alive visited the **White House** per logs on July 6th, 2016.. #sethrich

💬 1          ↻ 9          ♡ 11          ⬆



**Matt Couch** @RealMattCouch · May 21, 2017                    ···

According to **White House** Logs on 04/6/2016 Joseph P. **Capone** was part of a group of 4 that visited the **White House** from 12 PM until 11:59 PM

💬 1          ↻ 8          ♡ 5          ⬆

 **Matt Couch** @RealMattCouch · Jan 14, 2018                    · · ·
Replying to @RealMattCouch
Months later Joe **Capone** went on the record with other people stating he wasn't even working at the bar that night. Yet in the Crime Watch TV Interview he claims he offered Seth a Cab, or to stick around and get a ride home. He even states "Seth said he was going somewhere else"

   1              ⏴⏵ 8              ♡ 23              ⬆

 **Matt Couch** @RealMattCouch · Jan 14, 2018                    · · ·
That's multiple stories that Joe **Capone** has either lied or changed his story in an open Murder Investigation. That's called a Suspect in ANY Investigation. Joe **Capone** also visited the **White House** on July 6th, just a few days before the murder of Seth Rich #SethRich #AFMG

   2              ⏴⏵ 25             ♡ 44              ⬆



**Matt Couch** @RealMattCouch · Aug 5, 2017

In the undercover Joe **Capone** Video, Joe talks about how he was just doing the **White House** Tour, and how he was attacked on Twitter for it..

💬 3          ⟲ 9               ♡ 12              ↥



**Matt Couch** @RealMattCouch · Dec 10, 2017

10) Now what are the coincidences that Lou's City Bar GM Joe **Capone** claims to be the last person to see Seth Rich Alive, Is in the DC Mayors Re-Election Ad, Visited the **White House** 3 days before death Then wasn't there working at the Bar that night, #SethRich #HisNameWasSethRich

💬 4          ⟲ 54              ♡ 69              ↥

 **Matt Couch** @RealMattCouch · Nov 9, 2018                    ···

Things that we know in the Seth Rich murder investigation..

Kelsey Mulka (Girlfriend) and Seth Rich were in fact broken up at the time of the murder.

Donna Brazile and Mayor Muriel Bowser were at the Hospital within minutes of Seth Rich's arrival..

#HisNameWasSethRich

💬 8          ⟲ 57               ♡ 97          

 **Matt Couch** @RealMattCouch · Nov 9, 2018                    ···

Things that we know in the Seth Rich murder investigation

Joe **Capone**, the GM of Lou's City Bar visited the **White House** on July 6th, 2016 3 days before the murder

**Capone** also claimed he was at the bar on a September Crime Watch TV Show

Later, **Capone** claims he wasn't at the bar

💬 3          ⟲ 13               ♡ 22          ⬆

 **Matt Couch** @RealMattCouch · Sep 4, 2017   ···

Joe **Capone** has since deleted areas of the **White House** that are off limits he took pictures in off of his personal Facebook Page. #SethRich

   🗨 1      🔁 36      ♡ 27      ⬆

 **Matt Couch** @RealMattCouch · Aug 20, 2017   ···

Why did Joe **Capone**, GM of Lou's City Bar erase photo's from off limit area's of the **White House** he was in off his personal Facebook?

   🗨 9      🔁 53      ♡ 80      ⬆

 **Matt Couch** @RealMattCouch · Mar 3, 2018   · · ·
Replying to @RealMattCouch
Now is it coincidental that the people who were the Chief of Police and Assistant Chief of Police for the Washington, D.C. Metropolitan Police Department both resigned from the Department less than a year after the murder?

One 30 days, one 11 Months..

#SethRich

💬 5          ⟲ 97          ♡ 132          

 **Matt Couch** @RealMattCouch · Mar 3, 2018   · · ·
Why did Joe **Capone**, General Manager of Lou's City Bar visit the **White House** on July 6th, 2016... Just 3 days before Seth Rich was murdered in the streets of Washington, D.C. ....

