# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

**Matthew Couch,**
4000 S. Dixieland Road
Apartment A-201
Rogers, Arkansas 72758

    Plaintiff,

**v.**

**Verizon Communications, Inc.**
1095, Avenue of the Americas
New York, NY 10036

et al.,

    Defendants.

**Case No. 20-cv-2151 (RJL)**

---

**OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS
AND CROSS MOTION FOR LEAVE TO FILE A FIRST AMENDED COMPLAINT
AND CONDUCT CERTAIN DISCOVERY
AND MEMORANDUM IN SUPPORT THEREOF**

EDEN P. QUAINTON, ESQ. (D.C. Bar No. NY0318)
**QUAINTON LAW, PLLC**
2 Park Avenue, 20th Fl.
New York, New York 10016
Telephone: (212) 419-0575
*Attorneys for Plaintiff Matthew Couch*

## TABLE OF CONTENTS

I.    **INTRODUCTION**...................................................................................... 1

II.   **LEGAL ARGUMENT** ..............................................................................III

A.   Standard of Review ................................................................................... iii

B.   The Proposed First Amended Complaint Is Not Being Filed with Undue Delay, Does Not Create any Prejudice, Was Not Filed in Bad Faith and is Not Futile. ........................................ iii

    1.   There is No Undue Delay ................................................................. iii

    2.   Defendants Will Not be Prejudiced by the Filing of the Proposed Cross-Motion. ........ iv

    3.   Leave to File the First Amended Complaint is Not Being Sought in Bad Faith. ........... vi

    4.   The Proposed Amendments Are Not Futile. ..................................... vii

        a.   The First Amended Complaint identifies the appropriate Defendants. ................... viii

           i.   Isikoff ............................................................................... viii

           ii.   NPR......................................................................................... viii

           iii.   Yahoo. .................................................................................... viii

           iv.   Verizon. .................................................................................... ix

           v.   Apollo/John Doe, Inc. .............................................................. xi

        b.   The First Amended Complaint properly pleads actual malice................................. xii

        c.   Yahoo and NPR are liable for Isikoff's defamation as publishers and re-publishers of defamatory content. ..................................................................... xxi

        d.   NPR's attempts to avoid liability are unpersuasive. ................................................ xxiv

           i.   NPR acted with actual malice. ...................................................... xxiv

           ii.   The "gist and sting" of the NPR Interview is defamatory. ............................. xxv

           iii.   For NPR to imply that Couch was a proponent of the Hilary Clinton conspiracy theory is not merely "unpleasant................................................................... xxv

           iv.   The defamatory language targeting Couch is not mere "hyberbole."............. xxvi

           v.   The NPR Interview, repeating the themes of the *Conspiracyland* podcast, promotes the central conspiracy theory that the Kremlin was responsible for the Hillary Clinton assassination theory and that Plaintiff was involved in disseminating this theory. .................................................................................... xxvi

           vi.   It is not "substantially true" that Couch "hounded" Mark Mueller, but completely false. ................................................................................... xxviii

        e.   The First Amended Complaint properly pleads defamation *per se*. ................... xxviii

        f.   The First Amended Complaint properly pleads false light, tortious interference and intentional infliction of emotional distress. ................................................... xxxii

        g.   The First Amended Complaint states a claim for aiding and abetting and conspiracy against Verizon, Yahoo, NPR and Apollo. ..................................................... xxxiv

        h.   Plaintiff has adequately alleged negligent supervision against NPR and Yahoo. xxxvii

III.  **CONCLUSION** .....................................................................XLIII

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abdullah v. Washington*, 530 F. Supp. 2d 112 (D.D.C. 2008) ....................................................... 7

*Atchinson v. District of Columbia*, 73 F.3d 418 (D.C. Cir. 1996) ............................................. 7, 9

*Bingham v. Goldberg. Marchesano. Kohlman. Inc.*, 637 A.2d 81 (D.C. 1994) .......................... 13

*Caldwell Trucking PRP v. Rexon Tech. Corp.*, 421 F.3d 234 (3d Cir. 2005)............................... 15

*Chrysler Corp. v. Gen. Motors Corp.*, 589 F. Supp. 1182 (D.D.C. 1984) .................................. 14

*City of Moundridge v. Exxon Mobil Corp.*, 250 F.R.D. 1 (D.D.C. 2008) ..................................... 9

*Cooper v. First Gov't Mortg. & Invs. Corp.*, No. CIV.A. 00-536 (RMU), 2001 WL 1704307
    (D.D.C. Aug. 24, 2001)........................................................................................................... 10

*Farah v. Esquire Magazine*, 736 F.3d 528 (D.C. Cir. 2013) ..................................................... 36

*Firestone v. Firestone,* 76 F.3d 1205 (D.C. Cir. 1996)............................................................... 11

*Foman v. Davis*, 371 U.S. 178 (1962) ......................................................................................... 7

*Foretich v. Glamour*, 741 F. Supp. 247 (D.D.C. 1990) ............................................................. 25

*Freightquote.com, Inc. v. Hartford Cas. Ins. Co.*, 397 F.3d 888 (10th Cir. 2005)..................... 37

*Gates v. D.C.*, 66 F. Supp. 3d 1, 24 (D.D.C. 2014) .................................................................... 39

*In re Domestic Airline Travel Antitrust Litig.*, No. MC 15-1404 (CKK), 2017 WL 11565557
    (D.D.C. Aug. 31, 2017)............................................................................................................. 7

*Linn v. United Plant Guard Workers of Am., Loc. 114*, 383 U.S. 53 (1966)............................... 11

*Lohrenz v. Donnelly*, 223 F. Supp. 2d 25 (D.D.C. 2002), *aff'd,* 350 F.3d 1272 (D.C. Cir. 2003) 28

*Mashaud v. Boone*, 256 A.3d 235 (D.C. 2021)........................................................................... 33

*Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264
    (1974) ..................................................................................................................................... 30

*Phelan v. City of Mount Rainier*, 805 A.2d 930 (D.C. 2002) ..................................................... 45

*Pool v. F. Hoffman-La Roche, Ltd.*, 386 F. Supp. 3d 1202 (N.D. Cal. 2019) ............................. 13

*Robertson v. Cartinhour*, 691 F. Supp. 2d 65 (D.D.C. 2010)...................................................... 10

*St. Amant v. Thompson*, 390 U.S. 727 (1968)......................................................................... passim

*Stanton v. Metro Corp.*, 438 F.3d 119 (1st Cir. 2006)................................................................ 24

*Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987) .............................................................. passim

*Taylor v. Stratton Corp.*, No. 2:09-CV-297, 2010 WL 11552859 (D. Vt. July 9, 2010) ............. 15

*Tucker v. Paxson Mach. Co.*, 645 F.2d 620  (8th Cir. 1981) ...................................................... 15

*U.S. ex rel. Head v. Kane Co.*, 668 F. Supp. 2d 146 (D.D.C. 2009)........................................... 11

*United States v. Spann*, No. CR 19-0252 (ABJ), 2021 WL 4192046 (D.D.C. Sept. 15, 2021).... 33

*Willoughby v. Potomac Elec. Power Co.*, 100 F.3d 999 (D.C. Cir. 1996). ................................... 7

*Wultz v. Islamic Republic of Iran*, 755 F. Supp.2d 1 (D.D.C. 2010) ........................................... 41

**Statutes**

18 U.S.C. § 2261A(2) .................................................................................................................. 32

D.C. Code § 22–3133.................................................................................................................. 32

Public Broadcasting Act of 1967 ................................................................................................ 42

**Other Authorities**

*Liability of Corporation for Debts of Predecessor*, 149 A.L.R. 787 (Originally published in
    1944). ..................................................................................................................................... 13

Restatement (Second) of Torts § 578........................................................................................... 25

Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* § 2.4.2 (2004). .... 23

**Rules**

Federal Rule of Civil Procedure 15(a)(2) ................................................................. 7

**Indictments**

*United States v. Internet Research Agency, et al.*, 18-cr-0032 .................................... 34

**Articles**

Donie O'Sullivan, *Her Son Was Killed--Then Came the Russian Trolls*, CNN (June 29, 2018), https://www.cnn.com/2018/06/26/us/russian-trolls-exploit-philando-castiles-death/index.html. ...................................................................................................................... 34

https://www.cnbc.com/2021/05/03/verizon-sells-yahoo-and-aol-businesses-to-apollo-for-5-billion.html................................................................................................... 12

**Databases**

https://verizon.api.edgar-online.com/EFX_dll/EdgarPro.dll?FetchFilingConvPDF1?SessionID=QxywkIHs37lG_zQ&ID=15300858 ................................................................................................ 12

Plaintiff Matthew Couch ("Plaintiff"), by his undersigned counsel, hereby opposes the Motion for Judgement on the Pleadings, Dkt. 64 (the "Mot. for JOP"), filed by Defendant National Public Radio, Inc. ("NPR"), and hereby also respectfully moves this Court pursuant to Federal Rule of Civil Procedure 15 for an order permitting the filing of an amended complaint in the form attached hereto as Exhibit E to the Declaration of Eden P. Quainton, dated December 9, 2021 (the "Quainton Decl.") and allowing Plaintiff to conduct certain discovery, for the reasons stated in the following memorandum of points and authorities.[1]

## I.    **<u>INTRODUCTION</u>**

This case arises out of the defamation of Plaintiff by Michael Isikoff, the Chief Investigative Reporter for Yahoo! News ("Isikoff"), a division of Verizon Media, Inc. ("Verizon Media"), which has since been sold to an affiliate of Apollo Global Management, Inc. ("Apollo"), owned 90% by Apollo and 10% by Verizon Communications, Inc. ("Verizon"). Verizon Media, Inc. has been rebranded as "Yahoo." Isikoff defamed Plaintiff in a six-part podcast entitled "Conspiracyland" that ran from July 9, 2019 to August 6, 2019 and then again during an interview broadcast on NPR on August 8, 2019. Isikoff's defamation, published by Yahoo! News, under the control of Verizon Media and Verizon, and then broadcast and republished by NPR during an interview conducted by reporter Dave Davies ("Davies") on the

---

[1] In the course of preparing the present motion, Plaintiff understood that he would likely need certain discovery relating to corporate and contractual relationships between the various proposed defendants for the reasons set forth in more detail below, and primarily resulting from the sale of Verizon Media, Inc. to Apollo Global Management, Inc. on September 1, 2021 and the rebranding of Verizon Media, Inc. as Yahoo. Plaintiff did not have time to meet and confer with opposing counsel prior to filing the present motion. Because the Verizon entities oppose on the merits, Plaintiff believes they will also oppose any discovery at this stage. In the interests of judicial economy, Plaintiff believes it is most efficient to make all his requests in a single cross-motion, although he would be amendable to making a separate application if the Court so instructs.

nationally syndicated "Fresh Air" show (the "NPR Interview"), consisted in the fabrication of wildly implausible, yet intended as true, quotations, statements and actions by Plaintiff, that included, either by direct attribution or by implication the assertions that Plaintiff had:

- accused Hillary Clinton or aides to Hillary Clinton of conspiring to murder Seth Rich, a DNC staffer who was killed on July 10, 2016;

- harassed, targeted and hounded a witness to the Seth Rich murder, Mark Mueller, by "doxing" the witnesses and his family, attempting to burgle his home and disseminating an image of the witness with the super-imposed head of mass-murderer Jeffrey Dahmer; and

- accused bartender Joe Capone and witness Mark Mueller of "covering-up" the Seth Rich murder.