#HisNameWasSethRich
#SethRich
#AmericaFirstMedia

💬 15          ⟲ 151          ♡ 197



**Matt Couch** @RealMattCouch · Oct 5, 2017

Seth Rich Facts: 16) Joe **Capone**, GM of Lou's City Bar visited the **White House** on July 6th, 2016, 3 days before Seth Rich's murder. #SethRich

6          26          20

 **Matt Couch** @RealMattCouch · Nov 11, 2017 · · ·

Why did so many people involved in and around the Seth Rich murder visit the **White House**? Joe **Capone** on July 6, Mayor Bowser on July 8, Liz Lyons on July 12.. So much corruption and cover up America. Help us find the truth! #SethRich #AmericaFirstMedia

 Fundraising for Politics and Public Office | Fundly
Check out Politics & Public Office fundraising campaigns going on right now.
🔗 fundly.com

💬 2          🔁 36          ♡ 28          ⬆️

 **Matt Couch** @RealMattCouch · Jun 6, 2017 · · ·

135) Why did Joe **Capone** visit the **White House** on July 6th, days before Seth Rich's murder. Why does he have pictures in off limit area's?

💬 1          🔁 64          ♡ 69          ⬆️



**Matt Couch** @RealMattCouch · Aug 12, 2019                    ...

Why did so many people around this murder visit the **White House** before and after Seth Rich's Murder...

Seth Rich July 4th - Cancelled

Joe **Capone** GM of Lou's City Bar July 6th

Washington DC Mayor Muriel Bowser July 8th

Liz Lyons Privacy Officer Over Body Cams July 12th

💬 4          ↻ 31          ♡ 100          ⬆



**Matt Couch** @RealMattCouch · Aug 26, 2017                    · · ·

Joe **Capone** also visited the **White House** on July 6th, 2016, just a few days before Seth Rich was murdered. #SethRich

💬 5              ⟲ 43              ♡ 35              ⬆️

---



**Matt Couch** @RealMattCouch · May 27, 2017                    · · ·

Joe **Capone** (Owner/GM Lou's City Bar) visits the **White House** on June 6th. Logs show he was there 12 hours. Pictures in off limit areas.

💬 7              ⟲ 92              ♡ 79              ⬆️

---



**Matt Couch** @RealMattCouch · May 21, 2017                    · · ·

Incidentally, Joe **Capone** was inside a private room at the **White House** four days before the murder of Seth Rich. #SethRichCoverUp

💬 3              ⟲ 17              ♡ 10              ⬆️



**Matt Couch** @RealMattCouch · May 21, 2017

New Question in the Seth Rich murder investigation.. why was Bar Owner Joseph P **Capone** at the **White House** with 4 others on July 6th 2016???

💬 13          ⟳ 175          ♡ 175          ⬆️



**Matt Couch** @RealMattCouch · Jun 6, 2017

21) A little strange that the Bar Owner Joe **Capone** would visit the **White House** just days before Seth Rich was murdered in cold blood.

💬 13          ⟳ 89          ♡ 69          ⬆️



**Matt Couch** @RealMattCouch · May 21, 2017

Why did Bar Owner Joseph P **Capone** leave the United States 2 days after Seth Rich was murdered.. He was at **White House** 4 days before murder.

💬 6          ⟳ 60          ♡ 52          ⬆️



**Matt Couch** @RealMattCouch · Jul 2, 2017

134) Why did Joe **Capone**, the GM/Owner of Lou's City Bar visit the **White House** on July 6th, just 3 days before Seth Rich was murdered?

💬 10          ⟳ 59          ♡ 65          ⬆️



**Matt Couch** @RealMattCouch · Sep 28, 2017 · · ·

I Dare you to RT This! Joe **Capone**, Mayor Bowser, Liz Lyons, all visited the **White House** within a week of Seth Rich's Murder before/after..

💬 9          ↩ 170          ♡ 100          ⬆



**Matt Couch** @RealMattCouch · Jun 19, 2017 · · ·

152) Why did Joe **Capone** give conflicting stories of where he was that night? Why did he visit the **White House** on July 6th? #SethRich?