These lies and slurs were completely divorced from reality and no reasonable reporter or news organization would have put them into circulation without evidence—of which there was and is none. Because of Defendants' conduct, Plaintiff and his children have been subject to death threats, Plaintiff's health and financial livelihood have suffered, and his reputation has been almost irreparably tarnished.

On September 30, 2021, the Court entered an order granting the Motion to Dismiss Plaintiff's initial complaint, Dkt. 1 (the "Complaint") filed by Defendants Verizon and Isikoff. *See* Memorandum Opinion, dated September 30, 2021, Dkt. 60 (the "Opinion"). The Court reasoned that Plaintiff had not adequately plead "actual malice." Opinion, 10-11. The Court further held that Plaintiff's defamation *per se*, emotional distress, false light, intentional interference with business relations, conspiracy and aiding and abetting causes of action were duplicative and/or suffered from the same defect as Plaintiff's defamation claim. *Id.* at 11-13. As

to Plaintiff's remaining claim of negligent supervision, the Court held that Plaintiff failed to identify a "common law" cause of action underpinning the negligent supervision claim or any separate common law duty applicable to Verizon. *Id.* at 14.

Shortly after the Court's decision, counsel for Defendant NPR reached out to Plaintiff's counsel to inquire whether Plaintiff would voluntarily dismiss his claims against NPR. *See* Declaration of Eden P. Quainton, dated November 30, 2021 (the "Quainton Decl."), Ex. A. Plaintiff responded that he did not intend to dismiss his claims against NPR but would rather seek leave to amend the complaint and proposed extending NPR's time to answer or move until after the Court's ruling on the proposed amendment. Quainton Decl. ¶ 3. NPR initially appeared amenable to this proposal. Quainton Decl., Ex. B. However, the parties could not agree on the wording of a proposed stipulation to this effect and NPR elected to answer the complaint on October 14, 2021. Dkt. 62. NPR then filed a Motion for Judgment on the Pleadings on October 27, 2021 ("Mot. for JOP"). Dkt. 65. Counsel agreed on a proposed briefing schedule for the Mot. for JOP which the Court approved by Minute Order on November 12, 2021.

Separately, Plaintiff contacted counsel for Verizon and Isikoff to determine whether they would oppose the proposed amended complaint. Quainton Decl., Ex. C. Counsel indicated they would oppose and requested until January 18, 2022 to respond. *Id.*  Plaintiff further coordinated with counsel for NPR and the parties agreed on a proposed new briefing schedule for both the Mot. for JOP and the Cross-Motion for Leave to File a First Amended Complaint and Conduct Certain Discovery (the "Cross-Mot."), which has been submitted to and approved by the Court. Dkt. 68 and Minute Order, dated November 30, 2021. The proposed first amended complaint (the "First Amended Complaint") is set forth in redlined and clean versions as Ex. D and Ex. E to the Quainton Decl.

Plaintiff's opposition to the Mot. for JOP is provided by the Cross-Mot. and the

arguments presented in favor of the Cross-Mot. Thus, for clarity and simplicity, if the Court grants the Cross-Mot. as the facts and the law compel, it should, *ipso facto,* deny the Mot. for JOP. Conversely, if the Court denies the Cross-Mot., it should grant the Mot. for JOP and enter a final order so that Plaintiff can pursue his rights on appeal.

## II.   LEGAL ARGUMENT

### A.  Standard of Review

Under Federal Rule of Civil Procedure 15(a)(2), "a party may amend its pleading . . . with the Court's leave. The Court should freely give leave when the interests of justice so require." As the Supreme Court has stated, "this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962). The decision whether to grant leave to amend a complaint is within the discretion of the district court and leave should be freely given unless there is good reason to the contrary. *Willoughby v. Potomac Elec. Power Co.*, 100 F.3d 999, 10003 (D.C. Cir. 1996). Because leave to amend should be liberally granted, the party opposing the amendment bears the burden of demonstrating a colorable basis for denying leave to amend. *Abdullah v. Washington*, 530 F. Supp. 2d 112, 115 (D.D.C. 2008).

In considering whether to grant leave to amend, a court should consider factors such as: 1) undue delay; 2) any prejudice to the opposing party; 3) the futility of the amendment; and 4) any bad faith. *Atchinson v. District of Columbia*, 73 F.3d 418, 425 (D.C. Cir. 1996); *In re Domestic Airline Travel Antitrust Litig.*, No. MC 15-1404 (CKK), 2017 WL 11565557, at *1 (D.D.C. Aug. 31, 2017).

### B.  The Proposed First Amended Complaint Is Not Being Filed with Undue Delay, Does Not Create any Prejudice, Was Not Filed in Bad Faith and is Not Futile.

1.      There is No Undue Delay. As discussed above, promptly upon the entry of the Opinion, counsel for Plaintiff and counsel for NPR met and conferred and sought to agree on

a schedule to permit each party to preserve its respective rights. *See supra* at 1-2. Plaintiff and NPR originally sought to extend NPR's deadlines to respond to the original Complaint until after the Court had ruled on the proposed First Amended Complaint, but NPR then elected to answer and file the Mot. for JOP, agreeing with Plaintiff on a proposed briefing schedule submitted to the Court. *Id.* It is evident that Plaintiff and NPR were diligent and professional in agreeing upon a proposed briefing schedule. With respect to NPR, there can be no question of undue delay.

Before filing the present Cross-Mot., Plaintiff contacted counsel for defendants Verizon and Isikoff and inquired whether Verizon and Isikoff would oppose the motion. *See supra* at 2. Verizon and Isikoff indicated that they would oppose the motion and requested Plaintiff's consent to have until January 18, 2022, to respond to the motion. *Id.* Plaintiff agreed to Defendants' request and the Parties sought and obtained the Court's approval for a briefing schedule to address the proposed First Amended Complaint. *Id.* As with NPR, with Verizon and Isikoff, Plaintiff has acted in a timely fashion, well before any of the Defendants have taken any action that could prejudice their rights. The absence of undue delay clearly weighs in favor of granting the Cross-Mot.

      2.    <u>Defendants Will Not be Prejudiced by the Filing of the Proposed Cross-Motion.</u>

None of the Defendants will be prejudiced by the filing of the proposed First Amended Complaint. At this stage in the litigation, Defendants have devoted minimal resources to this matter. No discovery has been conducted, no interrogatories served, no depositions taken or scheduled, no experts hired. Indeed, the Parties have not yet had an initial scheduling conference and NPR moved the Court, on consent with Plaintiff, to stay all discovery and conferencing requirements until after the pending motions are decided. Dkt. 67. The Court granted this motion by Minute Order, dated November 12, 2021.

In addition, at least as to NPR, Plaintiff could have filed an amended complaint as of right, to which NPR could have made the same arguments that it will make in response to Plaintiff's cross-motion. Plaintiff is only filing the Cross-Mot. because discussions with NPR lasted until the eve of Plaintiff's deadline to file an amended complaint, at which time NPR chose instead to file its answer, followed by the Mot. for JOP. *See supra* at 1-2. NPR's litigation tactic was its own free choice and does not create any prejudice for NPR. For its part, Plaintiff is waiving any claim of prejudice.

As for Verizon and Isikoff, they will likewise not be prejudiced by the filing of the proposed First Amended Complaint. As noted, the matter is still in its earliest stages and few resources have been devoted to the litigation. Moreover, Verizon had requested that the original complaint be dismissed with prejudice. Dkt. 46 at 43. The Court did not grant Verizon's request, leaving open the possibility of motion for leave to amend. Such a motion, timely made, at an early stage in the litigation, cannot constitute prejudice. As this Court has held, "undue prejudice is not mere harm to the non-movant but a denial of the opportunity to present facts or evidence." *City of Moundridge v. Exxon Mobil Corp.*, 250 F.R.D. 1, 6–7 (D.D.C. 2008). *See Atchinson v. D.C.*, 73 F.3d at 427 (delay of <u>*two years*</u> and filing of motion to amend on the first day of trial created prejudice with respect to trial strategy and a proposed municipal defendant's ability to retain private counsel).

Nothing close to the type of prejudice necessary to deny leave to amend is present here. First, none of the Defendants will be limited in their ability to offer facts and evidence. As noted, the Court has granted a motion to stay all proceedings, including the initial scheduling conference, until 21 days after it has ruled on the Mot. for JOP. *See* supra at 2, 5. Thus, discovery cannot even begin until after the Court's ruling, at which point, if the Court grants the motion, the parties will proceed with a blank discovery slate. While there will be some additional cost in

opposing the motion to amend, such costs, by themselves, are incidents of litigation and do not constitute prejudice. *See, e.g.*, *Cooper v. First Gov't Mortg. & Invs. Corp.*, No. CIV.A. 00-536 (RMU), 2001 WL 1704307, at *1 (D.D.C. Aug. 24, 2001); *Robertson v. Cartinhour*, 691 F. Supp. 2d 65, 73 (D.D.C. 2010).

Second, Defendants' strategy will likewise not be affected, since Defendants will only decide upon a litigation strategy once the Court has determined what claims can proceed against which Defendants. Finally, nothing in the Cross-Mot. or its timing can or will affect Defendants' choice of counsel, who have remained unchanged and have negotiated proposed stipulations and motions on consent with counsel for Plaintiff.

In sum, if the Court denies the Cross-Mot., that will be the end of the litigation at the trial level and Defendants will barely have broken a sweat. If the Court grants the motion, that will mean the First Amended Complaint clarifies the legal basis for liability and states a proper basis to proceed to litigation on the merits. While Defendants would obviously rather not address the merits of Plaintiff's claims, the frustration of that desire because Plaintiff's claims are sufficiently meritorious to proceed cannot constitute legally cognizable prejudice. Even if Defendants would rather not litigate, there is no "prejudice" under Rule 15 in being required to address the merits of a well-plead amended complaint. The absence of prejudice here weighs heavily in favor of granting the Cross-Mot.

       3.   <u>Leave to File the First Amended Complaint is Not Being Sought in Bad Faith.</u>

There can be no suggestion of bad faith here. Plaintiff worked in good faith with NPR Verizon and Isikoff to develop briefing schedules and a discovery approach acceptable to all parties. Plaintiff' consulted with counsel prior to filing the Cross-Mot. and consented to a request giving Verizon and Isikoff substantial time to respond to the motion. Plaintiff has acted

constructively and in good faith with all the Defendants and has agreed to a lengthy delay for

Defendants' opposition papers to the Cross-Mot., precisely to avoid any prejudice to Defendants.

While the proposed First Amended Complaint does contain substantial new detail, none of this

detail can come as a surprise, as it primarily provides greater context for the defamatory nature

and implication of Defendants' statements, publications, broadcasts and republications to address

the Court's holding that the original Complaint did not adequately plead "actual malice."