💬 3          ↩ 23          ♡ 21          ⬆



**Matt Couch** @RealMattCouch · Aug 26, 2017 · · ·

Why did Joe **Capone** delete pictures off of his personal Facebook Page showing him in off limit **White House** areas? #SethRich

💬 3          ↩ 50          ♡ 53          ⬆



**Matt Couch** @RealMattCouch · Jul 1, 2017 · · ·

Joe **Capone** has officially deleted all of the **White House** photo's from off limits areas off his Facebook Page... Of course you did Joey :)

💬 8          ↩ 72          ♡ 98          ⬆



**Matt Couch** @RealMattCouch · Aug 7, 2018                    ...

91) Look who visited the **White House** just two days before the murder of Seth Rich...

Liz Lyons the Privacy Officer for D.C. Police, and former DHS and FBI agent visited the **White House** on July 12th, two days after the murder..

Joe **Capone**, the GM of Lou's visited on July 6th...

| Details of Visit | Muriel Bowser's Visits | Genera |
|---|---|---|

## Muriel Bowser
White House Visitor

Muriel Bowser's visit occurred on **Friday, July 8, 2016**. Bowser made appointment number U43283 at 12:00 pm on July 7, 2016 through caller Bridget Cummings. The

 **Matt Couch** @RealMattCouch · Dec 14, 2017                    ···

Seth Rich Murder.. Why did so many people visit the **White House** around Seth Rich's Murder?

-Liz Lyons Visited the **White House** on July 12, 2016
-Joe **Capone** Visited the **White House** on July 6, 2016
-Mayor Muriel Bowser Visited the **White House** on July 8, 2016

#SethRich #AFMG

💬 2                    ⟲ 36                    ♡ 45                    

 **Matt Couch** @RealMattCouch · Jun 25, 2017                    ···

13) Why did Joe **Capone** visit the **White House** on July 6th, 2016 according to the **White House** Logs? Shows in at 12pm and out at 11:59pm..

💬 5                    ⟲ 65                    ♡ 65                    ↑

 **Matt Couch** @RealMattCouch · Mar 6, 2018

Joe **Capone**...

Doing off limit things in the **White House**..

Nothing to see here America.. Move along..

#SethRich
#AmericaFirstMedia
#HisNameWasSethRich



 **Matt Couch** @RealMattCouch · Jun 4, 2017 ···

7) Joe **Capone** visited the **White House** 4 days before the murder of Seth Rich on July 6th, according to the **White House** Logs. #SethRichMurder

💬 9          ⟲ 122          ♡ 98          ⬆



**Matt Couch** @RealMattCouch · Nov 11, 2018   ···

Replying to @RealMattCouch

65) Oh, did we mention that Seth Rich was scheduled to visit the **White House** on July 4th, 2016 and cancelled his visit..

I know.. I know.. More conspiracy nonsense, knock it off Matt Couch and AFMG..

#HisNameWasSethRich #SethRich

💬 5          🔁 34          ♡ 74          ⬆️



**Matt Couch** @RealMattCouch · Nov 11, 2018   ···

66) Oh, did we mention that Joe **Capone**, the General Manager of Lou's City Bar also visited the **White House** on July 6th, 2016 and had pictures on his Facebook he took down where he was visiting off limit areas from the normal tour?

Ya know, more conspiracy stuff.. #SethRich

💬 4          🔁 36          ♡ 93          ⬆️



**Matt Couch** @RealMattCouch · Jun 6, 2017                    · · ·

20) Joe **Capone**, Owner of Lou's City Bar visited the **White House** on July 6th from 12pm to 11:59pm according to **White House** Logs.. #SethRich

💬 13            ⟲ 34            ♡ 30            ⬆️



**Matt Couch** @RealMattCouch · Aug 9, 2017                    · · ·

Joe **Capone** would visit the **White House** on July 6th, 3 days before Seth Rich's murder. #SethRich

💬 8             ⟲ 51            ♡ 53            ⬆️