Additional changes are the result of changes in the corporate structure of Yahoo since the filing

of the original Complaint and the withdrawal of certain claims, which required a substantial

refocusing of the allegations on Isikoff, Yahoo and NPR.  In addition, NPR's Mot. for JOP

argued that the original Complaint contained further defects beyond those identified by the Court

that Plaintiff has every right to address. The absence of bad faith also weighs strongly in favor of

granting the Mot. to Amend.

### 4.    The Proposed Amendments Are Not Futile.

As a threshold matter, amended pleadings are "almost always allowed to cure

deficiencies in pleading" where matters must be plead with clear and convincing evidence, such

as fraud. *See Firestone v. Firestone,* 76 F.3d 1205, 1209 (D.C. Cir. 1996). Both the Supreme

Court and this Court have upheld this principle with respect to pleading defamation claims. *Linn

v. United Plant Guard Workers of Am., Loc. 114*, 383 U.S. 53, 66 (1966) (leave should be given

on remand to amend complaint to make specific allegations of malice and harm required); *U.S.

ex rel. Head v. Kane Co.*, 668 F. Supp. 2d 146, 157 (D.D.C. 2009) (granting leave to amend

counterclaim for defamation after dismissal for failure to state a claim). Accordingly, as a

general matter, leave to amend a defamation claim should, absent undue delay or prejudice, not

present here, be granted.  In the present case, as discussed below, none of the specific

amendments would be futile and the Court should exercise its discretion to grant leave to file the First Amended Complaint.

     a.   <u>The First Amended Complaint identifies the appropriate Defendants.</u>

     i.   <u>Isikoff</u>

As the primary party responsible for the defamation of Plaintiff, Isikoff is obviously an appropriate defendant.

     ii.   <u>NPR.</u>

Similarly, to the extent the First Amended Complaint establishes actual malice on the part of Isikoff, NPR is liable, at a minimum for publishing Isikoff's defamatory statements. In addition, the First Amended Complaint details additional bases for liability, including aiding and abetting and conspiracy to defame.

     iii.   <u>Yahoo.</u>

Verizon had moved to dismiss on the grounds that it was not a proper defendant. Dkt. 46 at 42. At the time Verizon filed its motion, Yahoo! News, for whom Isikoff serves as Chief Investigative Reporter, was a division within Verizon Media, Inc., which was wholly owned by Verizon. First Amended Complaint ¶ 13. However, as noted, Verizon recently sold Verizon Media, Inc. to Apollo Global Management Inc. ("Apollo"). First Amended Complaint ¶¶ 12- 14.[2] Yahoo! News is now a division within a new company called Yahoo. First Amended Complaint ¶ 12. Yahoo is jointly owned by Verizon and Apollo through a partnership whose interests are held 90% by Apollo and 10% by Verizon. *Id.*[3] Yahoo is thus the successor to Verizon Media,

---

[2] *See also* https://www.cnbc.com/2021/05/03/verizon-sells-yahoo-and-aol-businesses-to-apollo-for-5-billion.html

[3] *See also* https://verizon.api.edgar-online.com/EFX_dll/EdgarPro.dll?FetchFilingConvPDF1?SessionID=QxywkIHs37lG_zQ&ID=15300858

Inc., itself the successor to Oath, Inc., the company created by Verizon to hold AOL and Yahoo jointly following their respective acquisitions. First Amended Complaint ¶ 13.

As a result, unless discovery reveals a contrary contractual allocation of liabilities or the presence of other factors, Yahoo is properly named as a new corporate defendant. *See, e.g., Pool v. F. Hoffman-La Roche, Ltd.*, 386 F. Supp. 3d 1202, 1213 (N.D. Cal. 2019)(corporations cannot escape liability by a mere change of name or a shift of assets when and where it is shown that the new corporation is, in reality, but a continuation of the old); *Bingham v. Goldberg. Marchesano. Kohlman. Inc.*, 637 A.2d 81, 89-91 (D.C. 1994) (summarizing conditions for successor liability in asset transactions). S*ee generally*, *Liability of Corporation for Debts of Predecessor*, 149 A.L.R. 787 (Originally published in 1944). However, this is a highly fact-specific inquiry that cannot be definitively answered without a minimum of discovery given the private nature of the Appolo/Verizon transaction and the limited available public disclosure.

### iv.    Verizon

As an initial matter, Verizon is headed by Hans Vestberg, who is aligned with Bill and Hilary Clinton. *Id.* Mr. Vestberg gave a commencement address jointly with Bill Clinton in 2020 and has twice been an invitee to the selective Clinton Global Initiative Annual Meeting. *Id.*  As discussed in more detail below, the *Conspiracyland* podcast centers around a conspiracy theory relating to Hillary Clinton, disseminated in a highly charged political environment involving accusations of Russian influence to elect and then support former President Trump. Verizon and its senior management had an interest in Isikoff's podcast far beyond the normal parent company in routine journalistic operations of a subsidiary.

But Verizon is appropriately named as a defendant for another, independent reason. Verizon argued that it should be dismissed from the case because its only connection to the case was as the parent of Oath, Inc. ("Oath"). Dkt. 46 at 42. Counsel suggested the appropriate

defendant would have been Oath, not Verizon. However, Oath was rebranded as Verizon Media **_before_** the *Conspiracyland* podcast aired. First Amended Complaint at ¶ 12. Verizon's counsel was thus incorrect: the appropriate predecessor entity that directly controlled Yahoo!News was Verizon Media, **_not_** Oath. Counsel's error points to an important issue that supports maintaining Verizon as a Defendant in this case. Verizon's corporate structure is complex, and it is extremely difficult to follow lines of control because of frequent reorganizations. If Verizon's own counsel is confused, this is because it is difficult to determine which entity is ultimately responsible for which division and indicates that the one constant directing force in the group's operations – the parent company – must bear final responsibility.

Moreover, Verizon continues to have a direct 10% stake in the Apollo affiliate that owns Yahoo. Fisrt Amended Complaint ¶ 12. As a holder of limited partnership units in the partnership that controls Yahoo, Verizon retains at least some power to influence the operations of Yahoo. *Id.* This contractual provision suggests an ongoing corporate interest in Yahoo's media business, which can shape affect the Verizon brand image, and supports an inference of control over the company's Internet publishing operations. It is reasonable to infer that the explosive and politically charged nature of the stories produced at Yahoo! News, in particular those developed by Isikoff, create reputational risks for the Verizon brand as a whole, and that Verizon's continued involvement in Yahoo's affairs reflect its historic implication in the operations of Verizon Media. At a minimum, Plaintiff is entitled to discovery to determine precisely how Verizon and Verizon Media are related on sensitive, even sensational, politically charged stories. *See, e.g.*, *Chrysler Corp. v. Gen. Motors Corp.*, 589 F. Supp. 1182, 1200 (D.D.C. 1984) (where the parent exercises continuing supervision and intervention in the subsidiaries' affairs, the subsidiaries' activities are attributable to parent); *Uebler v. Boss Media AB*, 432 F. Supp. 2d 301, 304 (E.D.N.Y. 2006) (directing parties to engage in

limited discovery for the purpose of developing the record with respect to parent's relationship with its subsidiaries); *Taylor v. Stratton Corp.*, No. 2:09-CV-297, 2010 WL 11552859, at *2 (D. Vt. July 9, 2010)(substantial ambiguity in the record about the nature of the relationship between parent and subsidiary needs to be explored and resolved through discovery).

v.        Apollo/John Doe, Inc.

It appears from the publicly available documents most likely that Apollo, acting through an affiliate, purchased the shares in Verizon Media, Inc. and created a new corporation, known simply as Yahoo, to hold the Internet and content business previously acquired from Yahoo! Inc. First Amended Complaint at ¶ 12-14. Generally, the buyer in a stock purchase agreement acquires all the liabilities attaching to the stock of the acquired entity, including litigation liability. See *Tucker v. Paxson Mach. Co.*, 645 F.2d 620, 622 (8th Cir. 1981). Thus, it appears that Apollo or its affiliate, referred to here as John Doe, LLP, is liable under ordinary principles of corporate law for the liabilities of Verizon Media.

Moreover, Apollo, with a 90% stake in Yahoo, has at least as great a corporate interest in retaining ultimate control over politically explosive content of the type favored by Isikoff as does Verizon. In acquiring Verizon Media, rebranded as Yahoo, Apollo may have also agreed contractually to assume or exclude certain liabilities of Verizon Media. *See generally*, *Caldwell Trucking PRP v. Rexon Tech. Corp.*, 421 F.3d 234, 242 (3d Cir. 2005)(allocation of liability between buyer and seller requires close reading of contractual provisions, including provisions for indemnification and contribution). Discovery is necessary to determine to what extent Apollo and/or John Doe, LLP may have allocated contingent liabilities of Verizon Media between themselves and Verizon.

b.   <u>The First Amended Complaint properly pleads actual malice.</u>

The Court's core holding in the Opinion was that Plaintiff had not properly plead "actual malice." Opinion at 10-11. NPR follows the Opinion and argues that judgment on the pleadings should be entered for the reasons set forth in the Opinion, Mot. for JOP at 5-6, and further that Plaintiff failed to allege "actual malice" adequately. *Id.* at 6-9. The First Amended Complaint has been modified to make clear than an inference of actual malice is warranted.

Actual malice can be established by evidence showing that that a story or statement was (1) "fabricated"; (2) "so inherently improbable that only a reckless man would have put [it] in circulation"; or (3) "based wholly on an unverified anonymous telephone call" or some other source that the defendant had "obvious reasons to doubt." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968); *Tavoulareas v. Piro*, 817 F.2d 762, 790 (D.C. Cir. 1987). The First Amended Complaint includes factual matter clearly sufficient to meet the pleading standard set forth in *St. Amant* and *Tavoulareas*.

The First Amended Complaint frames Isikoff's reckless disregard for truth by demonstrating Isikoff's responsibility for promoting the Steele "dossier," whose inherently implausible claims have now been shown to be based on lies for which the source is facing a criminal indictment. *See* First Amended Complaint, at ¶¶ 32-33. This general background shows Isikoff to be the type of "reckless" reporter who puts into circulation stories that he had "obvious reason to doubt." The First Amended Complaint shows that Isikoff's recklessness is a fundamental trait of his "journalism" and reflects his view of himself as an "actor" in political events with the power to shape the course of history, rather than as an objective news reporter. First Amended Complaint, at ¶ 30. In the *Conspiracyland* podcast and the NPR Interview, Isikoff demonstrates his reckless disregard for the truth by insisting, over and over, against all evidence, on the conspiracy theory that Russian foreign intelligence had planted the allegation that Hilary

Clinton ordered the assassination of Seth Rich on an obscure and ludicrous website, whatdoesitmean.com, *even after this theory had been decisively debunked by the Washington Post*. First Amended Complaint ¶¶ 57-61. Despite this theory's inherent lack of plausibility, its complete lack of any evidentiary basis, and its discrediting by the mainstream media, Isikoff insists on this tale, literally sears it into his listeners' minds and memories: it is the Kremlin, operating through an American website, that promoted the foundational story that Hillary Clinton murdered Seth Rich to prevent him from testifying against her to the FBI. First Amended Complaint ¶¶ 50, 51, 52, 57-61, 99, 111, 156, 176.

Because this wild tale is so prominent, so central to *Conspiracyland*, whenever Issikof mentions Hillary Clinton and/or her aides conspiring with others before the murder of Seth Rich, the listener has no doubt whatsoever that Isikoff is referring to his foundational conspiracy theory that Russian agents and their American enablers were fingering Hillary Clinton as the person responsible for assassinating Seth Rich. This fairy tale is so important to Isikoff that he fabricates defamatory statements in service of his journalism.

The most important such fabrication occurs in Episode 6 of *Conspiracyland*, when Issikof, in the course of interviewing Joe Capone, the manager at a bar frequented by Seth Rich, invents a statement that Plaintiff is alleged to have made, namely that Hilary Clinton, or aides to Hilary Clinton, "conspired" with Joe Capone. First Amended Complaint at ¶ 80.

The full exchange between Isikoff and Capone shows exactly how Isikoff, not Capone, fabricates the essential Couch quotation:

> Isikoff (speaking about a visit to the White House several days before the Seth Rich murder Capone does not deny making): So your name shows up on the [White House] visitors logs and someone saw it. Who saw it and what did they do with it?:
>
> Capone: There's one guy, I'm totally blanking on his name . . . . Matt

Couch.

Isikoff: Yup, we know him.

Capone: He assumes a bunch of things . . .

Isikoff: *What was Matt Couch saying was the significance of the fact that you had been to the White House on July 6*?

Capone: *That there were secret meetings going on*.

Isikoff: *Secret meetings with who*?

Capone*: Hillary. . . You know* . . .

Isikoff: *That you were conspiring with Hillary Clinton* or?

Capone: Must have been right?

Isikoff*: Or aides to Hilary Clinton*?

Capone: Yeah . . . I've never met Hilary. . . I've never seen any of these people.

While the above language was included in the original pleading, the specific, detailed allegation that Isikoff is responsible for *fabricating* this quotation – which is demonstrably the case here – is a crucial technical addition to the First Amended Complaint. It is not Capone who says that Couch claims Hillary Clinton was conspiring with Capone on the eve of Seth Rich's murder, it is *Isikoff* himself who literally makes up the allegation: "You were conspiring with Hillary Clinton."  Fabrication of quotations demonstrates "actual malice" under *St. Amant* and *Tavoulareas*.

Moreover, the First Amended Complaint makes clear that in fabricating the quotation that Matt Couch stated Hilary Clinton was "conspiring" with Joe Capone, the listener has no doubt that Isikoff is implying that *Couch* is advancing the crazy conspiracy theory that Hilary Clinton conspired to assassinate Seth Rich. The First Amended Complaint demonstrates how this theory,

xiv

and its alleged origins in Russia foreign intelligence *are at the absolute core* of the entire *Conspiracyland* podcast. *See supra* at 14; First Amended Complaint ¶¶ 50, 51, 52, 57-61, 99, 111, 156, 176. Thus, when Isikoff accuses Couch of spreading the statement that Hilary Clinton was conspiring with Joe Capone before Seth Rich's murder, *the only possible implication in any reasonable listener's mind* is that Couch is promoting the conspiracy theory that Hilary Clinton was involved in the murder of Seth Rich. The central conspiracy Issikoff promotes is that this "involvement" was the assassination of Seth Rich.

The First Amended Complaint also makes clear that Isikoff *knows* his fabrication is false because, although he claims to have reviewed *thousands* of Seth Rich-related emails, *he does not produce a single one* – because there none exist – *to support his slanderous accusation*. First Amended Complaint ¶¶ 89, 101. Under *St. Amant* and *Tavouleras*, an inference of actual malice can unquestionably be made here.

In a similar vein, Isikoff fabricates the accusation that Couch has claimed Capone and Mueller were involved in a "cover up" of the Seth Rich murder. First Amended Complaint, at ¶ 88. As to Capone, this allegation is not only fabricated, but also completely nonsensical. Isikoff has claimed that Matt Couch stated Hilary Clinton and Joe Capone were conspiring, presumably to kill Seth Rich, *before* Seth Rich was murdered. First Amended Complaint, at ¶ 80. It is nonsensical to claim, *without evidence*, that Couch is instead alleging that Joe Capone covered up his role in the murder *after* it occurred. Simply making up falsehoods that are inherently implausible, that a journalist has every reason to doubt because they contradict his own "reporting," that only a person with a reckless disregard for truth would inject into the stream of information with no evidence, constitutes the very essence of "actual malice." Similarly, as to Mueller, in all the litany of horrible acts that are attributed to Couch (discussed below), there is *not a single statement or suggestion* that Couch has accused Mueller of being involved in a

xv

"cover-up" other than Isikoff's bald claim, with no citation to anything Mueller says at any point during his interview, with not a shred of email or social media evidence to support his fabrication. Isikoff is again simply making up an alleged statement to serve his political and narrative ends. The proposed First Amended Complaint leaves absolutely no doubt of Isikoff's "actual malice."

Isikoff lies on matters big and small. He also fabricates alleged statements of fact as part of his character assassination of Plaintiff, inventing the claim that Couch resides in the Ozarks, when he is from the modern city of Rogers, home to the corporate headquarters of Wallmart, one of the largest companies in the United States. First Amended Complaint ¶ 62. This fabrication may seem minor, but in fact it is crucial to set up Plaintiff as an uneducated hillbilly who can be smeared at will. While the reference to the Ozarks was in the original complaint, the First Amended Complaint makes clear this is a pure fabrication, and, as such, provides evidence of actual malice under *St. Amant* and *Tavouleras*.

With respect to statements relating to Mark Mueller, the Court held that Couch failed to plead sufficient facts showing that "Isikoff or any defendant knew the falsity of the statements attributed to Couch." Opinion at 9. The First Amended Complaint adds the factual allegation that Isikoff boasts of having reviewed thousands of Seth Rich-related emails. First Amended Complaint ¶¶ 89, 101. The First Amended Complaint underscores that if Isikoff had *any* physical evidence of the truth of the allegations against Couch, Isikoff would doubtlessly have produced them, First Amended Complaint, at ¶ 89, as he does when he feels on firmer ground with Roger Stone and Jerome Corsi, *Id.* at ¶ 88.

The allegations made by Mueller, summarized in the First Amended Complaint at ¶ 89, are not anodyne, but wild and outrageous claims that are inherently improbable and ones that an investigative reporter with decades of experience would have every "reason to doubt," as the

Supreme Court stated in *St. Amant*, without at least a scintilla of physical evidence. First

Amended Complaint, at ¶ 90. Particularly the gruesome – and easily verifiable or falsifiable

claim – that Matt Couch was responsible for superimposing Jeffrey Dahmer's head on Mark

Mueller in a targeted act of social media harassment and cruelty, was "so inherently improbable

that only a reckless man would have put [it] in circulation." *St. Amant*, 390 U.S. at 732.

In granting the Motion to Dismiss of Verizon and Isikoff, the Court also held that there

was a separate and independent reason Couch's claims as to Mark Mueller were inadequately

plead: the statements are attributed to "people like Matt Couch" not Couch and "it is clear the

statement cannot reasonably be read to directly accuse Couch of the conduct in question but

rather people *like* him." Opinion at 9. The First Amended Complaint cures this defect by

showing how Isikoff makes it unambiguous that *he is implying Couch specifically*, and not others

like him, is the one responsible for the alleged statements and actions.  As soon as Mueller

mentions the name "Matt Couch," Isikoff immediately stops the flow of his discussion and

shines a spotlight directly on Couch, making it clear beyond doubt to the listener that Couch is

the implied author of the outrageous conduct alleged by Mueller. As the First Amended

Complaint explains:

85.   Thus, after a serious of anonymous references to "Internet
      trolls" who have doctored pictures linking him to a serial killer,
      doxed him, his family and neighbors, and jeopardized his
      business, Mueller connects all the horrible acts of which he
      complains to "alt-right" "people like Matt Couch."

86.   Indeed, Couch is the *only* person mentioned and is made to
      stand in for all the people who do the horrible, outrageous
      things Mr. Mueller alleges.

87.   Isikoff dramatically slows down his narrative and proceeds to
      spend the next several minutes of the podcast focusing on
      Couch, to sear into the listener's memory the name Matt

xvii

> Couch.[4] Isikoff highlights Matt Couch's willingness to
> apologize in an unrelated context, as though this provides
> support for the evidence-free attacks that are made on him by,
> with and through Capone and Mueller.[5] The obvious and
> ineluctable implication is that Matt Couch is responsible for the
> horrible words and conduct directed at Mr. Mueller. Isikoff
> even insinuates that Couch's failure to apologize for statements
> he never made about Mueller and Capone is somehow
> evidence of his guilt.[6] This is not journalism. It is character
> assassination.

First Amended Complaint, at ¶¶ 85-87.

As will be shown below, by the time of the later NPR Interview, Isikoff drops the mask

entirely and states baldly that Matt Couch, not people "like" Matt Couch, are responsible for the

attacks on Mueller, confirming the unavoidable implication from *Conspiracyland* that Plaintiff is

the person accused of harassing and targeting Mark Mueller. The D.C. Circuit has recently

summarized the elements that a Plaintiff needs to establish to make out a defamation by

implication case:

> In a defamation by implication case under D.C. law, the courts
> are charged with the responsibility of determining whether a
> challenged statement is capable of conveying a defamatory
> meaning.  A plaintiff must show first that the communication, viewed
> in its entire context, conveys materially true facts from which a
> defamatory inference can reasonably be drawn, and second, that the
> communication, by the particular manner or language in which the true
> facts are conveyed, supplies additional, affirmative evidence
> suggesting that the defendant intends or endorses the defamatory
> inference.

*Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 239–40 (D.C. Cir. 2021), *cert.
denied*, No. 21-121, 2021 WL 5043599 (U.S. Nov. 1, 2021).

The First Amended Complaint meets both of these requirements with respect to the

Mueller allegations. First, while these accusations are wild and outrageous, they are plainly

---

[4], Dkt 47-1, Episode 6 of *Conspiracyland* (hereafter "Episode 6"), 23:10-25, 24:1-12.
[5] Episode 6, 23: 9-15.
[6] Episode 6, 16-18.

intended as true statements. Indeed, entire thrust of Episode 6 of *Conspiracyland* is that third parties are <u>*actually*</u> subjected to horrible and "sickening" conduct of the type denounced by Mueller and relayed by Isikoff. *See* FirstAmended Complaint ¶ 95. Second, the particular manner in which the facts are conveyed, with Mueller identifying "people like Couch" as the culprit, and then Isikoff spending several minutes – approximately 10% of the entire podcast episode – immediately zeroing in on Couch, explicitly attempting to draw a parallel between conduct for which Couch has apologized and the horrible actions that have no connection to him, there is no question that Isikof wants the listener to believe it is actually Matt Couch, and not just someone like him, who is responsible for the harassment of Mueller. Isikoff's endorsement in NPR Interview of a direct accusation of Couch himself leaves no doubt whatsoever of the implication in the *Conspiracyland* podcast.

If a "reporter" were free to wield the power of the press in this manner without accountability, there would be no limit to the power of journalists to smear and destroy reputations by juxtaposition of the real and the imagined, blurring the line between fact and fiction, leaving the wrongfully charged man with the virtually impossible task – on a motion to dismiss, no less – of proving a negative. As in fraud cases, where the fraudster rarely leaves a note to files and the plaintiff must prove her case by circumstantial evidence, so too, in defamation cases, it is the overall context, the "manner or language" in which the slur is conveyed, that must be closely analyzed to be sure that the intended implication is not as devastating as, or even more harmful than, a frontal attack. What Isikoff has done in the podcast format, by deceptive juxtaposition, is very similar to the well-known defamatory technique used in print. *See* Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* § 2.4.2, at 2–19 (2004). As the First Circuit has shown, in reversing a district court, suggestive juxtaposition can give rise to defamation where a newspaper published the picture of a high

school girl next to the headline, "The Mating Habits of the Suburban High School Teenager."

*Stanton v. Metro Corp.*, 438 F.3d 119, 122 (1st Cir. 2006). Plaintiff alleged that the juxtaposition

of her photograph and the text describing suburban teenage promiscuity insinuated that she was

engaged in the conduct described in the article. *Stanton*, 438 F. 3d at 123. In carefully examining

the "article in its totality in the context in which it was uttered or published and considering[ing]

all the words used, not merely a particular phrase or sentence," the court concluded the

publication was "reasonably susceptible to a defamatory meaning." *Stanton*, 438 F.3d at 125,

128.  So too, here, at the pleading stage, and considering the additional context provided in the

First Amended Complaint, and in particular its stress on the manner in which Isikoff

immediately juxtaposes "people like Matt Couch" and Matt Couch himself, directly shining a

light on Plaintiff and underscoring his acknowledged mistake with respect to something totally

unconnected but conceptually similar, the listener has no doubt whatsoever that it is Couch who

was harassing and doxing Mueller and linking him to Jeffrey Dahmer, when, in reality these

claims are completely false. The D.C. Circuit has stressed that a reporter's general approach to a

story bears on the absence of diligence and evidence:

> St. Amant's failure to investigate was deemed not indicative of actual
> malice, inasmuch as the plaintiff had not proven "a low community
> assessment of [the source's] trustworthiness or unsatisfactory
> experience with him by St. Amant." The Court also found support for
> its decision in evidence tending to show that St. Amant published the
> charge in good faith, including St. Amant's testimony that he had
> verified other aspects of his source's information and evidence that the
> source had sworn to his answers in the presence of newsmen.

*Tavoulareas*, 817 F.2d at 790 (internal citations omitted).

Isikoff's approach in *Conspiracyland* demonstrates his overall untrustworthiness: his

insistence on repeating an outlandish  conspiracy theory even after it has been discredited by the

Washington Post, his uncritical dissemination of obviously fraudulent material (in the so-called

"dossier") that has lead to criminal charges against the material's source, his transparent

fabrication of statements by Couch, his commercial motive to have a villain around whom to

construct his narrative, his dissemination as fact of wildly improbably and utterly baseless

claims, his reliance on unsworn statements taken years after the facts at issue, his technique of

deceptive juxtaposition, his demonstrable failure to verify _any_ of his source's statements, his

later admission that he was, in fact, directly accusing Plaintiff of conduct for which he had no

corroborating evidence whatsoever—all lead, inescapably, to the conclusion that Isikoff's attacks

on Couch were made with "actual malice."

      c.   Yahoo and NPR are liable for Isikoff's defamation as publishers and re-publishers of defamatory content.

As the successor to Verizon Media, Inc., itself the successor to Oath, Inc., and Isikoff's

current employer, Yahoo is liable as the corporate publisher of the _Conspiracyland_ podcast. _See_

_supra_ at 9-10.

To the extent the First Amended Complaint cures the defects identified by the Court with

respect to Verizon and Isikoff, it necessarily cures these same defects as applied to NPR. It is

black letter law that the re-publication of defamatory statements subjects the re-publisher to the

same liability as the original defamer. "One who repeats or otherwise republishes defamatory

matter is subject to liability as if he had originally published it." Restatement (Second) of Torts §

578; _Foretich v. Glamour_, 741 F. Supp. 247, 253 (D.D.C. 1990).  NPR uncritically republishes

Isikoff's defamatory implication that Plaintiff is responsible for promoting the conspiracy theory

that Hillary Clinton ordered the assassination of Seth Rich by republishing the falsehood that

Couch claimed Hilary Clinton, or aides to Hilary Clinton, had conspired with Joe Capone prior

to the Seth Rich murder. NPR Interview at 14. Indeed, NPR publishes an even more

unmistakable implication that Couch is disseminating the Hillary Clinton murder theory, thus

becoming directly liable as a publisher of defamatory content and not simply the re-publisher of Issikof's earlier smears. *Id.* ("*Matt Couch and the Internet horde say*, a-ha, you see . . . Joe Capone must have been consulting with someone, *aides to Hilary Clinton*, and *this* somehow *had something to do with Seth Rich's death*.)"  It bears repeating that this sentence is a total lie. As discussed above, Isikoff has completely fabricated the claim that Matt Couch made any assertions about Hillary Clinton or aides to Hillary Clinton conspiring or having anything to do with Seth Rich's death. *See supra* at 14-16. The purpose of this fabrication is unquestionably to imply that Couch has promoted the crazy, Kremlin-inspired claims about Hilary Clinton, which Plaintiff's amended pleading makes clear with a detailed analysis of the NPR Interview. First Amended Complaint at ¶¶ 99 -111.

Isikoff rehashes his debunked conspiracy theory that the Russian foreign intelligence service planted the Hilary Clinton murder theory on an unknown website called whatdoesitmean.com. First Amended Complaint ¶ 99. Isikoff continues promoting this conspiracy theory even though it has been debunked by the Washington Post. First Amended Complaint ¶ 100. NPR makes clear its sympathy with Isikoff's purported exposé of conspiracy theories, such as the Hilary Clinton assassin theory that is Isikoff's hobbyhorse, that "pollute the political discourse" and "slime" innocent third parties. First Amended Complaint ¶ 102. NPR concludes by allowing Isikoff to present "Matt Couch and the Internet horde" as the villains who have "slimed" people like Joe Capone with allegations that he was conspiring with aides to Hilary Clinton on the eve of Seth Rich's murder. First Amended Complaint ¶ 105-106. As has been shown, Isikoff's allegations against Couch are pure fabrications, untethered from reality, recklessly attributed to Plaintiff. See *supra* at 14-16.  NPR claims that "no one stated in the *Fresh Air* broadcast that Couch espoused the conspiracy theory that Hillary Clinton had ordered Seth Rich's killing, *and no reasonable person could believe that the broadcast conveyed that*

*implication*." Mot. for JOP at 10 (emphasis added).  On the contrary, this implication is precisely what is conveyed by the broadcast.

NPR's liability extends to the republication of the false claim that "Matt Couch" and the Internet horde "hounded" Mark Mueller, made him a "target" and compared Mueller to mass-murderer Jeffrey Dahmer. NPR Interview, at 14.  As has been shown, these claims are "so inherently improbable that only a reckless man would have put [them] in circulation." *St. Amant*, 390 U.S. at 732; *Tavoulareas*, 817 F.2d at 790.

Unless Couch is simply guilty in advance of whatever lies the media chose to make up about him, the reckless spreading of evidence-free fabrications must create an inference of actual malice, or the very concept becomes a dead letter. NPR even permits Isikoff to go further in his defamation of Plaintiff than Isikoff went in *Conspiracyland*. In his podcast, Isikoff uses the defamatory technique of juxtaposition—quoting a witness as saying people "like" Matt Couch were responsible for harassing him and then immediately shifting the narrative focus to Mat Couch himself, so that people "like" Couch *become* Couch in the listener's mind. *See supra* at 19-21.

In the NPR Interview, Isikoff goes a step further and states explicitly that it is Matt Couch and his "Internet horde" who are hounding and attacking Mark Mueller. NPR Interview at 14. There is no "gist and sting" of truth here. Mot. for JOP at 11. Matt Couch had nothing to do with the Jeffrey Dahmer/Mark Mueller comparisons; Matt Couch never "hounded" Mark Mueller; Matt Couch never stood at the head of an Internet horde targeting, victimizing, oppressing Mueller; Isikoff knows all this because he has reviewed thousands of emails and interviewed dozens of witnesses and he knows there is no evidence – and he produces none – to support his attack. Isikoff has simply made up all his smears of Couch and NPR allows him to publish and republish his lies.

    d.   <u>NPR's attempts to avoid liability are unpersuasive.</u>

        i.   <u>NPR acted with actual malice.</u>

NPR is wrong as a matter of law that the failure to investigate or examine evidence cannot create an inference of actual malice. *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 45–46 (D.D.C. 2002), *aff'd*, 350 F.3d 1272 (D.C. Cir. 2003)(because defendants are not likely to willingly confess their ill intentions, courts permit plaintiffs to prove "actual malice" by relying upon circumstantial evidence, including a media defendant's "utter failure to examine evidence within easy reach or to make obvious contacts in an effort to confirm a story").

Here, NPR's mindless regurgitation of Isikoff's claims – when it was or should have been on notice that his central theory had been debunked by the Washington Post – demonstrates that it has done nothing to examine any evidence in "easy reach" and has just allowed itself to become Isikoff's mouthpiece, most likely because, from its hyper-partisan, anti-Trump editorial vantage point, the Kremlin-inspired Hilary Clinton assassination theory serves as an effective vehicle to target Trump and his supporters as agents responsible for "polluting political discourse," as NPR puts it.

Moreover, as with Isikoff himself, only a truly reckless organization would have put in circulation wildly implausible claims that Plaintiff accused a witness to a crime of being a mass murderer, or clearly implying that Plaintiff was promoting an insane conspiracy theory about Hilary Clinton without out verifying any evidence in easy reach, such as Plaintiff's tweets, or asking Isikoff to provide some physical evidence to support his allegations. As shown below, NPR coordinated closely with Isikoff in the preparation and presentation of the NPR Interview. Only the most reckless of organizations would allow totally unsubstantiated claims that an innocent third party was guilty of promoting the wildest conspiracy theories and "sliming" third parties without asking for some evidence to support these claims—particularly when the

purveyor of the claims is knowingly repeated a demonstrable falsehood central to his entire

theory: that Russian agents were at the origin of the Hillary Clinton story, a theory that had been

decisively discredited before the NPR Interview. *See supra* at 14, 22.

ii.   The "gist and sting" of the NPR Interview is defamatory.

NPR attempts to avoid liability by claiming that the "gist and sting" of the Isikoff

interview was justified. Mot. for JOP at 11. This argument is a flight of fancy. The gist and sting

of the interview, as set forth in great detail in the amended pleading, is that Couch is responsible

for propagating a delusional conspiracy theory that is polluting public discourse—not just any

conspiracy theory, but very specifically the conspiracy theory that is given pride of place in the

interview, namely, that Russian intelligence planted a story that Hilary Clinton had ordered the

murder of Seth Rich which was relayed by the fake news site "What Does it Mean" and then

pushed into the mainstream by Matt Couch and Fox News. Not a shred of evidence – not the

slightest "gist" or the faintest "sting" – supports the theory espoused by Isikoff and irresponsibly

broadcast and republished by NPR.

NPR also attempts to evade responsibility by claiming the statements it publishes and

republishes are not defamatory as a matter of law. Mot. for JOP at 9-11. These arguments also

fail, for the reasons set forth below.

iii.   For NPR to imply that Couch was a proponent of the Hilary
Clinton conspiracy theory is not merely "unpleasant.

NPR asserts that it is merely "unpleasant" for NPR to imply that Matt Couch is a

proponent of what Isikoff has presented as a conspiracy theory promoted by a nuclear adversary

of the United States that "pollute[s] the political discourse." NPR Interview at 13; Mot. for JOP

at 9-10. This is simply frivolous. The six-part *Conpsiracyland* podcast and the special interview

of Isikoff are based on the dangers posed by the conspiracy theory that Couch is, implicitly, guilty of spreading.

iv. <u>The defamatory language targeting Couch is not mere "hyberbole."</u>

NPR then claims that fingering Matt Couch as the member of a "horde" that was "targeting" and "hounding" Mark Mueller is mere rhetorical hyperbole. Mot. for JOP at 10. frivolous. NPR relies on *Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 286 (1974) for the proposition that "vigorous epithets" such as calling a strike-buster a "scab" are not actionable as defamation. But here Isikoff and NPR are not simply using "vigorous epithets"—they are making the demonstrably false claims that Matt Couch has singled out ("targeted") Mark Mueller and is harassing and placing him in fear as of being chased by dogs ("hounded") by claiming he is a mass-murderer ("Jeffrey Dahmer"). None of this is true. Plaintiff has taken none of the actions – in any form – underlying the vicious attacks on him. The implication, however, is clear that he *has* singled out and directed individualized frightening harassment of the vilest kind at an innocent bystander. Lies such as these bear no relation whatsoever to the use of the word "scab" to describe someone who is, objectively, a strike breaker. The Supreme Court in *Letter Carriers* was careful to note that "vigorous" even "hyperbolic" language can "be actionable, particularly if some of its words were . . . used in such a way as to convey a false representation of fact." *Letter Carriers*, 418 U.S. at 286.

v. <u>The NPR Interview, repeating the themes of the *Conspiracyland* podcast, promotes the central conspiracy theory that the Kremlin was responsible for the Hillary Clinton assassination theory and that Plaintiff was involved in disseminating this theory.</u>

Third, NPR asserts that "no reasonable person could believe that the broadcast conveyed [the] implication that Matt Couch has espoused the Hilary Clinton assassination theory." Mot.

xxvi

for JOP at 10. This is divorced from reality. Both the *Conspiracyland* podcast and the NPR Interview have as their central function promoting the idea that the Kremlin had planted a dangerous conspiracy theory that Hillary Clinton had ordered the assassination of Seth Rich and that various Americans, from obscure websites, such as Whatdoesitmean.com, to social media personalities to television anchors such as Sean Hannity, were responsible for disseminating this "fake news" that "pollutes" "political discourse."

The _only_ reason for fabricating claims that Matt Couch had accused Joe Capone of conspiring with Hilary Clinton or aides to Hillary Clinton was precisely to paint Couch as of one the social media personalities, along with others like Roger Stone, responsible for pushing Russian disinformation about Hillary Clinton into the mainstream. Isikoff does not invent accusations about Hillary Clinton and her aides because Capone would have been having tea with the former first lady and her advisors. No, Isikoff needs a villain, a social media influencer and amplifier who could help take his conspiracy theory mainstream, and so he simply lies about Couch. Issikof and NPR are not promoting this conspiracy theory as a parody or an exaggeration: they want the listener to believe it is actually, really, true that Russians injected the conspiracy theory into American political discourse and that Matt Couch is one of its promoters. The First Amended Complaint does not give Isikoff and NPR license to defame in this manner without consequence.

In a variation on this theme, NPR claims no-one could believe that Couch was falsely accusing Clinton of murder. Mot. for JOP at 11. This argument is simply a rehashing of the previous point and is equally meritless. Isikoff's central point is that crazy conspiracy theories about Hillary Clinton ordering the assassination of Seth Rich were actually being promoted by the Kremlin and the attacks on Couch are very consciously designed to imply that Couch is, in

essence, a "useful idiot" of Kremlin propaganda—a vile and baseless lie directed at a patriotic American citizen.

> ### vi. It is not "substantially true" that Couch "hounded" Mark Mueller, but completely false.

As discussed above Plaintiff has amended his pleadings to focus on the Capone and Mueller allegations. *See supra* at 7. First Amended Complaint at ¶¶ 103-111, 116. The "targeting" and "hounding" accusations referenced in the First Amended Complaint are not only not "substantially" true, they are completely false. First Amended Complaint ¶¶ 109-110. Couch has not targeted, attacked, harassed or hounded Mueller and never published personal information about him or sought to connect him with Jeffrey Dahmer. Isikoff has simply invented and fabricated these slurs, which NPR broadcasts and republishes without the slightest attempt at confirmation. First Amended Complaint ¶ 112.

> ### e. The First Amended Complaint properly pleads efamation *per se*.

NPR asserts that the Complaint fails to state a claim for Defamation *per se* as a matter of law. Mot. for JOP at 11. This was wrong with respect to the original Complaint, but has now been clarified to make explicit that Couch is being falsely accused of committing state and federal crimes of cyberstalking under and D.C. Code § 22–3133 and 18 U.S.C. § 2261A(2). *See* First Amended Complaint ¶ 127. The allegation of "hounding" Joe Capone and "going after" Mark Mueller making him a "target," comparing him to a mass murderer—these are all the alleged actions of Matt Couch and the Internet "horde" and, if true, could be prosecuted under both state and federal law, particularly in the post-Pizzagate environment of heightened sensitivities to social media and related activity.  The euphemism that had been employed in the *Conspiracyland* podcast – people "like" Matt Couch, even though the only plausible implication in context was that Matt Couch was specifically being singled out – has been abandoned in favor of a direct

attack on Matt Couch and his "horde" "dragging" and "tagging" innocent third parties. NPR Interview, at 13-14. Under D.C. law, "a person may not purposefully engage in a course of conduct directed at a specific individual intending, knowing, or having reason to know that his or her course of conduct would cause the individual to fear for his or her safety or the safety of another person; to feel seriously alarmed, disturbed, or frightened," or to suffer emotional distress." *Mashaud v. Boone*, 256 A.3d 235, 238 (D.C. 2021)(citing D.C. Code § 22-3133(a)(1)-(3)); *United States v. Spann*, No. CR 19-0252 (ABJ), 2021 WL 4192046, at *1 (D.D.C. Sept. 15, 2021)(sentencing defendant to a term of thirty months incarceration to be followed by thirty-six months of supervised release under ). As with *Conspiraclyand*, which is meant to cause the listener to feel that Matt Couch's alleged crimes are "sickening," there is no doubt that the listener is meant to believe that Matt Couch and his horde are actually engaging in the kind of conduct prohibited by federal and state cyberstalking laws, causing specific individuals to "feel seriously alarmed or disturbed and to suffer emotional distress." This is not merely rhetorical hyperbole; it is the accusation of a crime. And there is no doubt that Couch is specifically targeted in the NPR Interview. The criminal stalking and harassment allegation are made first against "Matt Couch and the Internet horde," NPR Interview, at 14, then against the "they" whose antecedent is "Matt Couch and the Internet horde," leaving no doubt that Couch personally is the clear target.

While the Court did not address specifically Verizon's claims that certain words use by Isikoff on the *Conspiracyland* podcast are not defamatory as a matter of law, Plaintiff has modified the Complaint to render even more clear the defamatory nature of the specific language used to defame him: member of the Internet conspiracy "horde," Episode 6, 11:7; one of the Internet "bullies," Episode 1, 7:12-13, Episode 6, Bonus Episode, 11:11, responsible for "targeting" Episode 6, 6:15, and "harassing" Episode 1, 7:12-13, Bonus Episode, 11:11, third

parties; an Internet "troll," Episode 6, 16:6-7, 23:6-7, Episode 2, 15:6-8; and an Internet "bully"

Episode 6, Bonus Episode, 11:11, Episode 1, 7:12-13.

Viewed in context, these terms are all defamatory. For the better part of four years, the

American public was told that US democracy had been attacked by Internet "trolls." *See, e.g.*,

Ellen Nakashima, *Trump administration hits Russian spies, trolls with sanctions over U.S.*

*election interference, cyberattacks*, WASH. POST (Mar. 15, 2018),

https://www.washingtonpost.com/world/national-security/trump-administration-sanctions-

russian-spies-trolls-over-us-election-interference-cyber-attacks/2018/03/15/3eaae186-284c-11e8-

b79d-f3d931db7f68_story.html. Special Counsel Robert Mueller even filed a widely publicized

indictment against these "trolls."  *United States v. Internet Research Agency, et al.*, 18-cr-0032.

These "trolls" were widely characterized as vicious, cynical actors who exploited death and

tragedy for their own ends. *See* Donie O'Sullivan, *Her Son Was Killed--Then Came the*

*Russian Trolls*, CNN (June 29, 2018), https://www.cnn.com/2018/06/26/us/russian-trolls-exploit-

philando-castiles-death/index.html. Isikoff pointedly connects the *Conspiracyland* trolls, of whom

he will present Couch as Exhibit A, with the evil agents of Vladimir Putin, excoriated in the press

and criminally prosecuted by the Department of Justice:

> So do you see the Seth Rich conspiracy story as
> sort of a continuation of this Russian tradition of
> active measures?
> JOHN SIPHER:  It's 100 percent a continuation of
> the Russian use of active measures.  We've now seen
> enough evidence, both from the indictments and the
> hacking and the trolls and the bots and the Russian
> troll farm in St. Petersburg, to have sort of a clear
> picture of what the Russians were doing.

Episode 2:1-15

And at the conclusion of *Conspiracyland*, Isikoff drives home his overarching theme:

> [Seth Rich's] death was cynically
> hijacked by a rogue's gallery, Julian Assange,

xxx

> Vladimir Putin's trolls and allies of President Trump

Bonus Episode, 33:14-19.

Thus, when Isikoff attacks Couch as an Internet "troll," this is not mere hyperbole, but a term intended to convey the definite implication that Couch is an anti-American agent using the Internet to spread falsehoods damaging to the fabric of American democracy—a false charge designed to destroy Couch's reputation. Isikoff simply lies about Couch to paint him as the face and name of the conspiracy "trolls" extending Putin's work. And Isikoff's attacks are meant to be taken literally:

> ISIKOFF: And it's really sickening when you
> when you listen to the way these people like Matt
> Couch –
> DAN KLAIDMAN: Yeah, I was going to say, I mean
> MICHAEL ISIKOFF:-- operate.
> DAN KLAIDMAN: Over and over again, you show the
> cruelty.

Bonus Episode, 8:5-10.

In addition, as with NPR, use of the words "harass," "horde," "bully" "target" in the context of false assertions about Couch's alleged behavior towards Capone and Mueller, and the reference to "over and over" above, are intended to carry the implication that Couch is guilty of criminal cyberstalking and are thus defamatory *per se. See supra* at 29-31. Similarly, the First Amended Complaint alleges that Isikoff has accused Couch, explicitly or implicitly of engaging in criminal "doxing" of Mueller and his family members and even attempted burglary. First Amended Complaint ¶¶ 85, 89, 116, 127, 136. The allegations in the First Amended Complaint plainly suffice to state a claim for defamation *per se*.

As the entity directly responsible for publishing the *Conspiracyland* Podcast and the successor to Verizon Media, Yahoo clearly faces liability for Isikoff's defamatory statements. NPR is liable because it promoted wildly implausible smears and accusations without evidence, examination, verification or investigation, even though it was on notice that the premise of

Isikoff's podcast had been discredited. Verizon is liable because of its operational control of its media subsidiary and its retention of a minority interest in the partnership that currently owns Yahoo. For similar reasons, Apollo is a proper defendant because it controls Yahoo and would normally have assumed all the liabilities of Verizon Media, now Yahoo. To the extent there is doubt about Apollo's or its subsidiary's liability, the Court should permit discovery to ascertain the precise relationship among the defendants and the contractual allocation of liabilities, if any.

      f.   <u>The First Amended Complaint properly pleads false light, tortious interference and intentional infliction of emotional distress.</u>

In the Opinion, the Court dismissed Plaintiff's false light, tortious interference and intentional infliction of emotional distress claims against Isikoff and Verizon because of its conclusion that Plaintiff had not adequately alleged actual malice. Opinion at 12. To the extent the proposed First Amended Complaint cures the actual malice pleading defects identified by the Court, the claims against Isikoff, Yahoo and Apollo should be permitted. NPR also alleges that Couch's additional direct claims beyond defamation and defamation *per se* actual malice also fail. Mot. for JOP at 12-13. To the extent the First Amended Complaint adequately pleads actual malice, NPR's arguments must be rejected.

In addition, a tortious interference with business relations is not necessarily duplicative of a defamation claim. *See Farah v. Esquire Magazine*, 736 F.3d 528, 540 (D.C. Cir. 2013), cited by NPR at page 12 of its Motion. *Farah* does not stand for the proposition that tortious interference and intentional infliction of emotional distress claims are <u>*always*</u> duplicative of defamation claims, but only that where the tort is <u>*based on*</u> defamatory speech, a failure to prove that such speech is defamatory dooms the related torts. Plaintiff has amended his pleadings to make clear his tortious interference claim does not depend on proof of defamation. Rather, the gravamen of Plaintiff's tortious interference claim is that Defendants have taken specific steps (i)

to damage Couch's business by casting aspersions on his use of crowdfunding, thus undermining his ability to fund legitimate investigations, particularly anything to do with Seth Rich, whose murder remains unsolved, and (ii) to present his sale of merchandise to fund an investigation as somehow illicit or illegitimate. First Amended Complaint ¶¶ 69-71, 150. Even if it were not defamatory to engage in the baseless character assassination animating *Conspiracyland* and the NPR Interview, which of course it is, Isikoff's direct interference in Couch's business by attempting to stigmatize Couch's fundraising and restrict his sale of merchandise would be actionable. *See* First Amended Complaint ¶150; *Freightquote.com, Inc. v. Hartford Cas. Ins. Co.*, 397 F.3d 888, 896 (10th Cir. 2005).

With respect to intentional infliction of emotional distress, NPR argues that Couch has not plead sufficient facts to show that Isikoff/Yahoo and NPR engaged in "extreme and outrageous" behavior and that Couch suffered severe emotional distress. Mot. for JOP at 12. These points are not well taken. As an initial matter, the First Amended Complaint adds extensive language showing that the thrust of the attacks on Couch are to connect him with what any reasonable person would view as one of the vilest, most extreme conspiracy theories imaginable—that Hillary Clinton conspired with FBI agents to assassinate Seth Rich. First Amended Complaint ¶¶ 2, 51-52, 57-59, 78-81, 99, 172, 193. More: in Isikoff's telling, this conspiracy theory is the work of a nuclear-armed geopolitical rival and Americans who further this conspiracy are, in effect, doing the evil dirty work of Vladimir Putin. If one steps back even for a second, it becomes evident that nothing Couch has ever said or suggested can in any way be fairly connected with the vile conspiracy theory that Isikoff claims Russian intelligence has introduced into American political discourse through a site that puts Q-Anon to shame—a theory Isikoff *knows* is wrong, yet willfully lays at Couch's door.

Second, to the extent the basis for Plaintiff's claim of severe emotional distress was not clear in the original complaint, Plaintiff's First Amended Complaint makes clear that Defendants' lies have caused Couch severe mental anguish resulting from frequent death threats, attacks on his children, and an aggravation of his heart condition. First Amended Complaint ¶ 140. Plaintiff's amended pleading thus makes out intentional inflection of emotional distress claims against both NPR and Isikoff/Yahoo even in the absence of the "actual malice" established in the First Amended Complaint.

> g.   The First Amended Complaint states a claim for aiding and abetting and conspiracy against Verizon, Yahoo, NPR and Apollo.

As with the non-defamation claims discussed above, the Court dismissed Plaintiff's aiding and abetting and conspiracy claims for failure to properly plead actual malice. Opinion, at 12-13. NPR adds the additional objections that Plaintiff failed to allege the existence of an agreement or substantial assistance sufficient to warrant conspiracy or aiding and abetting liability. Mot. for JOP at 13.

The First Amended Complaint addresses and remedies these alleged defects. First, as has been discussed, the First Amended Complaint adequately sets forth an underlying claim for defamation such that secondary liability can attach. *See supra* at 13-33.

Second, the First Amended Complaint also adds allegations sufficient to infer an agreement between NPR and Isikoff to defame Plaintiff. The First Amended Complaint shows in detail how Dave Davies of Fresh Air does not so much interview Isikoff as provide him with a pre-arranged format, based on obviously pre-agreed questions that were designed to elicit specific responses with no pushback or critical inquiry whatsoever. First Amended Complaint ¶¶ 154-157; 193-94; *see also infra* at 38-40. Had Isikoff and NPR not pre-arranged the structure and and pre-agreed the content of the interview, it would have been impossible for Isikoff to present the summary of

his key theories and central smears in the short time allotted in the interview. *See* First Amended Complaint ¶¶ 154-157; *see also* First Amended Complaint ¶¶ 191-93 The phrasing of Davies' questions, his awareness of the answers that would be given, the need to compress a six-hour podcast series into a short one-hour interview, the absence of any question that could have produced an "unscripted" response—all these facts strongly support an inference that Davies and Isikoff had agreed on the nature and content of the interview and shared the common objective of disseminating its core claims unfiltered, free from doubt, as the disturbing "truth" of a dangerous turn in the dissemination of "fake news." As this Court has put it, "plaintiff alleging a civil conspiracy . . . need not produce direct evidence of a meeting of the minds." *Gates v. D.C.*, 66 F. Supp. 3d 1, 24 (D.D.C. 2014) (internal quotations and citations omitted). Instead, the plaintiff need only provide "specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective" that would reasonably lead to the inference that [the defendants] positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Id.* The First Amended Complaint provides sufficient factual allegations to support an inference that Verizon, Yahoo and Isikoff conspired with Dave Davies on behalf of NPR to jointly produce a segment that would contain certain per-agreed themes and the pre-agreed defamation of Plaintiff.

As to aiding and abetting, the same underlying facts that support an inference of a conspiracy to defame also provide evidence of the support and assistance required for a claim of aiding and abetting. The support – financial and otherwise – provided by Verizon and senior management was essential for the success of a controversial and provocative new Internet-based show that was taking the company into the highly charged, partisan world of conspiracies and counter-conspiracies, particularly where one of the targets of the show was the sitting president of the United States.

The First Amended Complaint provides substantial new factual details to support Plaintiff's aiding and abetting allegation as to Verizon. Verizon acquired Yahoo! Inc., within which Yahoo! News was a division, for a hefty price of $4.8 billion in June 2017. First Amended Complaint ¶ 164. Verizon concurrently combined Yahoo! Inc. with another media acquisition, that of AOL, to form Oath, Inc. *Id.* In 2018, Oath was rebranded at Verizon Media, Inc. *Id.* Verizon Media struggled to justify the hefty price tag paid for Yahoo, and its operational results were disappointing. First Amended Complaint ¶ 166.

At the beginning of 2019, Verizon Media laid off 7% of its workforce as it struggled to gain traction. *Id.* As CNN reported at the beginning of 2019, "[in 2018, Verizon] said it would be leaning heavily on 5G and Oath as a way to differentiate in the crowded telecommunications market, but the media-focused business unit never got off the ground. *Id.* Likewise, Verizon Media's revenues were in decline by all measures, year-over-year, quarter-over-quarter, and quarter-to-quarter. First Amended Complaint ¶ 167. The *Conspiracyland* podcast was launched in the summer of 2019 as a means of "spicing up" Verizon Media's flagging revenues. *Id.* Plaintiff alleges that Verizon and its senior management, including CEO Hans Vestberg, were particularly interested in the success of the new podcast series and provided the resources and support for the show to be a success. *Id.* Further, Plaintiff alleges that Verizon management knew that a successful podcast would have a sensationalist flavor and encouraged the production of a highly partisan initial series on Seth Rich that could serve as a popular attack on the beleaguered President and his allies and supporters. *Id.* In any event, not long after the *Conspiracyland* podcast, Verizon Media managed to turn around its business, which Plaintiff believes can plausibly be attributed to the more sensationalist, headline-grabbing style of shows such as *Conspiracyland*. First Amended Complaint ¶ 170. By the fourth quarter of 2019, Verizon Media reported revenues of $2.1 billion, which it characterized as a "meaningful improvement

from the decline reported at the beginning of the year." *Id.* Yahoo and Verizon thus aided and abetted Isikoff by placing resources at his disposal to produce the *Conspiracyland* podcast, encouraging his provocative, evidence-free style of "attack" journalism, and providing him with the network and platform to maximize the reach of his sensational theories and personal smears.

NPR, for its part, provided critical support in the dissemination of Isikoff's narrative, , by broadcasting Isikoff's assertions unvarnished, without critique or commentary other than its pious head-nodding, which gave Isikoff not only access to a much larger national audience, but, crucially, the "blessing" of "public" radio, of a station duty-bound to avoid partisan attacks, so that Isikoff's politically-motivated theme that the Russian government had sought to help Trump by promoting a conspiracy theory damaging to Hillary Clinton, and his evidence-free skewering of Plaintiff could seem neutral, objective, reasonable. Even a single, mildly critical interrogation could have derailed Isikoff's entire presentation—but NPR provided the crucial assistance of its welcoming, uncritical and highly valuable seal of approval. As with *Wultz v. Islamic Republic of Iran*, 755 F. Supp.2d 1, 57 (D.D.C. 2010), cited by NPR at page 13 of its Mot. for JOP, plaintiff has clearly "adequately plead a claim for secondary liability."

      h.   <u>Plaintiff has adequately alleged negligent supervision against NPR and Yahoo.</u>

In its Mot. for JOP, NPR concludes with the argument that Plaintiff cannot make out a claim of negligent supervision. While Plaintiff believes that the basis for liability under this theory was clear from his original complaint, the First Amended Complaint clarifies that it is NPR's status as a public radio station with heightened duties of impartiality that serves as the basis for its liability for negligent supervision. As a public radio station, NPR has a duty to ensure that its programming steers clear of partisan politics. The original Complaint made this point explicitly: "NPR accepts public funding on the condition that it will publish truthful, honest and unbiased articles and statements, and that the federal funds it receives will not be used for

political purposes or to promote the private agendas of third parties." Dkt. 1 ¶¶ 9, 188. The First

Amended Complaint adds additional detail on the sources of NPR's duties as a radio broadcaster.

Under its Code of Ethics:

> To secure the public's trust, we must make it clear that our primary allegiance is to the public. Any personal or professional interests that conflict with that allegiance, whether in appearance or in reality, risk compromising our credibility.

Firs Amended Complaint, ¶ 187.

NPR is duty bound to be independent of the agenda of its sources:

> We don't allow sources to dictate how a topic will be covered, or which other voices or ideas will be included in the stories we do.

First Amended Complaint ¶ 188.

Moreover, NPR must:

> avoid appearances that call into question our impartiality, including situations where our appearance may appear to endorse the partisan agenda of a group or organization.

*Id.*

Finally, under the express terms of the Public Broadcasting Act of 1967, NPR is

prohibited from supporting any political party or candidate for elective public office. First

Amended Complaint ¶ 187.

 *Conspiracyland* was, as has been made clear throughout this memorandum and in the

First Amended Complaint, a hyper-partisan endeavor, designed to sully the reputations of

President Trump and his allies and supporters, while painting Hillary Clinton as the victim of

Russian misinformation. Isikoff is also notoriously hyper-partisan and his reputation in recent

years has been inextricably intertwined with his relentless promotion of lies about Donald

Trump, both as a candidate and then as President. *See* First Amended Complaint ¶¶ 3, 4, 8, 32-

32. NPR was aware of the content of Isikoff's theories before it invited him on its show, as the

following extracts from the NPR interview makes clear:

xxxviii

> DAVIES: This is FRESH AIR, and we're speaking with Yahoo News chief investigative correspondent Michael Isikoff. He hosts a new six-episode podcast called "*Conspiracyland*." It explores conspiracy theories surrounding the 2016 murder on a Washington, D.C., street of a Democratic National Committee staffer, named SethRich.

*NPR Interview* at 7.

> DAVIES: [The conspiracy theory] suggests . . . Rich's murder was a professional hit in some way related to those emails.

*Id.*

> DAVIES: Well, that raises another question, which is to what extent did the president or his allies stoke these conspiracy theories? Because, you know, he obviously didn't like the idea that his election's legitimacy could be challenged because it would be associated with Russian hackers. Seth Rich was a better story for him.

*NPR Interview* at 11.

> DAVIES: You know, it struck me as I listened to this that there are a lot of cases, as this particular conspiracy theory was stoked, where people are saying things that are just clearly factually inaccurate.

*NPR Interview* at 15.

Instead of adhering to its governing principles, the entire "interview" is a master class in the violation of NPR's guidelines: it aligns itself with an anti-Trump partisan political perspective, it implicitly endorses the illegitimacy of the 2016 election, it allows the source to dictate the story, and it permits Isikoff to determine which voices would be heard and which, such as Sy Hersh's, would be excluded. *See also* First Amended Complaint ¶¶ 191-193. Davies spoon-feeds Isikoff questions that allow him to repeat the *Conspiracyland* themes, even on points that had already been discredited by other news outlets.

> DAVIES:  First, I mean, you know, one of the things that inspired conjecture initially was the fact that the police thought it was a botched robbery, and yet his wallet, cellphone, other valuables were not taken. What did detectives make of that?

*NPR Interview* at 3.

> DAVIES: If this were a contract killing, do detectives think that's what we would have seen?

*Id.*

> DAVIES:    Remind us what was going on in the country at that time that would give some an interest, a motive to push conspiratorial theories about this?

*NPR Interview* at 4.

> DAVIES:  You spoke with Deborah Sines, who was the federal prosecutor in charge of the investigation. And these conspiracy theories kind of created an issue for her, and she made some efforts to find out where they may have come from. What did she discover?

*NPR Interview at 7.*

> DAVIES:  And . . . were Russian internet activists busy on this story?

*NPR Interview at 8.*

> DAVIES:  Right. So, yeah, how did this happen? I mean, how did they [Fox News] claim to have information, real information, that there was a connection between Seth Rich and WikiLeaks?

*NPR Interview at 8.*

> DAVIES:  Yeah. Well, that raises another question, which is to what extent did the president or his allies stoke these conspiracy theories? Because, you know, he obviously didn't like the idea that his election's legitimacy could be challenged because it would be associated with Russian hackers. Seth Rich was a better story for him.

*NPR Interview at 11.*

> DAVIES:  So there was never anything that - any confirmation that there was ever a FBI report that anyone can verify.

*NPR Interview at 12.*

> DAVIES:  One of the things that the podcast focuses on, apart from the way theories like this pollute the political discourse, is the number of innocent people who get dragged into this stuff, obviously Seth Rich's family primary among them. But the bartender at the bar where Seth Rich had had drinks and was well-known gets tagged. A neighbor who heard the shots and came out that night, both of them end up getting slimed on the Internet, right?

*NPR Interview at 13.*

> DAVIES:  You know, it struck me as I listened to this that there are a lot of cases, as this particular conspiracy theory was stoked, where people are saying things that are just clearly factually inaccurate.

*NPR Interview at 15.*

NPR's receipt of public funds, its statutory obligation to remain out of partisan politics, its unique journalistic standards, its public-interest focused Code of Ethics—all require it to exercise supervisory control over its reporters and interviewers, or else its obligations and commitments would be a dead letter. In this interview, NPR clearly violated its duties, to Plaintiff's detriment. NPR let the source dictate the story, used leading questions to elicit answers that followed the *Conspiracyland* script, allowed Isikoff to spin a politically motivated narrative with no pushback and audible approbation, while presenting itself as having

independent knowledge of the veracity of details of Isikoff's story, thus stamping his yarn with the imprimatur of "truth."

A reasonable listener could have no other belief than that Matt Couch and the Internet horde truly were responsible for "targeting" and "harassing" third parties, "sliming" them in Davies' phrase. Had NPR done a minimum of supervision in accordance with its own guidance, it would have been obligated to alert the listener to the following facts:

1. Matt Couch never made any assertions about Hillary Clinton's involvement, in any way, in Seth Rich's death.

2. Matt Couch never made any assertions about Joe Capone conspiring with Hilary Clinton or aides to Hilary Clinton.

3. Matt Couch never "harassed" Mark Mueller.

4. Matt Couch never disseminated images of Jeffrey Dahmer's head superimposed on Mark Mueller.

5. The Russian origin to the Hilary Clinton conspiracy theory had been discredited and any attempt to revive and promote it was a partisan act designed to continue damaging the President and his supporters.

Under D.C. law, "to establish a cause of action for negligent supervision, a plaintiff must show that the employer knew of or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." *Phelan v. City of Mount Rainier*, 805 A.2d 930, 937–38 (D.C. 2002).

Plaintiff has pled facts to satisfy this test as to both NPR and Isikoff. The regular producer of the Fresh Air broadcast is the journalist Terry Gross, a senior agent of NPR. Fresh Air is a nationally syndicated radio show, and one of NPR's flagship broadcasts, with

approximately 6 million weekly listeners. First Amended Complaint ¶ 182. Ms. Gross knew that

Dave Davies planned on filling in for her and knew or should have known that he planned on

providing Isikoff with a platform to promote his *Conspiracyland* ideas. First Amended

Complaint ¶ 196. Ms. Gross and NPR were also on constructive notice that Isikoff's podcast was

based on a discredited Russian conspiracy theory and was designed for hyper-partisan political

ends. First Amended Complaint ¶¶ 192, 195. NPR was thus on notice that its employee was in a

position to act in a dangerous manner that would violate NPR's Code of Ethics and risk

defamation of third parties. First Amended Complaint ¶¶ 192, 197. By failing to supervise Dave

Davies in this context, by at a minimum insisting on a disclaimer or warning as to the discredited

nature of Isikoff's theories and the unproven allegations that would be made about third parties

or performing a minimum of investigation of readily available sources, NPR failed to supervise

Daves adequately and is liable for the defamation of Plaintiff that occurred on its show. First

Amended Complaint ¶¶ 192, 198.

As to Yahoo, Verizon Media was clearly on notice of Isikoff's propensity for promoting

sensational, even false and evidence-free theories with a political objective. First Amended

Complaint ¶¶ 4, 30, 33, 60-61, 89, 99-100, 111, 176. Although the source of the "dossier" had

not yet been identified, and the likely criminal consequences for the lies on which it was based

had not yet become apparent, any reasonable person reviewing the "dossier" allegations would

have known they were based on rumor, speculation, innuendo and outright fabrication, and any

reasonable person would have known the wild reports were not credible. First Amended

Complaint ¶ 33. Yahoo was on notice that Isikoff prides himself on injecting himself as an actor

into his own stories regardless of the accuracy of his reporting. *See supra* at 13. Most

importantly, Verizon Media was on notice that the central theme of *Conspiracyland* – that

Russian intelligence was at the origin of the Hillary Clinton assassination theories that Plaintiff

was implicitly accused of fostering – had been discredited, and yet it took no action to stop the *Conspiracyland* publication, demand clarification or alert listeners to the falsity of key elements in the story. First Amended Complaint ¶¶ 60-61, 89, 99-100, 111. Thus, Verizon Media knew of Isikoff's reckless promotion of debunked theories and cavalier and careless attitude to the truth, and the danger this posed to innocent third parties. Yet it failed to supervise him and prevent his hyper-partisan narrative from dragging Plaintiff through the mud, when the most cursory examination of facts within easy reach would have shown the baseless nature of the charges recklessly leveled against Plaintiff and the damage caused by Isikoff's sustained campaign of defamation across multiple platforms, reaching millions of viewers, all while promoting ideas that, however titillating, only further poisoned political discourse and promoted the very evil they claimed to oppose.

## III.   <u>CONCLUSION</u>

For the foregoing reasons, NPR's Motion for Judgment on the Pleadings must be denied and Plaintiff's Cross-Motion for Permission to File a First Amended Complaint, in the form attached to the Quainton Decl. as Ex. E, should be granted. To the extent the Court has questions about the liability of individual defendants, discovery should be ordered to permit Plaintiff to establish the responsibility of the different entities identified in the First Amended Complaint.


**DATED**: December 9, 2021

By: /s/ *Eden Quainton*_____
EDEN P. QUAINTON, ESQ. (NY0318)
**QUAINTON LAW, PLLC**
2 Park Ave., 20th Fl.
New York, NY 10016
Telephone: (212) 419-0575
Fax: (212) 376-5699
E-mail: equainton@gmail.com
*Attorneys for Plaintiff Matthew Couch*
  xliii

**CERTIFICATE OF SERVICE**

The undersigned counsel certifies that on December 10, 2021, the foregoing document was filed through the CM/ECF system and thereby served electronically on counsel for National Public Radio, Inc., Michael Isikoff, and Verizon Communications, Inc.

**QUAINTON LAW, PLLC**

*/s/ Eden Quainton*
EDEN P. QUAINTON, ESQ.
2 Park Ave., 20th Floor
New York, New York 10016
Telephone: (212) 419-0575
E-mail: equainton@gmail.com
*Attorneys for Plaintiff Matthew Couch*